## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT STEINBUCH,

                        Plaintiff,

          - against -                 Case No. 1:05-CV-00970 (PLF)

JESSICA CUTLER,

                      Defendant.

### DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

      Defendant Jessica Cutler ("Cutler"), by counsel and making for now a limited appearance, pursuant to Fed. R. Civ. P. 12(b)(6), hereby moves for entry of an order dismissing plaintiff's complaint with prejudice for failure to state a claim upon which relief can be granted.

      The grounds for the relief sought are set forth in the attached memorandum of points and authorities. A proposed order is submitted herewith. Pursuant to D.D.C. Civ. R. 7(f), Cutler requests an oral hearing.

Dated: Washington, D.C.
       July 26, 2005

                         BERLINER, CORCORAN & ROWE, L.L.P.

                         Attorneys for Defendant

             By:    /s/ Thomas E. Wilson
                     Thomas E. Wilson
                        D.C. Bar No. 132704
                     Alexander C. Vincent
                        D.C. Bar No. 472459
                     Jason A. McClurg
                        California State Bar No. 232897

Application to D.C. Bar Pending

1101 17th Street, N.W.
Suite 1100
Washington, D.C.  20036-4798
Telephone:  (202) 293-5555
Fax:  (202) 293-9035
E-mail:        twilson@bcr-dc.com
               acv@bcr-dc.com
               jam@bcr-dc.com

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

ROBERT STEINBUCH,

                Plaintiff,

      - against -               Case No. 1:05-CV-00970 (PLF)

JESSICA CUTLER,

                Defendant.

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

        Defendant Jessica Cutler ("Cutler"), by counsel and making for now a limited appearance, submits this memorandum of points and authorities in support of her Motion to Dismiss the Complaint, filed July 26, 2005. The facts on which Cutler relies are of record or are set forth in the Declaration of Jessica Cutler, attached hereto as Exhibit 1.[1]

---

    [1]    Since the full text of each and every entry on Cutler's Internet blog (and the introduction written by the person who reconstituted it on the Internet) is attached as Exhibit A to plaintiff's complaint, the entire blog is a part of the complaint for all purposes. *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof <u>for all purposes.</u>") (emphasis added); 5 Charles A. Wright and Arthur R. Miller, *Federal Practice & Procedure* § 1327 (2nd ed. 1990) ("Because Rule 10(c) provides that the writing becomes a part of the pleading for all purposes, the contents of any attached writing must be considered <u>in determining the existence of a claim for relief</u> or a defense on a motion to dismiss for insufficiency, or in appealing from a dismissal, or in deciding a motion for summary judgment.") (emphasis added); In *People's Natural Gas Co. v. Federal Power Comm'n*, 127 F.2d 153 (D.C. Cir.), *cert. denied*, 316 U.S. 700 (1942), the District of Columbia Circuit interpreted Rule 10(c) to mean that a written instrument attached to a motion is part of the motion "for every reasonably possible purpose." Thus, even statements made in the attachment, but not in the motion itself, were deemed to have been made in the motion. *See id.* at 156.

## PRELIMINARY STATEMENT

In February 2004, defendant Jessica Cutler got a job as a staff assistant in the office of United States Senator Mike DeWine, Ohio Republican. At the time, plaintiff Robert Steinbuch ("Steinbuch") was serving as Senator DeWine's counsel on the Senate Judiciary Committee. On May 6, 2004, Steinbuch and Cutler met at a bar at Union Station for their first "date." Steinbuch does not drink, but Cutler became intoxicated. Within hours of first getting together, Steinbuch and Cutler left Union Station, and went to Cutler's apartment blocks away, where they had their first sexual encounter.

The next day, May 7, 2004, Cutler disclosed to her office friends intimate details of her sexual activity with Steinbuch the night before. She also posted such details on a personal Internet blog, which, coincidentally, she had started for the benefit of three of her personal friends on May 5, the day before she and Steinbuch went out on their date. In her blog, Cutler referred to Steinbuch only by his initials, "RS." Within days, Steinbuch learned that Cutler had shared intimate details of their sexual activity together with people around the office. He did not object. He told Cutler that he was not angry about her disclosures of their sexual encounters. In fact, he himself joked around the office about details of those encounters. Over the next 12 days, Steinbuch and Cutler continued their sexual encounters and Cutler continued to disclose details of those encounters to her friends and on her personal blog.

On May 18, 2004, unfacilitated by Cutler, a Washington, D.C.-centered Internet gossip site known as Wonkette broadcast the contents of Cutler's personal blog to Wonkette readers, thereby revealing to the world the details of Cutler's sexual activities with Steinbuch. Cutler immediately deleted her blog, but it was too late. News of Cutler's extracurricular activities (including those with "RS") had now become the "buzz" in official Washington.

2

DeWine's office promptly fired Cutler. A media "feeding frenzy," focusing on Cutler's blog and her ongoing relationships with various anonymous Washington personalities, including Steinbuch, swiftly ensued in print, on television, and on the Internet. Eventually, enterprising navigators of the "blogosphere" began speculating that "RS" was Steinbuch. Eliminating all doubt that "RS" was in fact himself, Steinbuch filed suit for invasion of privacy and intentional infliction of emotional distress on May 16, 2005, more than one year after all but the last of the blog entries were posted.

Steinbuch's complaint comes too late as to all but the last blog entry concerning him. Leaving aside the one-year statute of limitations, Steinbuch's complaint fails to state a claim upon which relief can be granted because: (1) Steinbuch had no reasonable expectation of privacy in a sexual relationship he chose to have with Cutler; (2) Steinbuch waived whatever right of privacy he may initially have held in his sexual relationship with Cutler by consenting to Cutler's disclosure of details of that relationship to their fellow co-workers; (3) most of the facts Cutler disclosed about Steinbuch in the blog were no longer private by the time they were described in the blog (the right of privacy with respect to the remainder having been waived); (4) the website Wonkette gained unauthorized access to Cutler's personal blog and "publicized" its contents within the meaning of invasion of privacy caselaw; and (5) Cutler had a First Amendment privilege to discuss her own personal sexual experiences with Steinbuch, which have a logical nexus to the general topic of sex, money, and political power, matters of legitimate public interest, especially in Washington.

Steinbuch's claim for intentional infliction of emotional distress suffers the same infirmities with respect to the statute of limitations and the First Amendment privilege. Additionally, this claim is deficient as a matter of law because: (1) Cutler's conduct was not so

outrageous in character as to go beyond all possible bounds of decency and neither was it so atrocious and utterly intolerable in a civilized community; (2) Steinbuch's allegations fail to satisfy the requisite level of intentionality or to establish causation; and (3) Steinbuch's allegations of emotional distress are wholly devoid of particularity and are therefore legal conclusions masquerading as fact.

And finally, Steinbuch's acquiescence to Cutler's sharing of the intimate details of his sexual relationship with her served to communicate to Cutler during the relevant period that he did not care who knew about such details. Steinbuch is thus now equitably estopped from complaining — more than a year later — about Cutler's disclosures.

## **RELEVANT FACTS**

Steinbuch filed this action for invasion of privacy by public disclosure of private facts and for intentional infliction of emotional distress on May 16, 2005. The core of operative facts on which Steinbuch's claim of invasion of privacy is based is as follows:  On May 5, 2004, more than one year before the filing of the complaint, Cutler visited a public Internet website known as Blogger (www.blogger.com), which offers a free service allowing users to create Internet-based and -accessible diaries called web logs or blogs. Cutler decided to create a blog to describe her various social activities, including details of her sexual relationships with several men, in order more efficiently to manage her social correspondence with her close friends (Ex. 1 [Cutler Decl. ¶¶ 2-3]). Rather than send multiple e-mails to different friends, Cutler decided it would be more efficient and entertaining to create a blog that each of her friends could visit at their convenience to learn about the latest news in Cutler's social life (Ex. 1 [Cutler Decl. ¶ 3]).

Cutler chose Blogger because it was the most user friendly of all the Internet

4

websites offering the same or a similar service (Ex. 1 [Cutler Decl. ¶ 4]).  To get started, Cutler

visited the Blogger site and typed in a "Blog title" and "Blog address," the latter being an

Internet universal resource locator or URL.  Cutler chose the title "Washingtonienne" for her

blog and assigned it the URL http://washingtonienne.blogspot.com (the "Blog").  Next, Blogger

asked Cutler to chose from among six design templates for her Blog.  Cutler selected a design

template called "Minima," which features a white background and text in "Georgia" font (Ex. 1

[Cutler Decl. ¶ 4]).  After choosing the design template, Blogger immediately allowed Cutler to

post content on her new Blog.

        Before doing so, however, Cutler visited the "Basic Settings" area of Blogger.

There, Cutler entered a "Description" of the Blog, which Cutler simply defined to be the same as

the "Blog title" — "Washingtonienne" (Ex. 1 [Cutler Decl. ¶ 5]).  Next, the "Basic Settings" area

asked Cutler whether she wanted to "Add your Blog to our listings?"  Answering "yes" here

would have displayed the Blog's URL on Blogger's public Internet site, thus advertising its

existence to the world of cyberspace.  Importantly, Cutler answered this question "no"!  She did

that in an effort to limit access to the Blog only to those close personal friends (and one friend of

one of those friends) with whom she wanted to share the contents of the Blog.[2]  Cutler could not

---

[2]        In the May 28, 2004, introduction to the text of the Blog attached as Exhibit A to
the complaint, a man identified only as "Kevin at Wizbang" states that he made an "exact
reproduction" of the Blog from what is likely his own "Internet Explorer cache."  He also states
that the Blog "was NEVER cached by Google."  If Google, now by far the most popular Internet
search engine available, never found, indexed, or retrieved content from the Blog before May 28,
2004, this is consistent with Cutler's contention that she did not advertise its existence or
otherwise allow people to access it other than the four individuals to whom she gave the URL.
See generally THE WORLD ALMANAC AND BOOK OF FACTS 2005 at 393 (William A. McGeveran,
Jr., ed.) ("Google . . . is the first choice for many Web surfers. . . .  Google's many features
include . . . the ability to retrieve an archived copy of a webpage made at the time the page was
indexed (the page may since have changed its content or gone offline)."  Google sites were
ranked fourth out of the top 20 most visited sites in June 2004 with 63,710,000 visitors.  Id.

find in the "Basic Settings" area or any other area of Blogger the option of making a blog password protected (Ex. 1 [Cutler Decl. ¶ 5]). And thus, by not adding the Blog to Blogger's listings, Cutler took all opportunities Blogger offered to restrict access to the Blog to a few individuals.

At the time she created the Blog, Cutler was employed as a Staff Assistant for U.S. Senator Mike DeWine, Ohio Republican. Cutler created the Blog on her office computer and began posting content on it on May 5, 2004 (Ex. 1 [Cutler Decl. ¶ 6]). Cutler continued to post content on the Blog on May 6, 7, 10-14, 17, and 18, 2004. Cutler deleted the Blog in its entirety on May 18, 2004, minutes after learning that its contents had somehow become public (Ex. 1 [Cutler Decl. ¶ 6]). Blog entries pertaining to Steinbuch are set forth in table format in Exhibit 2 hereto.

The day after Cutler created the Blog, on May 6, 2004, Steinbuch, Senator DeWine's counsel on the Senate Judiciary Committee, arranged for Cutler's boss on Senator DeWine's personal staff to have all three of them meet for drinks at Union Station after work that day.[3] While Steinbuch and Cutler had been briefly introduced several months earlier (by the same DeWine staffer who arranged the Union Station date), when Cutler was first hired, this involved nothing more than a perfunctory exchange of pleasantries. For all intensive purposes, Cutler and Steinbuch knew nothing about each other before meeting at Union Station on May 6, 2004 (Ex. 1 [Cutler Decl. ¶ 7]).

Cutler's boss soon left Cutler and Steinbuch alone at the Union Station bar (*see*

---

[3]     As Cutler testifies in the accompanying declaration, her boss was then Senator DeWine's speech writer, Anne O'Donnell. It was O'Donnell who arranged for Steinbuch and Cutler to meet at Union Station (Ex. 1 [Cutler Decl. ¶ 7]).

Ex. 2 [Blog entry for 2:02 p.m., May 7, 2004]).  Cutler proceeded to get intoxicated, while

Steinbuch remained stone-cold sober.  Sometime that evening, a still-sober Steinbuch

accompanied a drunk Cutler back to her apartment and had a sexual encounter (if not strictly

sexual intercourse) with her (*see* Ex. 2 [Blog entry for 9:35 a.m., May 7, 2004]).  At this point,

Steinbuch had known Cutler for no more than several hours.  As the complaint admits (*see*

Compl. ¶ 11), Steinbuch did not bother to ask Cutler whether she was sleeping with other men

or, for that matter, to find out much else of significance about her before becoming sexually

intimate with her himself.  The two thus began a sexual affair that lasted for the next 12

consecutive days.

By the morning of Friday, May 7, 2004, the morning after Steinbuch's and

Cutler's first sexual encounter, Cutler described it vividly in the Blog for the benefit of the three

friends to whom she had given the URL, including Steinbuch's proclivity for giving and

receiving spanking during sex (*see* Ex. 2 [Blog entry for 9:35 a.m., May 7, 2004]).  Several hours

later, at lunch with co-workers from Senator DeWine's staff, Cutler disclosed to them some of

the sexual and spanking details she had confided to the Blog.  Her co-workers remarked on how

Steinbuch should have exercised better judgment than jumping into bed with one of Senator

DeWine's most junior staffers, especially one so clearly intoxicated (*see* Ex. 2 [Blog entry for

1:16 p.m., May 7, 2004]).

By Monday, May 10, 2004, Steinbuch had learned that Cutler had disclosed to

their co-workers on Senator DeWine's staff Steinbuch's proclivity for sex-related spanking.

Cutler was mortified of Steinbuch's discovery that she had disclosed details of her sexual

encounter with him.  To her relief, Steinbuch told her he was not mad about her "spreading the

spanking rumor around the office."  He thus expressed no objection to the fact that these details

7

"got around and now EVERYBODY knows.  Even our L[egislative] D[irector] . . . ." (*see* Ex. 2 [Blog entry for 9:19 a.m., May 11, 2004]).

The next day, Tuesday, May 11, 2004, Steinbuch informed Cutler that the "rumor" of their spanking sexual encounter had "spread to other offices."  Again, Steinbuch expressed no objection to this development (*see* Ex. 2 [Blog entry for 5:54 p.m., May 11, 2004]).  At dinner that night, Steinbuch told Cutler that "He's really not mad about the gossip at all," that "he's actually joking around the office about it," and that "when he walks out of a room, he'll slap himself on the ass" (*see* Ex. 2 [Blog entry for 9:28 a.m., May 12, 2004]).

In relevant part, the Blog contains candid reflections on and sometimes graphic descriptions of Cutler's 12-day sexual relationship with Steinbuch, who is referred to only by his initials "RS."  The Blog contains 43 separately date- and time-stamped entries.  Of the 17 Blog postings specifically relating to Steinbuch, only eight mention sex, and only five contain descriptions of Cutler's sexual encounters with Steinbuch.  Only one Blog entry mentioning such an encounter — the one dated May 18, 2004 — was posted less than one year before the filing of the complaint on May 16, 2005 (*see* Ex. 2).

Cutler sent the Blog's URL to only three of her friends:  (1) Alethea Scally, Legislative Assistant for U.S. Representative Raul M. Grijalva, Arizona Democrat; (2) Alexandra Mace, of San Diego, California; and (3) Rachel Robertson, of New York, New York (Ex. 1 [Cutler Decl. ¶ 8]).[4]  At Miss Mace's request, Cutler gave permission for Mace to send the URL to a fourth person, her friend "James" from San Diego, California (Ex. 1 [Cutler Decl. ¶ 8];

---

[4]     Cutler identifies Miss Robertson as the author of a blog called "Clueless" (Ex. 1 [Cutler Decl. ¶ 8]).  The Blog mentions the author of "Clueless" (not by name) as commenting that "Clueless" is "so boring compared to" the Blog, which has "action occurring on a daily basis" and is "very entertaining" (*see* Ex. 2 [Blog entry for 8:56 a.m., May 17, 2004]).

*see also* Ex. 2 [Blog entry for 3:39 p.m., May 11, 2004]).  To Cutler's knowledge, information, and belief, only these four people had access to the Blog before May 18, 2004 (Ex. 1 [Cutler Decl. ¶ 8]).  By May 11, 2004, however, "EVERYBODY" on Senator DeWine's staff, including his Legislative Director, and members of other Senators' staffs had become aware of at least some of the salacious details of the Steinbuch-Cutler tryst recorded in the Blog.

On May 18, 2004, links to the Blog and/or portions of its content were displayed, without Cutler's knowledge or consent, on the popular Washington, D.C.-centered gossip site known as Wonkette (www.wonkette.com), which Cutler had twice referred to in the Blog (Compl. ¶ 17; see Ex. 2 [Blog entries for 1:11 p.m., May 13, 2004; 11:32 a.m., May 6, 2004]).  Cutler did not send the Blog's URL or any of its content to Wonkette.  Cutler also did not give permission for anyone else to do so, and, to this day, does not know who did (Ex. 1 [Cutler Decl. ¶ 9]).  Within minutes of discovering links to and the contents of the Blog on Wonkette, however, Cutler deleted the Blog and removed it from Blogger (Ex. 1 [Cutler Decl. ¶ 9]).  The Blog had nonetheless become public and attracted immediate, intense interest from print, broadcast, and Internet-based media.  This development effectively ended Cutler's 12-day sexual relationship with Steinbuch (*see* Compl. ¶¶ 15, 17-18).  This action was filed 363 days later, on May 16, 2005.

On June 15, 2005, Cutler was personally delivered a copy of the summons and complaint at Olsson's Books Records, 418 Seventh Street, N.W., Washington, D.C. 20004.  By consent motion dated June 24, 2005, Cutler requested pursuant to Fed. R. Civ. P. 6(b) an enlargement of time to answer or otherwise respond to the complaint to and including July 26, 2005.  By minute order dated June 30, 2005 (entered on the docket July 1), this Court granted that motion.

9

**ARGUMENT**

**STANDARD OF REVIEW**

In this Circuit, dismissal of a complaint as legally insufficient under Fed. R. Civ. P. 12(b)(6) "is inappropriate unless the 'plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  Although plaintiffs' factual allegations must be accepted as true and their complaint be construed liberally, this Court cannot accept inferences "unsupported by the facts set out in the complaint [or] legal conclusions cast in the form of factual allegations."  Thus, if the allegations contradict the claim asserted, dismissal is appropriate under Rule 12(b)(6).  *Browning*, 292 F.3d at 242.[5]

**POINT I**

**PLAINTIFF'S CLAIM FOR INVASION OF PRIVACY
BY PUBLIC DISCLOSURE OF PRIVATE FACTS
FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

**A.     Governing Legal Principles.**

Steinbuch's Cause of Action for Invasion of Privacy (Compl. ¶¶ 29-34) is governed in the District of Columbia by § 652D of the Second Restatement of Torts, which provides:

---

[5]      *Browning* considered, among others, a plaintiff's claim for tortious interference with prospective business opportunity.  The D.C. Circuit reviewed her complaint to determine whether it alleged sufficient facts to prove the first element of this tort — existence of a valid business relationship or expectancy.  The court commented that plaintiff's allegation that "she 'had a reasonable expectation' of selling her book to a publisher" might fall short of the required specificity to avoid dismissal under Rule 12(b)(6) were it not backed up by additional specific allegations showing the validity of the business expectancy.  *Browning v. Clinton*, 292 F.3d 235, 242-43 (D.C. Cir. 2002).

> One who gives publicity to a matter concerning the private life of
> another is subject to liability to the other for invasion of his
> privacy, if the matter publicized is of a kind that:  (a) would be
> highly offensive to a reasonable person, and (b) is not of legitimate
> concern to the public.

RESTATEMENT (SECOND) OF TORTS § 652D (1977); *see also Vassiliades v. Garfinckel's, Brooks Bros., Miller & Rhoades, Inc.*, 492 A.2d 580, 587 (D.C. 1985) (adopting Restatement § 652D formulation for public disclosure of private facts claim).

The District of Columbia Court of Appeals has further defined the tort, as set forth in § 652D, to include five constituent elements:  "(1) publicity, (2) absent any waiver or privilege, (3) given to private facts (4) in which the public has no legitimate concern (5) and which could be highly offensive to a reasonable person of ordinary sensibilities." *Wolf v. Regardie,* 553 A.2d 1213, 1220 (D.C. 1989); *see also Grunseth v. Marriott Corp.*, No. 95-7021, 1996 U.S. App. LEXIS 3688 at *4 (D.C. Cir. Feb. 9, 1996).  Failure to establish any one of these elements will defeat Steinbuch's cause of action.  *See id.* at 1220.

**B.     Plaintiff's Claims in Connection with All Defendant's Blog Postings Before May 16, 2004, Are Barred by the Applicable One-Year Statute of Limitations.**

In the District of Columbia, the relevant statute of limitations imposes a one-year time limit for bringing defamation actions and a three-year limit for bringing actions for which a time limit is not otherwise specifically prescribed.  In relevant part the statute provides:

> Except as otherwise specifically provided by law, actions for the
> following purposes may not be brought after the expiration of the
> period specified below from the time the right to maintain the
> action accrues: . . . (4) for libel, slander, assault, battery, mayhem,
> wounding, malicious prosecution, false arrest or false
> imprisonment — 1 year; . . . (8) for which a limitation is not
> otherwise specially prescribed — 3 years.

D.C. Code Ann. § 12-301(4), (8) (Lexis Nexis 2001).

11

1.     **The Invasion of Privacy Claim is Mostly Time-Barred and Otherwise Not Actionable As a Matter of Law.**

District of Columbia courts have applied the one-year limit for libel and slander claims under § 12-301(4) to invasion of privacy claims "on the rationale that invasion of privacy is essentially a type of defamation." *Grunseth v. Marriott Corporation,* 872 F. Supp. 1069, 1074 (D.D.C. 1995), *aff'd*, 79 F.3d 169 (D.C. Cir. 1996); *see also Doe v. Southeastern University,* 732 F. Supp. 7, 8 (D.D.C. 1990), (applying one-year limit to invasion of privacy claim, which "is essentially a defamation type action"), *appeal dismissed*, 927 F.2d 1257 (D.C. Cir. 1991).  Courts have also specifically applied the one-year limit to the tort Steinbuch sues for here. *See Nix v. Hoke,* 139 F. Supp. 2d 125, 134 n.9 (D.D.C. 2001) (citing *Grunseth* when applying the one-year statute of limitations to the public disclosure of private facts tort).  Under the foregoing authority, it is clear that an action for public disclosure of private facts is statutorily time-barred after the expiration of one year from the time the cause of action accrues.

Publicity is an essential element of the tort of public disclosure of private facts. Failure to establish timely publicity is therefore fatal to the cause of action. *See Wolf v. Regardie,* 553 A.2d 1213, 1220 (D.C. 1989).  Here, as with defamation claims, Steinbuch's cause of action accrued, <u>as to each private fact disclosed</u>, at the time when each private fact was publicized by Cutler. *Cf. Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 882 (D.C. 1998) (declining to apply continuing tort doctrine to defamation claim covering numerous individual statements and holding that statements published more than one year before filing of complaint were time-barred).  Just like with defamatory actions, each private fact publicized constituted a separate assault on Steinbuch's privacy. *Cf. id.* at 882 ("Each of these [allegedly defamatory] statements constituted 'a new assault on the plaintiff's reputation,' and each

therefore gave rise to a separate right of action.") (quoting *Jones v. Howard Univ.,* 574 A.2d 1343, 1348 (D.C. 1990)).

Solely for the purpose of this argument point (Point I(A)), Cutler assumes that the actual publicity of private facts occurred at the moment when each Blog entry containing such facts was posted. Thus, Steinbuch's right of action as to each Blog entry accrued on the posting date, as reflected in the date- and time-stamps accompanying each entry. The statute of limitations began to run from such date. As noted, only the May 18, 2004, Blog entry was posted less than one year before Steinbuch's complaint was filed. Because District of Columbia courts adhere strictly to the one-year limitation that applies here, *see Jin v. Ministry of State Security,* 254 F. Supp. 2d 61, 68 (D.D.C. 2003); *Mullin v. Washington Free Weekly, Inc.,* 785 A.2d 296, 298 (D.C. 2001) (deeming complaint time-barred when filed one year and three days after publication of allegedly defamatory newspaper article), Steinbuch's right of action as to all other Blog entries is time-barred.

The May 18, 2004, Blog entry discloses that Steinbuch and Cutler "fucked missionary" and that Steinbuch "came . . . [w]ith a condom on." Nevertheless, since by May 18, 2004, graphic details of Steinbuch's and Cutler's sexual encounters (*e.g.,* spanking) were well known in more than one Senator's office, the essential facts disclosed in the May 18 Blog entry — that Cutler and Steinbuch were participating in a torrid affair — were no longer private. *See, e.g., Nobles v. Cartwright*, 659 N.E.2d 1064, 1074 n.16 (Ind. Ct. App. 1995) ("If facts are already known to many people, such facts are not considered 'private' and no liability will accrue for their disclosure.") (citing RESTATEMENT (SECOND) OF TORTS § 652D, cmts. a & b (1977)); *Reuber v. Food Chemical News, Inc.,* 925 F.2d 703, 719 (4th Cir.) (holding that defendant's publication of letter was not a publication of private facts because, among other reasons, plaintiff

13

had previously given copies of it to 11 people; "[I]f information is already in the public domain when published by a defendant, it does not qualify as private facts."), *cert. denied*, 501 U.S. 1212 (1991); *Sipple v. Chronicle Publishing Co.,* 154 Cal. App. 3d 1040, 1047 (Ct. App. 1984) (holding that matters related to plaintiff's sexuality were already known by the public and were therefore not "private"); *Duran v. Detroit News, Inc., et al,* 504 N.W.2d 715, 720 (Mich. Ct. App. 1993) ("information disclosed must be of a private nature that excludes matters already of public record or otherwise open to the public eye"), *appeal denied*, 512 N.W.2d 846 (Mich. 1994); *Cash v. Smith,* 231 F.3d 1301, 1308 (11th Cir. 2000) (holding defendant's disclosure of plaintiff's diabetes not actionable because "[plaintiff] did not treat her diabetes condition as a private matter herself" by freely discussing the condition with co-employees).

Admittedly, it was Cutler, not Steinbuch, who initially disclosed intimate details of their sexual encounters to members of Senator DeWine's staff. But Steinbuch ratified those disclosures by assuring Cutler that he was not mad about them and did not mind. He also later joked around the office with colleagues about his sexual encounters with Cutler. In addition, after learning that Cutler was disclosing intimate details of their sexual activities together, Steinbuch continued to have intimate sexual encounters with Cutler, never admonishing her not to disclose details of those encounters. Indeed, the May 18, 2004, Blog entry describes one of those "post-disclosure" sexual encounters. For these reasons, the May 18, 2004, Blog entry is not actionable as a matter of law.

2.      **The Intentional Infliction of Emotional Distress Claim is Time-Barred and Otherwise Not Actionable As a Matter of Law.**

Steinbuch's claim for intentional infliction of emotional distress is similarly not actionable as a matter of law. Because this claim is intertwined with Steinbuch's claim for

14

public disclosure of private facts, the same one-year limitation period applies. *See Saunders v. Nemati,* 580 A.2d 660, 661-62 (D.C. 1990) (holding that if stated cause of action is "intertwined" with one for which a limitations period is specifically prescribed, the specific limitation period applies, not the "catch-all" period in § 12-301(8)); *Mullin v. Washington Free Weekly, Inc.,* 785 A.2d 296, 297 (D.C. 2001) (holding that because intentional infliction of emotional distress claim was sufficiently intertwined with defamation claim, the one-year statute of limitations applies). Thus, as with the public disclosure claim, only the May 18, 2004, Blog entry is not time-barred for purposes of Steinbuch's intentional infliction claim.

Here, the problem for Steinbuch is that Cutler's May 18 disclosure that they had sexual intercourse in the missionary position and that Steinbuch successfully used a condom, while perhaps a mildly embarrassing flourish, is not, as a matter of law, "conduct [that] goes 'beyond all possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized community.'" *Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C. 1980) (second brackets in original) (quoting RESTATEMENT (SECOND) OF TORTS, § 46, cmt. d. n.21 (1965)); *see also Jung v. Jung,* 791 A.2d 46, 50 (D.C. 2002); *Kerrigan v. Britches of Georgetowne, Inc.,* 705 A.2d 624, 628 (D.C. 1997). Certainly, Cutler's disclosure does not reflect an "intent to 'purposefully [cause] a disturbance of another's mental or emotional tranquility to such a degree that physical consequences would not be unlikely to occur.'" *Waldon*, 415 A.2d at 1077 (brackets in original) (quoting *Clark v. Associated Retail Credit Men.*, 105 F.2d 62 (D.C. Cir. 1939)). This is an essential prerequisite to liability, and the May 18 disclosure's failure to satisfy it dooms Steinbuch's intentional infliction claim as a matter of law.

For the foregoing reasons, Steinbuch's claims relating to all Blog entries before May 18, 2004, are time-barred, and his claims relating to the only remaining Blog entry not time-

15

barred fail as a matter of law.

C.    **As a Matter of Law, Plaintiff's Invasion of Privacy Claim Is Barred by the Lack of Any Reasonable Expectation of Privacy, by Waiver, or Because the Facts Disclosed by Defendant Were Public Facts.**

1.    **The Nature of Plaintiff's Relationship With Defendant Gave Plaintiff No Reasonable Expectation of Privacy as to the Details of Their Sexual Encounters.**

For Steinbuch to recover on his Cause of Action for Invasion of Privacy, he must demonstrate (among other elements) that the facts disclosed by the Blog were private.  To satisfy the privacy element, Steinbuch must establish that:  (a) he had a subjective expectation of privacy; and (b) such expectation of privacy is recognized by society at large as reasonable.[6]  *See Hatch v. Town of Middletown,* 311 F.3d 83, 86 (1st Cir. 2002) (applying Rhode Island statute similar, though not identical, to Restatement § 652D) ("For a fact to be private . . . plaintiffs must demonstrate that they actually expected a disclosed fact to remain private, and that society would recognize this expectation of privacy as reasonable and willing to respect it."); *Peckham v. Boston Herald, Inc.,* 719 N.E.2d 888, 891 (Mass. Ct. App. 1999) (interpreting Massachusetts privacy statute using Restatement § 652D's comment about reasonable expectation of privacy; "A person may relinquish a privacy right by engaging in certain activities, or by placing himself in certain contexts where his legitimate expectation of privacy is reduced.").

Here, Steinbuch entered into a sexual relationship with Cutler knowing practically nothing about her character, her attitude toward sexual relations, her relationships with others, or anything else by which he could assess whether he could reasonably expect her to keep their

---

[6]    As Cutler argues below, even if Steinbuch had a subjective and objectively reasonable expectation of privacy, the facts about their sexual relationship lost their private status by their disclosure, consented to by Steinbuch, to members of Senator DeWine's and other Senators' staffs.

16

sexual relationship private. Furthermore, during the (at most) several hours between the beginning of Steinbuch's and Cutler's first "date" and their first sexual liaison, Cutler had become intoxicated, thereby reducing substantially the likelihood that Steinbuch could have had any serious, in-depth conversation with her.

Certainly, Steinbuch's and Cutler's "relationship" was not a marriage, even by common-law standards. Nor did it even rise to the level of long-term relationship of mutual trust and commitment between individuals who, while not married to each other, were nevertheless emotionally involved under circumstances where an expectation of privacy about their intimate encounters might reasonably be inferred. The Ninth Circuit has noted that "The right of privacy is closely connected with the integrity and sanctity of the family" and that "[m]any of the [Supreme] Court's early decisions implicating the right of privacy arose in the context of husband-wife and parent-child relationships." *Fugate v. Phoenix Civil Service Bd.,* 791 F.2d 736, 738 (9th Cir. 1986). Similarly, the Fourth Circuit concluded that "The personal intimacies of marriage, the home, procreation, motherhood, childbearing and the family have been held 'fundamental' by the Supreme Court and, hence, have been encompassed within protected rights of privacy." *Lovisi v. Slayton,* 539 F.2d 349, 351 (4th Cir.), *cert. denied*, 429 U.S. 977 (1976). Cutler has found no cases either expressly or implicitly creating a duty of partners to a sexual relationship not to disclose the details of that relationship outside the context of marriage. Since Steinbuch essentially knew nothing about Cutler before entering into sexual relations with her, there was simply nothing that could have given him any objectively reasonable expectation of privacy in the facts of their sexual encounters.

     2.     **Plaintiff Waived Whatever Privacy Right He May Arguably Have Had in Facts Disclosed by Defendant.**

Even if Steinbuch initially had an objectively reasonable expectation of privacy in his sexual encounters with Cutler, he nevertheless almost immediately waived the right to claim those facts as private. By May 10, 2005, four days into the 12-day relationship, Steinbuch knew about and retroactively consented to Cutler's disclosure of the details of their sexual encounters to members of Senator DeWine's staff and other Senators' staffs. He thus had no problem with the fact that "now EVERYBODY knows. Even our L[egislative] D[irector] . . . ." In addition, Steinbuch himself admits that he was "actually joking around the office about it," and that "when he walks out of a room, he'll slap himself on the ass." Moreover, after learning of Cutler's disclosures of intimate details of their sexual activity, Steinbuch willingly continued to have sexual encounters with Cutler. These facts quintessentially fit the description of waiver, which is a knowing and intelligent relinquishment of a known right. *See Travelers Indemnity Co. v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 992 (D.C. 2001); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). As Steinbuch's statements and conduct demonstrate in the case at bar, "the right to privacy, like other personal rights, may be lost in many ways — by express or implied waiver or consent, or by a course of conduct which prevents its assertion." *Capital City Press v. East Baton Rouge Parish Metro. Council,* 696 So.2d 562, 566 (La. 1997).

Cases involving claims for public disclosure of private facts have held that where, as here, the plaintiff communicates the facts of a sexual encounter with a co-worker to third persons, a waiver has occurred. *See Cummings v. Walsh Construction Co.,* 561 F. Supp. 872 (S.D. Ga. 1983); *see also Fisher v. Ohio Dept. of Rehab. and Correction,* 578 N.E. 2d 901 (Ohio Ct. Cl. 1988) (plaintiff's communication to co-workers of plaintiff's sexually-related conduct

with son waived her right to privacy in connection with employer's disclosure of report based on interview of plaintiff about plaintiff's conversations with co-workers). In this case, Steinbuch's consent to Cutler's disclosure of the details of their sexual encounters to members of Senator DeWine's staff — and his participation in the dissemination of those details — is tantamount to inviting third parties into the bedrooms where he and Cutler were engaging in conduct the publicity associated with which Steinbuch now claims to be a tortious disclosure of "private facts." *See Lovisi v. Slayton,* 539 F.2d 349 (4th Cir.) (spouses waived right to privacy regarding their intimate sexual acts by inviting third party into their room), *cert. denied*, 429 U.S. 977 (1976). In effect, Steinbuch was allowing his sexual relationship with Cutler to be played out in the public arena that is the Capitol Hill gossip mill. In that sense, Steinbuch participated in a process by which the details of his sexual encounters with Cutler became "open and notorious." *Cf. Fugate v. Phoenix Civil Service Bd.*, 791 F.2d 736, 743 (9th Cir. 1986) (Wallace, J., concurring) ("[A]lthough the particular sexual acts between the officers and their girlfriends may have taken place in private, their relationships were carried on in public, and the sexual dimensions were not concealed. Under these circumstances, the officers have failed to demonstrate a reasonable expectation of privacy in their relationships by virtue of their open and notorious conduct.").

   **3.     After Noon on May 7, 2004, the Facts Disclosed by Defendant Were No Longer Private.**

   The chronology of Cutler's disclosure of the details of her sexual relationship with Steinbuch demonstrates that these facts had become public by the time of her May 7, 2004, noontime luncheon with colleagues on Senator DeWine's staff. As noted previously in connection with the May 18, 2004, Blog entry (*see supra* Point I(A)), this means that all Blog

19

entries after noon on May 7 disclosed facts that were no longer private and therefore not actionable as a matter of law. *See, e.g., Nobles v. Cartwright,* 659 N.E.2d 1064, 1074 n.16 (Ind. Ct. App. 1995) ("If facts are already known to many people, such facts are not considered 'private' and no liability will accrue for their disclosure.") (citing RESTATEMENT (SECOND) OF TORTS § 652D, cmts. a & b (1977)); *Reuber v. Food Chemical News, Inc.,* 925 F.2d 703, 719 (4th Cir.) (holding that defendant's publication of letter was not a publication of private facts because, among other reasons, plaintiff had previously given copies of it to 11 people; "[I]f information is already in the public domain when published by a defendant, it does not qualify as private facts."), *cert. denied,* 501 U.S. 1212 (1991); *Sipple v. Chronicle Publishing Co.,* 154 Cal. App. 3d 1040, 1047 (Ct. App. 1984) (holding that matters related to plaintiff's sexuality were already known by the public and were therefore not "private"); *Duran v. Detroit News, Inc., et al,* 504 N.W.2d 715, 720 (Mich. Ct. App. 1993) ("information disclosed must be of a private nature that excludes matters already of public record or otherwise open to the public eye"), *appeal denied,* 512 N.W.2d 846 (Mich. 1994); *Cash v. Smith,* 231 F.3d 1301, 1308 (11th Cir. 2000) (holding defendant's disclosure of plaintiff's diabetes not actionable because "[plaintiff] did not treat her diabetes condition as a private matter herself" by freely discussing the condition with co-employees.).

        As a result, even if the statute of limitations does not apply here, only the Blog entry for May 7, 2004, at 9:35 a.m. could possibly be seen arguably to involve private facts. That entry is therefore the only one even theoretically actionable as a matter of law. Almost immediately, however, Steinbuch waived any cause of action he might have had on that entry. In addition, as explained below in Point I(D), Steinbuch has no claim on which relief can be granted with respect to the May 7, 9:35 a.m. Blog entry (or, for that matter, any other entry) because, as

Steinbuch himself effectively admits, the Blog was not publicized (within the meaning of the caselaw defining the publicity element of the tort) until it appeared on Wonkette on May 18, 2004 (*see* Compl. ¶ 17).

**D.    As a Matter of Law, Defendant's Blog Postings Did Not Constitute Publicity.**

Comment (a) to § 652D of the Restatement defines the publicity element of the tort of public disclosure of private facts differently from the publication element of defamation. Thus, publication, as it is used in the defamation context, "includes any communication by the defendant to a third person." Publicity, "on the other hand, means that the matter is <u>made public,</u> by communicating it to <u>the public at large, or to so many persons that the matter must be</u> <u>regarded as substantially certain to become one of public knowledge</u>." RESTATEMENT (SECOND) OF TORTS § 652D, cmt. a (1977) (emphasis added). Comment (a) explains further that it is the scope, not the means, of communication that triggers liability:

> The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public. Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section [652D]. The distinction, in other words, is between private and public communication.

*Id.*

Courts adopting § 652D's definition of the tort Steinbuch alleges here have expressly adopted comment (a)'s definition of publicity. *See, e.g., Bodah v. Lakeville Motor Express, Inc.,* 663 N.W.2d 550, 554 (Minn. 2003) ("Thus it is not an invasion of the right of

privacy, within the rule stated in this Section [652D], to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.") (citing comment a); *Swinton Creek Nursery v. Edisto Farm Credit*, 514 S.E.2d 126, 131 (S.C. 1999) ("[C]ommunication to a single individual or to a small group of people will not give rise to an invasion of privacy claim."); *Yoder v. Ingersoll-Rand Co.*, No. 97-3710, 1998 U.S. App. LEXIS 31993, at *8 (6th Cir. Dec. 22, 1998) (holding that disclosure to three people does not qualify as communication to the "public at large, or [to] so many persons that the matter must be regarded as substantially certain to become one of public knowledge"); *Nix v. Hoke*, 139 F. Supp. 2d 125, 134 (D.D.C. 2001) (applying Ohio law, which has adopted § 652D, and holding that disclosure of contents of wiretapped telephone calls to various residents of town, a police officer, and various attorneys "falls considerably short of a communication to the 'public at large,' or of a claim that the information has become 'public knowledge' in any sense"); *Tureen v. Equifax, Inc.*, 571 F.2d 411, 419 (8th Cir. 1978) (publicity means "communication to the public in general or to a large number of persons, as distinguished from one individual or a few.").

Here, Cutler's posting of the Blog entries did not constitute publicity. Before the Blog appeared on Wonkette on May 18, 2004 (through no action by Cutler), the Blog was only available to four people to whom Cutler had directly or indirectly disclosed the Blog's URL. Just because one of these four people subsequently apparently sent the Blog's content and/or its URL to Wonkette (without Cutler's knowledge or consent) does not make Cutler vicariously liable for giving publicity, within the meaning of that term here, to her sexual relationship with Steinbuch. Steinbuch admits that the Blog's contents "became notorious throughout Washington, D.C. and the nation" and "was repeated through other internet sites, through numerous mainstream newspapers and tabloid publications published in the United States and

22

abroad" <u>only after</u> it first appeared on Wonkette (*see* Compl. ¶¶ 17-19). Steinbuch further tacitly

admits that Wonkette was not alerted to the existence of the Blog by Cutler because Cutler

"immediately contacted [Ana Marie] Cox [editor of Wonkette] and identified herself for Cox's

website (Wonkette) as the source of the [Blog]" only several days <u>after</u> Wonkette had publicized

the Blog (*see* Compl. ¶ 20).[7]

In *Swinton Creek Nursery v. Edisto Farm Credit*, 514 S.E.2d 126 (S.C. 1999), the

South Carolina Supreme Court considered this very issue. The court held that a creditor's

disclosure of the details of the plaintiff's financial distress to a potential third-party buyer of the

plaintiff's business did not constitute publicity, even if the information eventually became public

via that third party. Rejecting the plaintiff's argument that the creditor should be held

vicariously liable for the third party's disclosure, the court said:

> Owner nevertheless argues that EFC should be liable for "sparking
> the flame" of publicity. In other words, even if EFC published the
> statement to only one person, if the information eventually became
> public, EFC should be held accountable. However, such an
> approach would effectively eviscerate the requirement that the
> *defendant* be the one to have publicized the private information. If
> this approach were adopted, almost any form of gossip would be
> actionable, regardless of the discretion taken in its initial
> communication.

*Id.* at 132 (emphasis in original); *see also Bauer v. Ford Motor Credit Company,* 140 F. Supp. 2d

1019, 1023-24 (D. Minn.) (collection agency's statements about plaintiff's debts to four

---

[7]     Solely for purposes of this motion to dismiss, Cutler accepts as true the allegation
in the complaint that she, Cutler, contacted Ana Marie Cox, editor of Wonkette (*see* Compl. ¶
20). Nevertheless, for the record, as set forth in Cutler's accompanying declaration, it was Ana
Marie Cox who first telephoned Cutler after somehow securing Cutler's unlisted cellular
telephone number. Cutler first spoke to Cox only upon her return of Cox's earlier call (*see* Ex. 1
[Cutler Decl. ¶ 10]). The fact that Ms. Cox first initiated communication with Cutler (not the
converse) tends further to confirm that Cutler was not responsible for Wonkette's earlier
disclosure of the Blog.

neighbors or relatives and one employer of plaintiff, even if it generated "substantial gossip," did not constitute publicity), *vacated in part on other grounds*, 149 F. Supp. 2d 1106 (D. Minn. 2001); *Robins v. Conseco Fin. Loan Co.,* 656 N.W.2d 241, 245-246 (Minn. Ct. App. 2003) (lender's disclosure of plaintiff home buyer's unfavorable credit report to seller, who later informed others does not constitute publicity: "It would be an expansion of the concept of publicity to find [that] publicity has occurred when [seller] repeats the information [obtained from plaintiff buyer] to yet other [third] parties.").

Here, Cutler did not advertise the Blog on Blogger or anywhere else, for that matter. She gave the Blog's URL only to three close friends (directly) plus a friend of one of those friends (indirectly). Thus, Cutler provided access to the Blog to only <u>four</u> people, three of whom she knew very well. Therefore, Cutler's posting of content to the Blog cannot be considered publicity because only four people had access to it. For this reason, the Blog cannot be deemed the equivalent of a radio broadcast, unless, by analogy, it was made on a non-commercially available frequency requiring a special tuner to pick up, which, at the relevant time, only four people possessed. Apparently, one of the four people with knowledge of the Blog's URL notified Wonkette of the Blog's existence, thus "sparking the flame" of the publicity that ensued on May 18, 2004. Under the reasoning of *Swinton Creek, Bauer*, and *Robins*, however, Cutler's Blog postings do not constitute publicity. For these reasons, Steinbuch's invasion of privacy claim as to any of the Blog postings, even assuming that those posted after noon on May 7, 2004, did not involve facts that were already public among the community of Capitol Hill staffers (*see supra* Point I(C)), fails as a matter of law.

**E.     Plaintiff's Invasion of Privacy Claim Is Barred by the First Amendment.**

One of the essential elements of Steinbuch's invasion of privacy claim is that the

public had no legitimate concern about the details of his sexual relationship with Cutler. Under

District of Columbia law, "It is a defense to a claim of invasion of privacy that the matter

publicized is of general public interest." *Vassiliades v. Garfinckel's, Brooks Bros., Miller &*

*Rhoades, Inc.*, 492 A.2d 580, 589 (D.C. 1985) (citing *Pearson v. Dodd*, 410 F.2d 701, 703 (D.C.

Cir.), *cert. denied*, 395 U.S. 947 (1969) and RESTATEMENT (SECOND) OF TORTS § 652D (1977)).

"Moreover, this defense or privilege is not limited to dissemination of news about current events

or public affairs, but also protects 'information concerning interesting phases of human activity

and embraces all issues about which information is needed or appropriate so that that individual

may cope with the exigencies of their period.'" *Id.* (quoting *Campbell v. Seabury Press*, 614 F.2d

395, 397 (5th Cir. 1980) (*per curiam*)). Thus, the newsworthy defense to privacy and publicity

torts "is not limited to 'news' in the narrow sense of reports of current events. It extends also to

the use of names, likenesses or facts in giving information to the public for purposes of

education, amusement or enlightenment, when the public may reasonably be expected to have a

legitimate interest in what is published." *Shulman v. Group W. Prod., Inc.*, 955 P.2d 469, 485-86

(Cal. 1998) (quoting RESTATEMENT (SECOND) OF TORTS § 652D, cmt. j).

Furthermore, this "broad [newsworthiness] privilege would deny a remedy even

to persons who have not sought or have attempted to avoid publicity." *Vassiliades v.*

*Garfinckel's, Brooks Bros., Miller & Rhoades, Inc.*, 492 A.2d 580, 589 (D.C. 1985).

Concededly, however, "[t]he conflict between the public's right to information and the

individual's right to privacy requires a balancing of the competing interests." *Id.*

In conducting the foregoing balancing test, courts often look for a logical nexus

between the private facts disclosed and the asserted issue of legitimate public concern. *See id.* at

590; *Campbell v. Seabury Press,* 614 F.2d 395, 397 (5th Cir. 1980) (*per curiam*) (logical nexus

25

must exist between complaining individual and matter of legitimate public interest); *Bonome v. Kaysen*, No. 03-2767, 2004 Mass. Super. LEXIS 172, at \*16 (Super. Ct. 2004) ("Thus, otherwise private information may properly be published when it is sufficiently related to a broader topic of legitimate public concern."); *Nobles v. Cartwright*, 659 N.E.2d 1064, 1077 (Ind. Ct. App. 1995) (disclosure of private facts is of legitimate public interest "only if it was substantially relevant and closely related to a matter or an event which was of legitimate public interest"); *Anonsen v. Donahue*, 857 S.W.2d 700, 704 (Tex. App. 1993) (acknowledging that factual questions may be presented about the newsworthiness of private facts <u>unrelated</u> to general newsworthy topics). The presence of such a nexus is key to a finding that the privilege outweighs the privacy interest. *See Gilbert v. Medical Economics Co.*, 665 F.2d 305, 308 (10th Cir. 1981) (If "every private fact disclosed in an otherwise truthful, newsworthy publication [has] some substantial relevance to a matter of legitimate public interest . . . the facts in the publication and inferences reasonably drawn therefrom fall within the ambit of first amendment protection and are privileged.").

Here, the Blog's descriptions of Steinbuch's and Cutler's sexual encounters concerned a workplace liaison between an entry level staff assistant to a U.S. Senator (a position Cutler said is popularly referred to by men on Capitol Hill as "staff ass," *see* Ex. 2 [Blog entry for 4:20 p.m., May 12, 2004]) and that same Senator's counsel on the Senate Judiciary Committee. Court's have recognized such a topic as an issue "of general modern public interest." *See Peckham v. Boston Herald, Inc.*, 719 N.E.2d 888, 894 (Mass. Ct. App. 1999) (workplace liaison between employee and her superior is an issue of "general modern public interest"). Furthermore, read as a whole and in context, Cutler's Blog makes a shocking and disturbing portrayal of casual and even reckless sexual encounters between young, entry-level Capitol Hill staffers like Cutler and more senior staffers like Steinbuch, more prominent

26

executive branch officers, and older, married, powerful, and wealthy men. The interrelationship between youth, beauty, sex, money, and power in Washington has long been a matter of legitimate and sometimes <u>pressing</u> public interest.

More importantly, however, Cuter's descriptions are those of a participant in the events described, which make the facts disclosed as much Cutler's private facts as they are Steinbuch's. This should tilt the balance in favor of newsworthiness and the First Amendment. For example, in *Anonsen v. Donahue*, 857 S.W.2d 700 (Tex. App. 1993), the defendant appeared on a national television show (Donahue) and revealed that her ex-husband had committed incest or rape with her then 11-year-old daughter (the plaintiff) and that a child was born as a result of the event. Although the defendant did not disclose the names of her family members involved, she did disclose her own name. As a result of the broadcast, plaintiff (defendant's daughter) and her child (defendant's grandson) suffered harassment from those who had viewed the broadcast. Plaintiff brought suit against the defendant alleging invasion of privacy through the public disclosure of private facts. *Id.* at 701-02.

The court ultimately decided that the newsworthiness analysis was irrelevant, choosing instead to affirm the trial court's grant of summary judgment for the defendant on the basis that the defendant had a First Amendment right to tell her own story of how she reacted to her daughter's rape and how it and the child thereby conceived impacted her life. *Id.* at 705. The court specifically determined that the cases addressing the newsworthiness of the disclosure sued upon involved disclosure by a third party, not by one of the participants in the events themselves. *Id.* at 704-05. For these reasons, the court held that "a person's right to make public the most private details of their own life . . . when the information also reveals painful intimacies of other persons" is unlimited. *Id.* at 701.

27

In *Campbell v. Seabury Press,* 614 F.2d 395 (5th Cir. 1980) (*per curiam*), the defendant wrote a book about his brother, a contemporary religious and civil rights leader. One of the major themes of the book is the fraternal affection between the defendant and his prominent brother. The book demonstrates the role that the brother played in the author's life. In the book, defendant disclosed a number of facts about the brother's home life and marriage to the plaintiff. The information was included in the book in the context of the brother's relationship with his wife, the plaintiff, and how that marriage relationship personally affected the relationship between the defendant and his brother. *See id.* at 397. The plaintiff (defendant's brother's wife) filed suit against the defendant for publishing facts about the plaintiff's relationship with her husband, defendant's brother.

The Fifth Circuit held that there was a requisite logical nexus between: (1) the defendant's close association with his older brother (and how the brother shaped the defendant's religious maturation and involvement in civil rights activities); and (2) the defendant's autobiographical account of how his brother's marriage affected the defendant's relationship with his brother. As a result, the defendant-author's disclosures enjoyed a constitutional privilege against invasion of privacy liability. *See id.* at 397.

In *Bonome v. Kaysen,* 2004 Mass. Super. LEXIS 172 (Super. Ct. 2004), the plaintiff's complaint arose from his girlfriend's publication of a book chronicling the effects of the author's vaginal pain on her overall physical and emotional state, friendships, and the author's relationship with her boyfriend (referred to only as "boyfriend"), the plaintiff. Specifically, the book revealed details of the defendant-author's and the plaintiff's sexual activity, portrayed the plaintiff as emotionally unavailable and insensitive to the defendant's vaginal pain, and culminated with the suggestion that the plaintiff raped the defendant. *See id.* at

28

*4-6, 13.

In reviewing the defendant-author's motion to dismiss, the Superior Court of Massachusetts determined that the explicit and highly personal details concerning the plaintiff's sexual activity were a necessary part of the book's exploration of the impact of the defendant's pain on her physical and emotional relationship with the plaintiff and the issue of when undesired physical intimacy crosses the line into non-consensual sexual relations. *Id.* at *18. More importantly, however, the court found a critical distinction between the case before it and most other publicity of private facts cases. Specifically, the court noted that the defendant-author "was not a disinterested third party telling [the plaintiff's] personal story in order to develop the themes in her book. Rather she is telling *her own* personal story — which inextricably involves [the plaintiff] in an intimate way." *Id.* at *18-19 (emphasis original). Thus, for the Massachusetts Superior Court, the plaintiff's involvement in the very experiences the defendant-author offered as a contribution to the public debate about pain and sexuality, and men's and women's differing attitudes towards both, was unavoidable. "Because the First Amendment protects [the defendant-author's] ability to contribute *her own* personal experiences to the public discourse on important and legitimate issues of public concern, disclosing [plaintiff's] involvement in those experiences is a necessary incident thereto." *Id.* at *19-20 (emphasis original).[8]

---

[8]    The *Bonome* court also found that the defendant-author's disclosure of private information about the plaintiff bore the necessary nexus to the issues of public concern in part because the book did not mention the plaintiff by name. In the case at bar, the Blog did not mention Steinbuch by name, only by his initials. In the end, Cutler's use of Steinbuch's initials did not protect his identity, but it was only <u>after</u> Wonkette publicized the Blog that other third parties actively began seeking to discover the identity of "RS." Similarly, in *Bonome*, the plaintiff's "many local friends and family" and business clientele (which included friends of the defendant-author) identified the plaintiff after reading the book. *Bonome v. Kaysen,* 2004 Mass.

29

Under the reasoning of *Anonsen*, *Campbell*, and *Bonome*, this Court should hold

that the Blog constitutes First Amendment-protected speech or, at the very least, that the Blog is

protected by the common-law privilege to publicize true facts related to an issue of legitimate

public concern.  The details of Cutler's sexual relationship with Steinbuch are critical to her

portrayal — via her own personal experiences — of casual sex among members of the political

class in Washington and its impact on her self-esteem, her social status, her ability to generate

income, and her professional advancement.  Under these circumstances, Steinbuch cannot

demonstrate the absence of a privilege to publicize the facts disclosed in the Blog, which is an

essential element of his invasion of privacy claim.  This claim should therefore be dismissed.


## POINT II

### PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Steinbuch's claim for intentional infliction of emotional distress (count two of the

complaint) appears to be make-weight.  It is devoid of particular factual allegations and, instead,

comprises the thin gruel of conclusory statements that merely track (without more) the essential

elements of the claim as it is defined by District of Columbia caselaw.  For the reasons stated in

Point I above, Steinbuch's claim is almost entirely barred by the statute of limitations.  Even if it

were not, the descriptions of Steinbuch's sexual activity in the Blog constitute privileged

expression, as argued above.  As with invasion of privacy, the lack of privilege is an essential

element of liability for intentional infliction of emotional distress.  *See Waldon v. Covington,* 415

A.2d 1070, 1077 (D.C. 1980) (common elements of intentional infliction of emotional distress

---

Super. LEXIS 172, at *5 (Super. Ct. 2004).

30

claims "are deceit or falsity, a <u>total lack of privilege</u>, and such wantonness that it can be presumed that the defendant would foresee severe consequences") (emphasis added); *Powell v. District of Columbia,* No. 94-7157, 1995 U.S. App. LEXIS 8796, at *2 (D.C. Cir. Mar. 8, 1995) (because defendant newspaper's article about plaintiff was fair and accurate account and was matter of legitimate public concern, no reasonable juror could find that publication was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.") (internal quotation marks and citation omitted); *Green v. Chicago Tribune Co.,* 675 N.E.2d 249, 257 (Ill. Ct. App. 1996) (recognizing First Amendment privilege for publishing truthful information of legitimate public concern in cause of action for intentional infliction of emotional distress), *appeal denied*, 679 N.E.2d 379 (Ill. 1997).

Quite apart from the statute of limitations and privilege hurdles, Steinbuch's allegations fail to satisfy the essential elements of the claim of intentional infliction of emotional distress. "To establish a claim for intentional infliction of emotional distress, a plaintiff must prove that the defendant engaged in: (1) extreme and outrageous conduct that (2) intentionally or recklessly caused (3) severe emotional distress to another." *Jung v. Jung,* 791 A.2d 46, 50 (D.C. 2002); *Kerrigan v. Britches of Georgetowne, Inc.,* 705 A.2d 624, 628 (D.C. 1997).

Regarding the first element, "liability 'clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities;' it is imposed only when conduct goes 'beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.'" *Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C. 1980) (citing RESTATEMENT (SECOND) OF TORTS, § 46, cmt. d. n.21 (1965)); *see also Jung v. Jung,* 791 A.2d 46, 50 (D.C. 2002); *Kerrigan v. Britches of Georgetowne, Inc.,* 705 A.2d 624, 628 (D.C. 1997). The District of Columbia Court of Appeals has emphasized that extreme and outrageous

conduct, a requirement that "is not an easy one to meet," *Drejza v. Vaccaro*, 650 A.2d 1308,

1312 (D.C. 1994), must be judged according to both community standards <u>and</u> the specific

factual context of the complained of conduct:

> There are two primary components of "extreme and outrageous conduct" we must consider: (1) applicable contemporary community standards of offensiveness and decency, and (2) the specific context in which the conduct took place, for "in determining whether conduct is extreme or outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred." . . . The "context" consists of the nature of the activity at issue, the relationship between the parties, and the particular environment in which the conduct took place.

*King v. Kidd,* 640 A.2d 656, 668 (D.C. 1993).  For three reasons, Cutler's conduct in creating the

Blog does not, as a matter of law, constitute extreme and outrageous conduct.

First, Cutler was only responsible for giving access to the Blog to four persons,

three of whom were close personal friends.  There was therefore no public communication <u>by</u>

<u>Cutler</u> calculated to subject Steinbuch to widespread community opprobrium, embarrassment,

and humiliation.  Second, Steinbuch consented to Cutler's disclosure of intimate details of their

sexual encounters to a much larger group of Senate staffers than the group of four with access to

the Blog; he concedes "joking around the office" about the revelations.  Accordingly, Steinbuch

himself judged Cutler's revelations <u>not</u> to be extreme and outrageous conduct.  In fact, even after

learning that Cutler was disclosing intimate details of their sexual activity together, Steinbuch

continued to pursue his sexual relationship with Cutler.

Third, while Cutler's disclosure in the Blog of some details (*i.e.,* Steinbuch's

ejaculations, spanking, hair-pulling, "humping," and difficulty using a condom) might be found

to be embarrassing to some, such revelations can hardly be viewed as shocking when viewed in

the context of a contemporary American media and popular culture that is saturated with sexual

activity, imagery, innuendo, and enticement.  Certainly, Steinbuch's allegations are no more

outrageous in character than allegations of physical distress held not to meet the requisite level of

outrageousness.  *See, e.g., Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 861 (D.C. 1999) (holding

that allegations of "angst, sleeplessness, and humiliation . . . as a result of comments and

innuendos by colleagues and business associates" not beyond all possible bounds of decency and

not supported by evidence proving that such discomfort was "greater than a reasonable person

could be expected to tolerate") (internal quotation marks omitted); *Smith v. Washington Metro.*

*Area Transit Auth.*, No. 95-0687-LFO, 1997 U.S. Dist. LEXIS 4504, at *13 (D.D.C. Apr. 4,

1997) ("Plaintiff's asserted injuries of anxiety and depression also do not rise to the level of

'severe emotional distress.'"), *aff'd*, No. 97-7071, 1998 U.S. App. LEXIS 13051 (D.C. Cir. May

28, 1998); *Paul v. Howard Univ.*, 754 A.2d 297 (D.C. 1997) (holding that allegations of

"heightened levels of stress, high blood pressure, and disrupted sleep as a result of appellees'

allegedly outrageous conduct" not supported by any showing that such conduct was "so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency") (internal quotation marks and citation omitted).

      Furthermore, other Blog comments (*i.e.,* Cutler's comment that Steinbuch has a

"great ass" and that Cutler and Steinbuch had sexual intercourse "every which way" and that they

had "nasty sex like animals") are merely Cutler's characterizations of Steinbuch's body and her

sexual encounters with him, not clinical descriptions of his anatomy or the precise, more specific

sexual activity they actually engaged in.[9]  In any case, the disclosure of private <u>facts</u> does not

_____

      [9]      Read in context, Cutler's comment that "we have nasty sex like animals, not man
and wife" (Ex. 2 [Blog entry for 9:53 a.m., May 14, 2004]) appears to reflect Cutler's

involve the kind of "deceit or falsity" commonly found in intentional infliction of emotional distress cases by which "it can be presumed that the defendant would foresee severe consequences." *See Waldon v. Covington*, 415 A.2d 1070, 1077 (D.C. 1980).

For these several reasons, Steinbuch's allegations fail to establish that Cutler's Blog postings constitute conduct that "goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community." *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980) (internal quotation marks and citation omitted).

Regarding the second element, Steinbuch fails to establish actual or proximate causation or the requisite level of intentionality or recklessness. Cutler only granted four people access to the Blog. The intense media interest in the Blog and the spread of its contents throughout print, broadcast, and Internet media was caused by Wonkette, as Steinbuch admits (*see* Compl. ¶ 17), and Wonkette did not receive access to the Blog from Cutler. Cutler could therefore not have known with substantial certainty that one of her friends would independently take it upon herself, without Cutler's knowledge or consent, to disclose the Blog to Wonkette, or that Wonkette would find the Blog interesting enough to create a link to it or display its content. Moreover, in view of Steinbuch's consent to Cutler's disclosure of intimate details of their sexual relationship to Senate staff members and Steinbuch's own clowning around about it among Senator DeWine's staff, Cutler could not have anticipated that the Blog would cause Steinbuch severe emotional distress. For these reasons, as a matter of law, none of Cutler's Blog postings reflect an "intent to 'purposefully [cause] a disturbance of another's mental or emotional tranquility to such a degree that physical consequences would not be unlikely to occur.'"

---

questioning of the nature of her relationship with Steinbuch, not an explicit description of sexual activity. It is therefore questionable whether this comment can even fairly be described as a fact.

*Waldon*, 415 A.2d at 1077 (brackets in original) (quoting *Clark v. Associated Retail Credit Men.*, 105 F.2d 62 (D.C. Cir. 1939)).

Regarding the third element, Steinbuch's assertions that he "suffered severe emotional distress" and "caused Plaintiff to suffer damages" (Compl. ¶¶ 37 & 41) are wholly unsupported by any specific factual allegations demonstrating the nature and degree of the emotional distress or other damages. Specifically, Steinbuch's complaint fails to provide a single example of how he has been embarrassed or humiliated, and it fails to allege any specific physical manifestations of Steinbuch's claimed severe emotional distress. Additionally, the complaint is utterly devoid of specific facts showing that Steinbuch sought or obtained psychological counseling or medical treatment, that he has experienced (for example) insomnia, depression, anxiety, loss of self-esteem, eating disorders, changes in his daily lifestyles or work environment, or that he is taking medication to alleviate any injurious symptoms. *See, e.g., Abourezk v. New York Airline, Inc.*, 705 F. Supp. 656, 665 (D.D.C. 1989) (granting summary judgment for defendant on intentional infliction of emotional distress claim because record devoid of any allegation that plaintiff received physical or psychiatric treatment as a result of complained of conduct), *aff'd*, 895 F.2d 1456 (D.C. Cir. 1990).

Put simply, there are no factual allegations, even if accepted as true for purposes of this motion to dismiss, that would permit a reasonable jury to conclude that Cutler's conduct caused Steinbuch to suffer an emotional disturbance "of so acute a nature that harmful physical consequences might not be unlikely to result." *See Clark v. Associated Retail Credit Men.*, 105 F.2d 62, 65 (D.C. Cir. 1939). Absent such type of averments, Steinbuch's allegations of emotional distress are wholly conclusory and cannot therefore withstand a motion to dismiss. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (court not required to accept as true

35

on Rule 12(b)(6) motion inferences unsupported by facts set out in complaint).

        For these several reasons, Steinbuch's claim for intentional infliction of emotional distress fails to state a claim upon which relief can be granted and should therefore be dismissed.

## POINT III

### PLAINTIFF IS EQUITABLY ESTOPPED FROM MAINTAINING AN ACTION WITH RESPECT TO DISCLOSURES HE CONSENTED TO DEFENDANT MAKING ABOUT THEIR SEXUAL RELATIONSHIP

        The facts discussed above in Points I and II proving that Steinbuch waived whatever right to privacy he may have had with respect to disclosures Cutler made to members of Senator DeWine's staff and her Blog friends also independently bar him from maintaining this action under the doctrine of equitable estoppel.  Under District of Columbia law, "[t]he elements of an equitable estoppel claim are:  (1) conduct amounting to a false representation or concealment of material fact (2) made with actual or constructive knowledge of the true facts, and (3) with the intention that another person act in reliance upon it; (4) the other person's lack of knowledge and of the means of knowledge concerning the truth of the representation, (5) and his reliance upon the misrepresentation, (6) causing him to act so as to change his position prejudicially.  It is not essential to the creation of an equitable estoppel . . . that the party sought to be estopped should have had an actual intent to deceive, defraud, or mislead.  Nor is it essential that the representation or conduct relied upon be motivated by actual malice." *Cassidy v. Owen*, 533 A.2d 253, 255 (D.C. 1987) (citations omitted).

        The facts of this case meet all the necessary elements of equitable estoppel.  First, Steinbuch assured Cutler that he did not mind that she had disclosed intimate details of their sexual encounters to their office co-workers, and he himself actively participated in the

dissemination of such details. This amounts to a false representation in light of Steinbuch's claim now — more than a year later — that he has been injured by Cutler's alleged publicity of these allegedly private facts.

Second, if Steinbuch was truly injured in the way he claims here, surely he was aware of his injury no later than May 10, 2004, at which time details of his sexual relationship with Cutler were circulating on Capitol Hill and were being reported in the Blog. Third, aware of the fact of his supposed injury, Steinbuch nonetheless expressed to Cutler that he did not object to her disclosures and engaged in conduct evidencing the lack of such objection. Implicit in his statements and conduct is the intention that Cutler rely on them in deciding whether to make further disclosures.

Fourth, it goes without saying that Cutler lacked the knowledge or the means of acquiring knowledge of Steinbuch's injury when, in effect, he assured her that he was not injured by her disclosures. Fifth, Cutler relied on Steinbuch's statements and conduct in making further disclosures of intimate details of their sexual encounters to the Blog, even assuming that such disclosures constitute "publicity" necessary to trigger liability for invasion of privacy. And sixth, Cutler's reliance caused her to change her position prejudicially because once Blog entries containing the aforementioned disclosures were posted, there was no guarantee that Cutler could remove them without third parties (even limited to the four people to whom she had given access to the Blog) having read them.

For all these reasons, Steinbuch's invasion of privacy and intentional infliction of emotional distress claims are both barred by the doctrine of equitable estoppel.

## CONCLUSION

For the foregoing reasons, the motion should in all respects be granted, and plaintiff's complaint should be dismissed with prejudice.

Dated: Washington, D.C.
       July 26, 2005

                              BERLINER, CORCORAN & ROWE, L.L.P.

                              Attorneys for Defendant


                    By:    /s/ Thomas E. Wilson
                           Thomas E. Wilson
                                  D.C. Bar No. 132704
                           Alexander C. Vincent
                                  D.C. Bar No. 472459
                           Jason A. McClurg
                                  California State Bar No. 232897
                                  Application to D.C. Bar Pending

                           1101 17th Street, N.W.
                           Suite 1100
                           Washington, D.C.  20036-4798
                           Telephone:  (202) 293-5555
                           Fax:  (202) 293-9035
                           E-mail:        twilson@bcr-dc.com
                                          acv@bcr-dc.com
                                          jam@bcr-dc.com