UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEINBUCH | ) |
| | ) |
| Plaintiff, | ) |
| | ) CASE No. 01:05-CV-00970 (PLF) |
| v. | ) |
| CUTLER | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S "MOTION TO DISMISS"**

**INTRODUCTORY STATEMENT**

Plaintiff and Defendant met in the Winter of 2004 and entered into a relationship in the Spring of that same year. From the inception of that relationship, unbeknownst to Plaintiff, Cutler revealed and disseminated personal, private, intimate facts about Plaintiff through her Internet website, or weblog (also knows as a "blog"), on the World Wide Web for anyone to read. Cutler also made false claims about Plaintiff in her public blog, painting Plaintiff in a false light. Cutler identified Plaintiff in various ways, including by using his name – for the ready identification by people who know Plaintiff, and people who don't know him.

Cutler sought and received notoriety through her public blog. Cutler went on television and radio, further publicizing her invasion of Plaintiff's privacy, and Cutler republished her privacy-invading public blog in the *Guardian* newspaper and in book form. Cutler's outrageous and tortious actions subjected Plaintiff to pain and suffering beyond that which any reasonable person should be expected to bear.

Plaintiff filed his Complaint in May of 2005. Without providing any discovery, including that required by Fed. R. Civ. P. 26, Cutler filed a motion to dismiss the Complaint.

Dockets.Justia.com

# FACTS[1]

Plaintiff was a resident of Maryland and a counsel for the United States Senate Committee on the Judiciary, with an office in the Dirksen Senate Office Building. Plaintiff has never been married and has no children. Defendant was a resident of Washington, D.C., employed by a Senator, working in a different building than Plaintiff. Complaint ¶¶ 2-3.

Plaintiff and Defendant met in the Winter of 2004 and entered into a relationship in the Spring of that same year. Upon the inception of the relationship, Cutler published, without Plaintiff's knowledge or consent, Plaintiff's personal, private, intimate facts on an Internet website, also known as a "weblog" or "blog," And, Cutler made false claims about Plaintiff in her public blog, painting Plaintiff in a false light. Complaint ¶ 10, ¶ 31.

Cutler admits that she deliberately declined to password protect her blog, thus intentionally making it publicly available to anybody on the Internet. Cutler created a captioned title for her public blog -- the "Washingtonienne." *Id*. Cutler maintains ongoing conversations with strangers in her public blog. Moreover, the public blog has a catchy commercial title – "Washingtonienne" (which she also used as the title of her book.) Complaint Appendix A.

Cutler's public blog described in graphic detail her ongoing sexual relationships with Plaintiff and other men. Plaintiff did not know that Cutler was disclosing Plaintiff's private, intimate facts on the Internet and was engaged in sexual relationships with other men. Complaint ¶ 11.

Plaintiff was clearly identifiable to a substantial segment of the community in Cutler's her public blog. Cutler used the following identifiers for Plaintiff: his first name (Rob), his initials (RS), his religion (Jewish), his job (Committee Counsel to the Senate Committee on the

---

[1]     These facts are taken from the Complaint, and must be accepted as true for the purposes of a motion to dismiss.

Judiciary), his specific place of residence (Bethesda, MD), the fact that he has a twin; his

appearance; his resemblance to a commonly-known individual; and the one specific and

identifiable detail of Plaintiff that Cutler apparently had previously disclosed to colleagues and

co-workers without Plaintiff's permission or knowledge.  Complaint ¶¶12-13.[2]

      Cutler's public blog contained the following passages of and concerning Plaintiff

(Complaint ¶ 13):

*Item!  A new contender for my fair hand. He works in one of the Committee offices. We will call him RS. . . . I put the moves on HIM. That is, I brought him back to MY place, I was the one who jumped on HIM. . . . To answer The Question, no, RS and I did not fuck. . . .  RS looks just like George Clooney when he takes off his glasses. I am serious.  [He] Has a great ass.  Number of ejaculations: 2.  He likes spanking. (Both giving and receiving.)*

*. . . I told my coworkers about the spanking over lunch, but left out the nasty parts. (We were eating.)  So they were shocked. Not sure I should have told them. . . .  One of them told me that RS wore a purple turtleneck with a bright blue fleece over it at a recent staff retreat. Now I wonder if he's crazy or what.*

*. . . [A colleague] mentioned that RS is very discrete, so I am taking that as a hint to keep quiet.*

*. . . RS [and I] stopped and talked in the hall and he asked me out for a drink tonight. (Except he doesn't drink?)*

*. . . Went out w/ RS after work yesterday. [Afterwards] we fucked every which way. THEN he tells me that he heard I've been spreading the spanking rumor around the office! He's not mad, but I am so ashamed of my behavior: I have such a big mouth. It got around and now EVERYBODY knows.*

*But last night was fun. He's very up-front about sex. He likes talking dirty and stuff, and he told me that he likes submissive women. Good, now I can take it easy in bed. Just lay back and watch him do freaky shit.*

*. . . By popular demand, I have finally created a key to keeping my sex life straight. . .*

*. . . RS=My new office bf with whom I am embroiled in an office sex scandal. The current favorite.*

---

[2]      Defendant falsely claims that the public blog only refers to Plaintiff by his initials.  As seen above, that is simply false. *See* Complaint ¶¶12-13 (quoting the blog).

*. . . RS just called again. Bad news: the rumor [that I spread about spanking] has spread to other offices. This is bad.*

*. . . We went to his house after dinner, a four bedroom in Bethesda. . ..*

*So it turns out that RS cannot finish with a condom on. He can barely stay hard. So he ends up taking it off and humping away at me. . . . I also learned that he was a cop, so he has scary police shit like handcuffs in his closet.  He implied that we would be using tem next time, which is intiguing, but I know I'm going to get scared and panicky.  (Which would probably turn him on.) . . . .  I like this crazy hair-pulling, ass-smacking dude who wants to use handcuffs on me. Shit.*

*. . .  I called RS and told him to come over so AS could get a look at him. This morning she says (via IM), "He does look like George Clooney, but he's totally Woody Allen."  She also said, "He will do anything to make you happy."*

*. . . Then AS went home and RS took me back to his place for the second night in a row.*

*. . .So I called RS [the next day] . . . .  I ended up sleeping over in Bethesda for the third night in a row.  He wants us to get tested together so we can stop using condoms. . .*

*So I don't know if it's getting serious or what. We're seeing each other every day now. I like him very much and he likes me. But can it go anywhere, i.e. marriage? I don't know. He's Jewish, I'm not. And we have nasty sex like animals, not man and wife. But we work together, so there is an incentive to stay together and avoid an awkward breakup. And after a few months, people around the office will start "hearing wedding bells."  I really just want to be a Jewish housewife with a big rock on my finger.*

*. . .  Oh, I forgot: I learned that RS has a twin! (Unf, nobody finds this as fascinating as I do.)*

*. . . So Rob and I went upstairs and got ready for bed.. . . Then we fucked missionary. And he came. With a condom on. Then he was like, "Who the hell comes missionary anymore?!"*

---

At the same time that Cutler was posting her public blog, she was also writing on her Senate computer a journal on how to exploit men for financial and materialistic gain.  She did not post this on the Internet.  Complaint ¶ 14.

Cutler hyperlinked her public blog to another public blog called the "Wonkette," by Anna Marie Cox.  On May 18, 2004, Cox hyperlinked back to the Defendant's public blog.  Complaint

¶¶ 16-17; Defendant's Brief at 9.[3]  That is, Cox did <u>not</u> copy or repeat Cutler's public blog into

her own blog, Cox merely hyperlinked to Cutler's own public blog.

Cutler immediately contacted Cox and <u>identified</u> <u>herself</u> for Cox's blog as the source of

the Washingtonienne public blog.  Only after Cutler's identified herself did Cox publish Cutler's

identity – giving her the notoriety she was seeking.  Cutler went out on a late-night drinking

spree with Cox, posed for suggestive photos with Cox that Cox put on -- and later removed from

-- her own website, and spent the night at Cox's house in Arlington, VA.  Complaint ¶¶ 20-21.

As a result of Defendant's actions, her public blog became notorious throughout

Washington, D.C. and the nation.  Complaint ¶¶ 17-18.  The contents of Cutler's public blog,

and the identification of Plaintiff by his full name, was repeated through other Internet sites,

numerous newspapers and tabloid publications published in the United States and abroad, and

various broadcast and cable television media, including *The Washington Post*, *The New York*

*Times*, CNN, Fox News, *The Scotsman*, *The Guardian*, *The India Times*, *The New York Post*,

---

[3]    This was Wonkette's only original reference in her own blog to Cutler's public blog:

*"We realize that some of you who* **follow this link** *[bold added] will never come back: Compared to our humble blog,* <u>*Washingtonienne*</u> *[hyperlink] has half the politics and twice the ass-fucking. And she apparently gets paid for it. The ass-fucking, we mean. (Wish we'd thought of that.) But how could we not introduce you to her? She's like a Hill-based Belle de Jour and is full of, uhm, good advice, like, "A man who tries to fuck you in the ass when you are sober does not love you." (Good thing we're rarely sober!) She gives the serious inside scoop, too:*

> *Most of my living expenses are thankfully subsidized by a few generous older gentlemen. I'm sure I am not the only one who makes money on the side this way: how can anybody live on $25K/year??"*

http://www.wonkette.com/archives/a-girl-after-our-own-heart-shes-so-getting-a-book-deal-out-of-this-004148.php

Indeed, most of Cox's Wonkette blog follows this format – *i.e.*, comprised of hyperlinks and Cox's, well, "clever" introductory comments.

And the very same day, Cox referred to Cutler's public blog as just that:  "Here she [Cutler] was, just keeping a <u>public blog</u>."

http://www.wonkette.com/archives/where-is-washingtonienne-004154.php (emphasis added).

*The National Enquirer*, and *The Star*. Complaint ¶ 19.  Plaintiff was contacted directly by, among many others, the *National Enquirer, the Hill* and the *Washington Post*.

 Cox hired Cutler to write for her website; Cutler and Cox went on television together; Cutler and Cox discussed posing jointly for *Playboy Magazine.*  Complaint ¶¶ 20-21.  Cutler sought widespread public attention and publicity for herself; she further disseminated the contents of the public blog through the channels of mass media; she granted numerous interviews, capitalizing on her newfound fame and attention, and Cutler, herself, <u>republished the entire public blog on June 2, 2004</u>, in an article she wrote for the Guardian Newspaper (online version). http://www.guardian.co.uk/usa/story/0,12271,1229806,00.html

 Cutler, but not Cox, posed for a nude photo spread in *Playboy Magazine*, capitalizing on the publicity generated by her public blog and her relationship with Plaintiff.  Complaint ¶¶ 25-26.  Cutler signed a book deal, receiving a $300,000 advance, with Hyperion-Disney Press, to write, as described by the publisher, "a thinly disguised novel," in which the contents of her public blog, including her relationship with Plaintiff, are described in graphic detail.  According to Hyperion-Disney, Cutler writes an "utterly unrepentant roman a clef exposing the scandalous truth. . . .  Now, in *The Washingtonienne*, Cutler's real-life experiences in the capital become fodder for a sexy, <u>semi-autobiographical novel that is sure to initiate a new Washington parlor game of *Who's Who*</u>.  In a witty, <u>unapologetic</u> voice, the novel's narrator Jackie <u>tells the story of . . . the staff counsel whose taste for spanking she 'accidentally' leaks to the office</u>."[4]  Hyperion-Disney Advertisement for Cutler's book (reproduced on numerous sites including Amazon.com).  Cutler commented in the press that she feels sorry for those people that write blogs for years and never obtain a book deal.  Complaint ¶¶ 27-28.

---

[4] Individuals "own the right to exploit their names and likenesses for commercial gain."  *Michaels v. IEG*, 5 F. Supp. 2d 823, 836 (C.D. Ca. 1998).  Here, Defendant has misappropriated Plaintiff's likeness for her own commercial gain.

Finally, Cutler lied about Plaintiff and scandalized private and personal facts to attract more attention, placing Plaintiff in a false light to all who read Cutler's public blog.  Cutler falsely claimed , *inter alia*, that Plaintiff:

1. liked to "do freaky shit" with Cutler,

2. "fucked [Cutler] every which way,"

3. "likes talking dirty [to Cutler]"

4. is "crazy,"

5. "implied that [Plaintiff and Cutler] would be using [handcuffs] next time,"

6. would be "turned on" by Cutler getting "scared and panicky,"

7. and "[Cutler] have nasty sex like animals," and

8. "told [Cutler] that he likes submissive women."

Complaint ¶ 31 & Appendix A.

These disclosures were not made for the dissemination of news or material published in the public interest.  These disclosures were a cruel and malicious exposure of the most intimate details of Plaintiff's life.  Complaint ¶¶ 31-32.  Plaintiff suffered severe emotional distress, humiliation, embarrassment, and anguish. Complaint ¶¶ 33-34.

## DISCUSSION

I.    <u>Standards for Motion to Dismiss</u>

To survive . . . a [12(b)(6)] motion, the complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established . . . to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." . . . [T]he . . . court must draw all reasonable inferences in favor of the plaintiff, and must not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief.

*Barnes v. District of Columbia*, 2005 U.S. Dist. LEXIS 10435 at *3-*4 (D.D.C. July 18, 2005)

(citations omitted) (brackets in original); *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*,

59 F. Supp. 2d 27, 30-31 (D.D.C. 1999) ("Dismissal is appropriate 'only if "it is clear that no

relief can be granted under any set of facts that could be proven consistent with the

allegations."'")

Motions to dismiss under Rule 12(b)(6) are guided by Rule 8(a), which merely requires

"a short and plain statement of the claim showing that the pleader is entitled to relief." *Schlagel*

*v. Learning Tree Int'l*, 1998 U.S. Dist. LEXIS 20306, at *5 (C.D. Cal. Dec. 23, 1998); 5A

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990). Pursuant

thereto, the motion must be denied if any legal theory supporting the complaint could be

successful. *Id* at *5-6 (citing *Haddock v. Board of Dental Examiners*, 777 F 2d. 462, 464 (9th

Cir. 1985). Questions of proof, not pleading, and are simply not the province of 12(b)(6)

challenges. *See, e.g., Jiricko v. Moser and Marsalek, P.C.*, 184 F.R.D. 611, 614 (E.D. Mo. 1999)

(citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

## II.    Defendant Fails to Apply the Standard for a Motion to Dismiss by Contesting the Truthfulness of the Complaint and by Attempting to Introduce Material from Outside the Complaint

Defendant fails to apply the proper standard for a motion to dismiss. A defendant is

required to rely on the facts contained in the Complaint and accept them as true. Instead,

Defendant here asserts "facts" wholly outside the Complaint and contends that they should be

accepted as dispositive.[5] The source of Defendant's "factual" assertions are three-fold – and

none of them constitute the only available source of facts for a motions to dismiss, *i.e.*, the

Complaint:

First, in an action that itself demonstrates that a motion to dismiss is inapposite,

---

[5]    Absolutely no discovery has taken place in this case yet.

Defendant attached an affidavit to her motion to dismiss. Defendant's Exhibit 1.

Second, Defendant relies on her public blog that is a subject of this case for the truth of the matters asserted therein. Of course, attaching Defendant's public blog as an exhibit to the Complaint does not transform the statements contained therein into undisputed facts. As the Complaint makes perfectly clear, many of the statements contained in Defendant's public blog are false and give rise to a cause of action for false light. Complaint ¶ 31; *Gill v. Curtis Pub. Co.*, 239 P.2d 630, 635-36 (CA 1952) ("[t]he published article and likeness are attached to the complaint [and set forth claims for invasion-of-privacy based on the false assertions therein]). Otherwise, by Defendant's logic, a complaint for false light that appropriately attached the false comments would be instantly self-defeating – as the alleged tortfeasor would simply assert that statements were now true by virtue of their attachment.

Third, Defendant relies on the anonymous hearsay statements found on a random Internet site from "a man identified only as 'Kevin at Wizbang.'" Defendant's Brief at 5. Indeed, Defendant does not even attach a printout of this alleged web-site – perhaps recognizing that each time she brings attention to the fact that she is relying on material outside the Complaint, it confirms the inapplicability of a motion to dismiss.

The assertions that Defendant relies upon from her affidavit, her public blog, and the statements from the unidentified "Kevin at Wizbang" are simply not in the Complaint, and the evidence at trial will show them all to be false or immaterial. Defendant's reliance on the above-stated material defeats her Motion to Dismiss.

III. **Defendant Tortiously Invaded Plaintiff's Privacy**

Cutler's action constituted an invasion of Plaintiff's privacy. "Invasion of privacy is not one tort, but a complex of four, each with distinct elements and each describing a separate interest capable of being invaded. The four constituent torts are (1) intrusion upon one's solitude

or seclusion; (2) public disclosure of private facts; (3) publicity that places one in a false light in the public eye; and (4) appropriating one's name or likeness for another's benefit." *Wolf v. Regardie*, 553 A.2d 1213, 1216-17 (D.C. 1989). "[I]t is 'possible and not infrequent' for a particular act to constitute more than one of the four types of privacy torts." *McSurely v. McClellan*, 753 F. 2d 88, 113 (D.C. Cir. 1985) (citing *Restatement (Second) of Torts* § 652A). Defendant has disclosed private facts of Plaintiff and placed him in a false light.[6]

### A.    Defendant Publicly Disclosed Plaintiff's Private Facts

One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter published is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public. The tort is generally considered as having five constituent elements: (1) publicity, (2) absent any waiver or privilege, (3) given to private facts (4) in which the public has no legitimate concern (5) and which would be highly offensive to a reasonable person of ordinary sensibilities.

*Wolf v. Regardie*, 553 A.2d 1213, 1220 (D.C. 1989).

Cutler caused widespread publication of private intimate facts concerning Plaintiff in a manner that would be deemed outrageous and highly offensive to an ordinary reasonable person of average sensibilities, subjecting Plaintiff to severe emotional distress, humiliation, embarrassment, and anguish; the private facts revealed include the number of times Plaintiff ejaculated, his difficulty in maintaining an erection while wearing a particular condom, spanking and hair pulling during sexual activity with Cutler (conveniently leaving out Cutler's request of both), Plaintiff's intimate personal conversations with Cutler during sexual activity and the course of their relationship, physical descriptions of Plaintiff's naked body, the physical details of the sexual positions Plaintiff assumed during sexual activity, Plaintiff's suggestion that he and

---

[6]    Defendant's attempts to disingenuously limit Plaintiff's claims are unavailing. Plaintiff's claims are not only clear, but even if they were not, they would satisfy the pleading requirements of the Federal Rules of Civil Procedure. *Perkins v. School Bd. of Pinellas County*, 152 F.R.D. 227, 229 (M.D. Fla. 1993); *see Gilbert v. Medical Economics Co.,* 665 F.2d 305, 310 (10th Cir. 1981).

Cutler be tested for sexually transmitted diseases so that they would not have to make use of a

condom, and statements made by Plaintiff regarding sexual positions.  Complaint ¶¶ 30-31.[7]

Defendant's actions constitute an improper public disclosure of private facts.  *See*, *e.g.*, *McSurely*

*v. McClellan*, 753 F. 2d 88, 112 (D.C. Cir. 1985) (disclosure of intimate, sexual facts constitutes

invasion of privacy); *Michaels v. Internet Entertainment Group, Inc.*, 5 F. Supp. 2d 823, 840

(C.D. Cal 1998) (disclosure of private facts in explicit internet video satisfies elements of tort).

### B.     <u>Defendant Placed Plaintiff in a False Light</u>

> To prevail on a false light claim . . . [a party] must show that (a) the published material places appellant in a false light which "would be highly offensive to a reasonable person," and (b) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

*Weyrich v. New Republic, Inc.,* 235 F.3d 617, 628 (D.C. Cir. 2001).

Cutler published material that places Plaintiff in a false light that would be highly

offensive to a reasonable person, and Cutler knew or acted recklessly as to the falsity of the

material and how it placed Plaintiff in a false light.  Cutler falsely claimed , *inter alia*, that

Plaintiff:

1. liked to "do freaky shit" with Cutler,

2. "fucked [Cutler] every which way,"

3. "likes talking dirty [to Cutler]"

4. is "crazy,"

---

[7]     Defendant argues that because Plaintiff and Defendant were not married, Plaintiff had no reasonable expectation of privacy in his relationship with Defendant.  Defendant is mistaken.  Unmarried individuals have a right to privacy.  "If the right of privacy means anything, it is the right of the *individual,* <u>married or single</u>, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person . . . ."  *Lawrence v. Texas*, 539 U.S. 558, 565 (2003) (citing *Eisenstadt v. Baird,* 405 U.S. 438, 453 (1972)) (italics in original, underline added).  Moreover, in the public blog itself, Cutler speaks in depth about marrying Plaintiff.  Cutler's public blog says: "[C]an it go anywhere, i.e.[,] marriage?  I don't know.  He's Jewish. . . .  After a few months, people around the office will start 'hearing wedding bells.'  I really just want to be a Jewish housewife with a big rock on my finger."  Complaint ¶ 13.

5. "implied that [Plaintiff and Cutler] would be using [handcuffs] next time,"

6. would be "turned on" by Cutler getting "scared and panicky,"

7. and "[Cutler] have nasty sex like animals," and

8. "told [Cutler] that he likes submissive women."

Complaint ¶ 31 & Appendix A.

These assertions constitue false light. *Gill v. Curtis Pub. Co.*, 239 P.2d 630, 634-36 (CA 1952) (depiction of "persons engaged in the so-called 'wrong kind of love'" constitutes false light); *cf. Geisler v. Petrocelli*, 616 F.2d 636, 637-39 (2d Cir. 1980) (valid claim for false depiction of "untoward sexual conduct which is graphically portrayed [in allegedly fictional book]").

Cutler intentionally distorted and sensationalized Plaintiff's statements and activities. Notwithstanding Cutler's comments to the contrary, Plaintiff didn't do "freaky shit [to Cutler]," Plaintiff and Cutler didn't have sex "every which way," Plaintiff didn't "like to talk dirty [to Cutler]," Plaintiff isn't "crazy," Plaintiff never "implied that [Plaintiff and Cutler] would be using [handcuffs] next time," Plaintiff wouldn't be "turned on" by Cutler getting "scared and panicky," Plaintiff and Cutler didn't "have nasty sex like animals," and Plaintiff never "told [Cutler] that he likes submissive women."  Compliant ¶ 31.

When the public blog is "read as a whole and in context," Defendant's Brief at 26, Cutler's characterizions about Plaintiff's sexual activities with her, including calling them "freaky," gave the false and offensive impression that the Plaintiff demonstrated highly unusual sexual behavior with Cutler.  In fact, Plaintiff's sexual activities with Cutler were rather conventional, particularly when compared to what Cutler was doing with her other sex partners. Cutler furthered the false and offensive impression of Plaintiff in her book, Complaint ¶ 31, falsely suggesting, *inter alia,* that Plaintiff  was an alcoholic. *See Smith v. Huntington*

*Publishing Co.*, 410 F. Supp. 1270, 1273-74 (D. Ohio 1975) ("The test is neither the intent of the author, nor the recognition by the plaintiff that the article might be about him.  The test is whether a reasonable person could reasonably believe that the article referred to the plaintiff. . . . Viewed as an invasion of privacy case, the identification v. fictional problem is the same."); *Cf. Geisler v. Petrocelli*, 616 F.2d 636, 637-39 (2d Cir. 1980) (valid claim for false depiction "untoward sexual conduct which is graphically portrayed [in allegedly fictional book]").  All of this clearly constitutes false light.

> **C.    Defendant Publicized Her Public Blog**
>
> > **1.  Defendant Has Admitted That She
> >     Intentionally Publicized Her Public Blog**

Cutler has <u>admitted</u> satisfying the publicity element of the tort of Invasion of Privacy.  In a cover-story interview in the *Washington Post Magazine*, Cutler said:  "I was the one writing on the bathroom wall."  April Witt, *Blog Interrupted,* Washington Post Magazine, Aug. 15, 2004, at W12.  Cutler said: "With a blog, you can't expect your private life to be private anymore."[8]  As Cutler admitted "once Blog entries containing the aforementioned disclosures were posted, there was no guarantee that Cutler could remove them without third parties (even limited to the four people to whom she had given access to the Blog) having read them."  Defendant's Brief at 37.[9]

Publicity was her goal.  Cutler said:  "Some people with blogs are never going to get famous, and they've been doing it for, like, over a year. I feel bad for them."  *Id.*  According to

---

[8]    http://www.playboy.com/sex/features/dc_intern/dcintern_pop.html

[9]    Cutler again admits publicity:  "the Blog was not publicized (within the meaning of the caselaw defining the publicity element of the tort) <u>until</u> . . . May 18, 2004."[9]  Defendant's Brief at 21 (emphasis added).  Cutler suggests that another blogger publicized Cutler's blog.  However, as Cutler admits, May 18, 2004 is the date that another blogger hyperlinked to Cutler's public blog:  "links to [Cutler's publicly available] Blog . . . were displayed on [Cox's] popular Washington, D.C.-centered gossip site."  Defendant's Brief at 9.  Cutler tries to confuse the issues by implying that Cox reproduced Cutler's statements;  she did not.  Cox merely hyperlinked to Cutler's own public blog.  Cutler's argument is akin to arguing "I publicized the material on the radio or television, but I'm not responsible because somebody else advertised the program."  This is unavailing.

13

Cutler: "Everyone should have a blog. It's the most democratic thing ever." *Id.*

## 2. **Defendant Publicized Her Blog by Placing it on the Internet**

Placing something on the Internet, without any limitations in access such as password, constitutes widespread publicity. The Internet is undoubtedly and indisputably a powerful medium for the widespread distribution of information. If placing data on the Internet doesn't constitute publicity, what does? This Court has ruled that the entire world has access to Internet cites, including Cutler's public blog, by virtue of it being published on the Internet. *Blumenthal v. Drudge*, 992 F. Supp. 44, 48 (D.D.C. 1998) ("The web is designed to be inherently accessible from every Internet site in the world."). This Court held: "Never before has it been so easy to circulate speech among so many people. . . . [O]nce the word is written, it is disseminated to a mass audience literally with the touch of a button." *Id.* at 48  n.7 (emphasis added). The facts of this case bear out the power of the Internet. In an instant, a blog can catch the interest of millions of readers. This is precisely what happened to Cutler's blog. Any other rule, especially one that attempts to guess as to the number of people who actually read something on the Internet is simply unworkable.

In an attempt to suggest that her actions don't satisfy the publicity element of the tort, Defendant for the first time, with material from outside the Complaint, asserts that she could not find the settings to password protect her public blog. Cutler is stymied by the facts; Cutler told the *Washington Post*, "I thought that was, like, too much trouble for my friends to have to type in a password." April Witt, *Blog Interrupted,* Washington Post Magazine, Aug. 15, 2004, at W12.

3.  **Defendant's False Claim That She "Only"
Shared the Existence of Her Public Blog
with Several People, Even had it been True,
<u>Does Not Alter the Publicity of Her Public Blog</u>**

Defendant claims that to her "knowledge, information, and belief, [sic] only these four

people had access to the Blog before May 18, 2004."  Defendant's Brief at 9.

Notwithstanding that this is a factual matter that cannot be decided on a motion to dismiss,

Defendant <u>admits</u> that she does not know how many people were reading her public blog

when she concedes that "apparently" one of them contacted Cox.  Defendant's Brief at 22.

Cutler isn't saying for sure that this is true.  She could have easily asked her friends.  Instead,

she says "apparently."  Indeed, Cutler does not and cannot dispute that Cox could have read

Cutler's public blog by finding it on the web herself, or having yet another third-party who

found it, mention it to Cox.  Discovery of Ana Marie Cox will undoubtedly shed some light

on this factual question.

Moreover, the claim that "only these four people [may have] had access to the Blog" is

silly.  It was available to the world.  If one broadcasts something on TV, but only 3 people

tune in, it's still publicity.  One doesn't look to the Neilsons or take a poll about how many

people might have watched a show.  Publicity doesn't hinge upon how many readers or

listeners or watchers actually hear the message but upon the degree of the exposure.  Thus, *in

all cases*, courts have never required people whose information was broadcast on television,

radio, or on a sign outside a store to bring in a parade of people to testify that they actually

saw or heard it.  Instead, it is assumed that if the defendant uses a medium that is capable of

widespread dissemination, publicity is satisfied.

That four or more people may have been explicitly informed about Cutler's public blog

by Cutler, herself, or her friends, does not mean that only these people were reading it.  In fact,

this proved to be false, countless people, including Plaintiff, read Cutler's <u>actual</u> public blog –

<u>not a copy or excerpts on another site</u>.  Cutler chose not to limit access to her blog.  Futhermore,

Cutler readily admits that she did not even know, and never had any contact with, at least one of

the readers of the public blog.  Defendant's Brief at 8.  She never sought or received any

assurances that this individual would keep the contents of her public blog confidential.  This

alone waives any claim that Cutler attempted to, or did, keep confidential her readily-accessible

blog.  If Defendant believed or treated the blog as private, why would she allow a perfect

stranger to read it?

     Moreover, if, as Defendant contends, she just wanted to get the information <u>only</u> to three

friends, why not just create an email list?  Why create a blog -- and why expressly let others to

read it?  Indeed, Cutler <u>admits</u> that she sent out a "mass email" investigating whether there

would be an audience for her public blog.  Cutler told the *Washington Post* "So I sent a mass e-

mail out: 'You guys, should I have my own blog or what?'".  April Witt, *Blog Interrupted,*

Washington Post Magazine, Aug. 15, 2004, at W12.  The answer was "yes."  Cutler could have

continued communicating by "mass e-mail."  She chose, consciously, to use a public blog

instead.  And, if only intended for friends, why give the public blog a catchy title and tagline

(which was reused for the book).[10]  As Cutler said:  "I was the one writing on the bathroom wall.

. . .  Some people with blogs are never going to get famous, and they've been doing it for, like,

over a year. I feel bad for them."  April Witt, *Blog Interrupted,* Washington Post Magazine, Aug.

---

[10]     Cutler again admits publicity in her brief:  "the Blog was not publicized (within the meaning of the caselaw defining the publicity element of the tort) <u>until</u> . . . May 18, 2004."[10]  Defendant's Brief at 21 (emphasis added).  As Cutler admits, this is the date that another blogger told her readers about the existence of Cutler's public blog:  "links to [Cutler's public] Blog . . . were displayed on [Cox's] popular Washington, D.C.-centered gossip site."  Defendant's Brief at 9.  Cutler's defense seems to be that she didn't give permission to Cox (for whom Cutler later worked) to advertise Cutler's public blog, which Cox found on the internet herself, through another random reader, or through the assistance of one of the people that Cutler herself controlled.  *Id.*  Cutler's argument is akin to arguing "I publicized the material on the radio, but I'm not responsible because somebody else told potential listeners to listen to the program."  This is unavailing.

15, 2004, at W12.[11]  Cutler herself explicitly said:  "With a blog, you can't expect your private

life to be private anymore."[12]

Indeed, Courts have held that disclosures even more limited than what Defendant,

herself, admits she made, satisfied the publicity element of the tort:

> [A] single communication to a single person [can] . . . constitute publicity. . . . [W]e agree
> with the trial court that the character and nature of the one person to whom the offending
> information was communicated . . . was a matter that had to be probed at a full trial. [The
> Court needed to determine whether the person to whom the Defendant disclosed
> Plaintiff's private facts] was "the biggest gossip in Muskego and West Allis Hospital" or
> whether "she had the stiffest upper lip of anyone in the state."

*Pachowitz v. LeDoux*, 666 N.W.2d 88, 96-97 (WI Ct. App. 2003); *McSurely v. McClellan*, 753 F.

2d 88, 112 (D.C. Cir. 1985) ("'publication of the embarrassing facts to only one person alone

was unlawful publication.'. . the size of the "public" was not relevant to whether a disclosure of

embarrassing facts was tortious") (citations omitted).[13]  And, even under Defendant's set of facts,

she asserts that one of her four recipients was a gossip who relayed the private information to

Cox, who linked to Cutler's public blog.  Defendant's Brief at 22.  This, of course, is a factual

issue that requires, *inter alai*, discovery of the four people.[14]

Cutler is trapped by her own "facts."  Either (1) Cutler notified the Cox of the existence

---

[11]    Cutler's farfetched analogy to a fictional non-commercially available frequency that somehow required
some fanciful special tuner to pick up, which, at the relevant time, only four people possessed, is misplaced.
Anybody with a computer could have "picked up" her blog.  There was no limitation to accessing Cutler's blog,
whatsoever.  She could have made it unavailable, but chose not to.  Indeed, the analogy is so strained that it's
unclear what special equipment her friends, her friend's unknown acquaintance, Cox, Plaintiff, and anybody else
who read the public blog, needed to "pick it up."   The appropriate analogy is that Cutler broadcast on an ordinary
radio station.  She thinks that because she only told a few friends of her radio broadcast that only they will be
listening and everybody else – all of others with access – won't be tuning in.  We know that did not happen.

[12]    http://www.playboy.com/sex/features/dc_intern/dcintern_pop.html

[13]    "We discern no substantial disparity in the premises underlying privacy tort law in the two jurisdictions
[of the District of Columbia and Kentucky]."  *McSurely v. McClellan*, 753 F. 2d 88, 110 (D.C. Cir. 1985).

[14]    Cutler's assertion that Miss Robertson is the author of a blog called "Clueless" who communicates directly
with Cutler in her publicly available bog is again outside the scope of the Complaint.  The Complaint asserts that Cutler
was communicating with other unknown bloggers on the Internet.  Complaint ¶ 10.

of her public blog, or (2) one of the people that she claims she controlled[15] notified Cox of the public blog, or (3) people other than those that Cutler knew about were already reading the public blog.  Under any of the alternatives, Cutler is responsible for the publication of her own public blog.

Defendant's "third-party" cases are inapposite.  In those cases, Defendants told a third party, and the third party repeated the private facts.  Here, Cutler put the private information <u>on the Internet</u>.  Cutler didn't tell one person – she told <u>everyone</u> and <u>anyone</u> who cared to read Cutler's public blog.  Cutler admits that she doesn't know who was reading her public blog.  Cutler's tortured claim is that although some unknown number of people were reading her public blog (<u>including Cox</u>), more people read <u>the same actual public blog</u> (not a copy on another site) after Cox mentioned the existence of Cutler's public blog.  That's simply irrelevant.  Cox did not repeat the private facts that Cutler placed on her public blog.  Cox hyperlinked to Cutler's public blog.  In essence, Cox said "look over there, see what private facts Cutler is actively disclosing."  Now that more people "looked over there" to Cutler's public blog, Cutler blames her former employer Cox.[16]  Her attempts are unpersuasive.  No court has ever held that placing data on the Internet is akin to hallway gossip.  There is a big difference between whispering a secret to a friend versus putting it on the Internet for the world to see.

**4.    <u>Cutler Herself Actually Sent Her Public Blog to Cox</u>**

Cutler tries to blame her friend and former employer for hyperlinking to her public blog

---

[15]    Cutler claims that her friend sought explicit permission from Cutler before alerting others to the public blog.

[16]    Defendant now claims that it was "Cox who first telephoned Cutler after somehow securing Cutler's unlisted cellular telephone number.  Cutler first spoke to Cox only upon her return of Cox's earlier call."  Indeed, it is obviously a question of fact as to how Cox got Cutler's "unlisted" number -- on a phone not even owned by Cutler, but, rather, by one of her other sex partners.  Moreover, even if Cutler's assertion is true, Cutler's return of an unanswered call not only demonstrates that she sought out Cox, but also shows that she was pursuing publicity.

and somehow suggests that this avoids liability for her.  As discussed above, this premise is false.  Moreover, Cutler herself notified Cox of her public blog.

Cutler admits that she "had twice referred to [the Wonkette blog site] in [her Washingtonienne]" blog.  Defendant's Brief at 9 (brackets in original).  The reference in Cutler's publicly-available blog was a hyperlink to the Wonkette.  This means that any reader of Cutler's publicly-available blog who clicked his/her cursor on this hyperlink in Cutler's blog would be immediately redirected to the Wonkette blog.  *Blumenthal v. Drudge*, 992 F. Supp. 44, 47 (D.D.C, 1998) n.2 ("Through a 'hyperlink,' a browser may connect to another web site by clicking on the specially highlighted text or images on the initial web site. After clicking on the highlighted text, the browser is then directly taken to that particular web site.").  Moreover, once the reader of Cutler's blog linked to the Wonkette through Cutler's public blog, Cox <u>was notified as to the identity and location of Cutler's blog through her "sitemeter" feature.</u>  *See* http://www.sitemeter.com/default.asp?action=stats&site=sm1wonkette (providing a log of the blogs that link to Wonkette).  These are the facts, and they will readily be proven at trial.

Indeed, there are myriad websites that describe the way a blogger can draw more attention to her blog.  With near unanimity, they say that the blogger should seek "reciprocal linking" – where the blogger and another blogger or website link to each other; and, "it's courtesy to add their link to your site first."  *See* http://www.firstwebbuilder.co.uk/getlinks.html.  That is exactly what Cutler admits to doing.  Cutler's admission of hyperlinking to Wonkette is alone an admission that she notified Wonkette as to the existence of her public blog, notwithstanding Cutler's other communications with Cox/Wonkette.[17]

---

[17]    Defendant misstates the clear language of the Complaint when she asserts that Plaintiff "further tacitly admits that Wonkette was not alerted to the existence of the Blog by Cutler."  Paragraph 20 of the Complaint, clearly says that Cutler contacted the Wonkette to identify herself as the author of the blog.  Moreover, if she wanted to keep the blog confidential, why would Cutler provide her identity?  Her name, unlike Plaintiff's, was not public until she, herself, made it public through the very blog (Wonkette) that she claims "coincidentally"

### D.    <u>Defendant Has No Claim to "Waiver"</u>

Cutler appears to be claiming that <u>her</u> own improper prior oral disclosure regarding "spanking" somehow prejudices and estoppes Plaintiff from asserting his privacy rights regarding that improper disclosure <u>and</u> all other private facts about him.  And, Cutler seems assert that had Plaintiff not inquired into Cutler's background, which he did, she would have been free to tortiously invade his privacy.  Such a legal "claims" are unprecedented.[18]  Cutler is wrong on the facts and the law.

### 1.    <u>Plaintiff Never Approved of Defendant's Improper Disclosures</u>

Defendant has no basis in the Complaint or elsewhere for her false claim that Plaintiff knew about and retroactively consented to Cutler's disclosure of private facts about him. Plaintiff never condoned or ratified Cutler's spreading the spanking rumor.  At trial, the evidence will show that Plaintiff asked Defendant about a rumor that he heard that Defendant told someone in the office that Plaintiff and she "had spanked each other."  Defendant responded by: claiming that she told only <u>one</u> person in confidence; claiming that that person must have (contrary to Defendant's instructions) disclosed it to others;[19] claiming that she was extremely sorry; and, promising it would <u>never</u> happen again.  Plaintiff clearly stated that he was upset and counseled Cutler that rumors spread easily, so she should be particularly careful in what she says and should exercise better discretion in the future.  Defendant readily agreed and again apologized.  The facts indicate that Plaintiff clearly communicated to the Defendant that he wanted the intimate details of their relationship to remain private.  Defendant in her own public

---

advertised the existence of her public blog.

[18]    Such overreaching by Defendant's counsel is unsurprising in light of his previous claim that he will use a "scorched earth" approach to this litigation and suggestion that he will make this litigation very uncomfortable for U.S. Senator Mike DeWine during his reelection.

[19]    Defendant conveniently uses the very same argument here to describe how the Wonkette found out about Cutler's blog.

blog even acknowledges as being on notice that Plaintiff is "discreet" and that she should "keep [his private facts] quiet."[20]  Indeed, when Defendant announced that she was writing a book, Plaintiff requested not to be in her book.  Notwithstanding that, Cutler made Plaintiff the centerpiece of that book.  According to Cutler's publisher (and agent), Cutler writes a "semi-autobiographical novel that is sure to initiate a new Washington parlor game of *Who's Who*.  In a witty, unapologetic voice, the novel's narrator Jackie tells the story of . . . the staff counsel whose taste for spanking she 'accidentally' leaks to the office."  Hyperion/Disney Advertisement for Cutler's book (reproduced on numerous sites including Amazon.com).  Moreover, Cutler continues to ignore Plaintiff's request for privacy, even in the face of litigation, by now selling her book to HBO for broadcast.

### 2.    Even if Defendant's Assertions from Outside the Complaint Were True, Which They're Not, Cutler Cannot Make a Claim for Waiver

Even if Defendant's false claims of Plaintiff somehow retroactively consenting to Cutler's limited disclosures were true and were contained in the Complaint, both of which they are not, they would not act as a waiver of Plaintiff's right to privacy.  "The Court is not prepared to conclude that public exposure of one sexual encounter forever removes a person's privacy interest in all subsequent and previous sexual encounters."  *Michaels v. IEG*, 5 F. Supp 2d at 845*; Times Mirror Co. v. Superior Court*, 244 Cal. Rptr. 556, 561 (Cal. Ct. App. 1988) (plaintiff's right to privacy not diminished by telling "neighbors, friends, family members, and officials" the private facts); *Y.G. v. Jewish Hospital*, 795 S.W.2d 488 (Mo. Ct. App. 1990) (plaintiff's right to privacy not diminished after telling several people); *Multimedia WMAZ, Inc.*

---

[20]    Similarly, Cutler again relies on her own public blog as dispositive and falsely asserts that Plaintiff approved of her inappropriate office disclosure.  Cutler further claims that this somehow would constitute "approval" of all other disclosures about which Plaintiff didn't know.  Indeed, each time Plaintiff and Cutler discussed her inappropriate office disclosure, she apologized.  Why would she apologize if she thought Plaintiff's actions constituted some curious form of after-the-fact consent to her previous actions?

*v. Kubach*, 443 S.E.2d 491 (Ga. 1994) (plaintiff's right to privacy not diminished after telling 60 people).

Defendant cites *Nobles v. Cartwright*, 659 N.E.2d 1064, 1074 n.16 (Ind. Ct. App. 1995) for her novel "waiver" claim, but that case does not deal with waiver at all. The Court there found that the facts disclosed were a matter of public concern. The case simply does not stand for the proposition that Defendant suggests. Interestingly, however, the Court did state:

> [E]ven though a matter is of legitimate public concern, there may be details about a person involved in that matter which are too private to also be considered of legitimate public concern. . . .We are aware the disclosure of sexual and other such intimate information about even the most public of figures is often not considered newsworthy because it usually has nothing to do with that person's public life, and thus may not be considered of any legitimate concern to the public. Likewise, where involuntary public figures are involved, information of a sexual or intimate nature usually is unrelated to the general topic legitimately within the public's interest.

*Id*. at 1077.[21]

Defendant next cites *Sipple v. Chronicle Publishing Co.,* 154 Cal. App. 3d 1040, 1047 (Ct. App. 1984). That case supports Plaintiff, not Defendant. In *Sipple*, plaintiff sued certain publications for publishing that he was gay. Sipple himself, however, never considered this fact as private, as required by the tort. "In fact, [Sipple] quite candidly conceded that he did not make a secret of his being a homosexual and that if anyone would ask, he would frankly admit that he was gay." *Id*. at 1048. Moreover,

---

[21]     Defendant also cites *Reuber v. Food Chemical News, Inc.,* 925 F.2d 703, 719 (4th Cir.) *cert. denied*, 501 U.S. 1212 (1991), for the proposition that the plaintiff waived his right to privacy. That case, too, supports Plaintiff's position here. In *Reuber,* the plaintiff sued the news company that published a reprimand letter about plaintiff that was obtained from an unknown source. The Court held that the news company could not be liable for the disclosure, as the news company was republishing what someone else had already illegally disclosed to it. *Id*. at 718-19. That case parallels this one, but Cutler is on the wrong side of the liability equation. Cutler is the one that made the initial disclosure, not Cox. Cutler is now trying to blame her former friend and employer, Cox, not even for republishing the contents of the blog, but merely for directing readers to Cutler's public blog on the Internet.[21] Defendant's Brief at 9. While Cox may be liable for certain behavior, *Reuber* makes clear that Cutler is responsible for her original disclosure. Of course, if Cutler really believes Cox responsible, she should implead her here.

> The undisputed facts reveal that prior to the publication of the newspaper articles in question appellant's homosexual orientation and participation in gay community activities had been known by hundreds of people in a variety of cities, including New York, Dallas, Houston, San Diego, Los Angeles and San Francisco. Thus, appellant's deposition shows that prior to the assassination attempt appellant spent a lot of time in "Tenderloin" and "Castro," the well-known gay sections of San Francisco; that he frequented gay bars and other homosexual gatherings in both San Francisco and other cities; that he marched in gay parades on several occasions; that he supported the campaign of Mike Caringi for the election of "Emperor"; that he participated in the coronation of the "Emperor" and sat at Caringi's table on that occasion; that his friendship with Harvey Milk, another prominent gay, was well-known and publicized in gay newspapers; and that his homosexual association and name had been reported in gay magazines (such as Data Boy, Pacific Coast Times, Male Express, etc.) several times before the publications in question.

*Id*. at 1047-48.  Plaintiff here did <u>not</u> disclose any facts -- Defendant did.[22]

Thus, even under the facts that Defendant proffers from thin air, had Plaintiff (not the Defendant) disclosed the "spanking," (and done so sufficiently to constitute "publicity") Plaintiff certainly would be able to pursue his valid cause of action for all of the other disclosures in the public blog, which include, among others, comments about ejaculations, erections, physical descriptions of body parts, physical details of sexual positions, use and difficulty with a condom, hair pulling, and intimate personal conversations.  Defendant's attempts to bootstrap all of her other tortious disclosures onto the one that <u>she</u> wrongfully disclosed is simply unavailing.  None of the cases cited by Defendant support the proposition that had Plaintiff, contrary to the facts, actually consented to any disclosure, that he would have somehow waived his right to privacy regarding the many other private facts that Defendant disclosed.  Indeed, the law is exactly the opposite.  *Michaels v. IEG*, 5 F. Supp 2d at 845.

---

[22]      Defendant also cites *Duran v. Detroit News, Inc., et al,* 504 N.W.2d 715, 720 (Mich. Ct. App. 1993) , *appeal denied*, 512 N.W.2d 846 (Mich. 1994) and *Cash v. Smith,* 31 F.3d 1301, 1308 (11th Cir. 2000).  Again, these cases neither support the propositions for which they were cited nor Defendant's position in general.  In *Duran,* the plaintiffs sued for disclosure of where they lived.  *Duran* at 720.  The Court simply held that plaintiffs' address was already a matter of public record.  *Id*.  Here, Plaintiff' private information was in no way a matter of public record.  In *Cash*, "Cash's deposition testimony, however, establishes that she did not treat her diabetes condition as a private matter herself."  *Cash* at 1308.  Plaintiff here always treated his private facts as private, and never disclosed them.

**3.    Plaintiff Inquired into Defendant's
Sexual and Non-Sexual History and Defendant Lied to Plaintiff**

Defendant makes false, post-litigation assertions – again not found in the Complaint --
regarding what Plaintiff knew about Cutler's character, her attitude toward sexual relations, her
relationships with others, and other factors by which he could assess Cutler.[23]  Defendant seems
to be arguing that had Plaintiff not made inquiries of Defendant, Defendant somehow would be
free to commit well-defined torts against Plaintiff.  That's simply not the law, nor is it logical.

At trial, the evidence will demonstrate that Plaintiff and Defendant did, in fact, discuss all
of these topics:  Defendant claimed, among other things, that she was not in a relationship,[24] that
she had never had a one-night stand, that her married parents were supplementing her income
and subsidizing her rent, and that she didn't use drugs.  Plaintiff did not know at the time that
Defendant's statements were lies.  Cutler affirmatively withheld the fact that she was having sex
with five men, using drugs, and living in an apartment rented by, and in the name of, one of the
other men with whom she was having sex.[25]  Even if Defendant's strained "waiver-of-privacy-
rights-through-insufficient-questioning" argument were a valid legal claim, under such a theory,
Defendant's fraud itself could not serve to prejudice Plaintiff.[26]

---

[23]    Defendant's counsel baldly and incorrectly asserts that "For all intensive [*sic*] purposes, Cutler and
[Plaintiff] knew nothing about each other."  Defendant's Brief at 6.

[24]    Indeed, Defendant specifically discussed previous relationships that had ended.  In doing so, Defendant
identified by name some of the people in her public blog.  She went so far as to describe how and when those
relationships ended.  The description of those relationships as ending was fiction.

[25]    *See, e.g.*, Susannah Breslin, *The Washingtonienne: A Novel*, Wired News, June 2, 2005 (In responding
to what she has done with her new found wealth resulting from her lucrative book deal, Cutler says "I guess you
can buy more drugs."); Cutler on-line letter to Ana Marie Cox of the Wonkette ("Even though I'm high right
now as I write this").

[26]    Furthermore, Defendant contends, again without attribution to the Complaint, that she was at one point
intoxicated, creates out of whole cloth further "facts" based thereon, and actually derides Plaintiff for being "stone-
cold" [*sic*] sober.  The evidence at trail will show that Defendant was not intoxicated.  Moreover, this does not bear on
any issue in this case.  Similarly, Defendant also falsely asserts that the colleague that she and Plaintiff met after work
was Defendant's supervisor.  This is a clearly testable assertion, and will be disproved at trial.

Moreover, Defendant was an employee of two United States Senators, one from each party, and a Member of Congress, and Plaintiff reasonably relied upon the fact that Cutler underwent background checks for her Congressional positions.  After all, Plaintiff did not meet Cutler on a street corner – although, perhaps, in retrospect, he could have.  That the various House and Senate Offices in which Cutler worked were unable to discover her lies about graduating college (when she did not), her actual age (which she altered in her applications), her drug use (which she failed to disclose), only demonstrates that time did not expose her proclivity for prevarication.

### E.     Defendant's Disclosure of Plaintiff's Private Facts is Not Protected as "Newsworthy"

Defendant's post-hoc claim of "newsworthiness" of Plaintiff's private facts is belied by the law and her own admissions.

#### 1.     Cutler Has Admitted that Plaintiff's Private Sexual Matters are Not Newsworthy

Cutler has consistently maintained – prior to this litigation, that is -- that she does not believe her the public blog to be newsworthy.  In an interview with the *Washington Post*, Cutler said: "' If I were sleeping with a congressman, maybe [the public blog would be interesting], but I'm a nobody and the people I'm writing about are nobodies.'"  Richard Leiby, *Reliable Source*, Washington Post, May 23, 2004.  And, Cutler said on Cox's "Wonkette" blog:  "I just think it's so silly. <u>The blog is really about a bunch of nobodies fucking each other</u>. I still can't believe people care. I mean, I thought it was pretty typical. Most people I know, that's a typical week." Wonkette blog found at http://www.wonkette.com/archives/washingtonienne-speaks-wonkette-exclusive-must-credit-wonkette-the-washingtonienne-interview-009693.php  Cutler told *Playboy*:  "I wasn't doing anything that extraordinary . . . .  None of these people [identified in the public blog] were elected officials, so they don't deserve the scrutiny. . . .  [It's not like I

dated Dick Cheney.  If I had,] I would have tried to cash in on that earlier." *Internal Affairs*,

Playboy (online), September 8, 2004.  If Cutler now claims that her recitation of private facts

"about a bunch of nobodies [having sex]" is newsworthy, then no bureaucrat or employee in

Washington, D.C. – indeed no person anywhere in the Country – would have a right to privacy.

### 2.    It is Hornbook Law that Sensational Prying into Private Sexual Matters is Not Newsworthy

> While . . . the general criteria for determining newsworthiness are (a) the social value of the facts published; (b) the depth of the article's intrusion into ostensibly private affairs; and (c) the extent to which the individual voluntarily acceded to a position of public notoriety, the cases and authorities further explain that the paramount test of newsworthiness is whether the matter is of legitimate public interest which in turn must be determined according to the community mores. . . . *The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake*, with which a reasonable member of the public, with decent standards, would say that he had no concern.'"

*Sipple v. Chronicle Publishing Co.*, 154 Cal. App. 3d 1040, 1048-49 (italics in original,

underline added, citation omitted).[27]

The right to privacy "is not merely balancing the individual's privacy interest against the

public's interest in disclosure. The public, as evidenced by the enactment of [a right to privacy]

has an equally important interest in safeguarding the individual's right to keep private aspects of

his life private. . . .  Privacy in [certain] matters is not only essential to the welfare of the

individual, but also to the well-being of society." *Bonome v. Kaysen*, 17 Mass. L. Rep. 695, No.

03-2767, 2004 Mass. Super. LEXIS 172 (Super. Ct. 2004) at *9-*10 (emphasis added).

It is hornbook law that "[s]exual relations . . . are normally entirely private matters . . . .

[Even regarding a] public figure, . . . intimate details of . . . sexual relations are entitled to [be]

ke[pt] [private]." *Doe v. Mills*, 212 Mich. App. 73, 82 (Mich. Ct. App. 1995).

---

[27]    Moreover, "[i]f there is room for differing views whether a publication would be newsworthy the question is one to be determined by the jury and not the court." *Times-Mirror Co. v. Superior Court*, 198 Cal. App. 3d 1420, 1428-1429 (Cal. Ct. App. 1988) (court found that witness' name in murder case is not newsworthy).

3.    **Plaintiff's Private Sexual Matters are Not Newsworthy**

In her motion, Defendant doesn't even attempt to describe the "newsworthiness" of:  the number of times Plaintiff ejaculated, his difficulty in maintaining an erection while wearing a particular condom, spanking and hair pulling during sexual activity with Cutler (conveniently leaving out Cutler's request of both), Plaintiff's intimate personal conversations with Cutler during sexual activity and the course of their relationship, physical descriptions of Plaintiff's naked body, the physical details of the sexual positions Plaintiff assumed during sexual activity, Plaintiff's suggestion that he and Cutler be tested for sexually transmitted diseases so that they would not have to make use of a condom, and statements made by Plaintiff regarding sexual positions.  Complaint ¶¶ 30-31.  Here, "the publicity is so offensive as to constitute a morbid and sensational prying into private lives for its own sake, it serves no legitimate public interest and is not deserving of protection.'"  *Michaels v. IEG*, 5 F. Supp. 2d at 840.   In fact, Cutler admitted such, stating that "I wrote an X-rated blog."  April Witt, *Blog Interrupted,* Washington Post Magazine, Aug. 15, 2004, at W12.[28]

---

[28]    In contrast to this case, in *Bonome v. Kaysen*, defendant wrote a book about her:

> seemingly undiagnosable vaginal pain in a series of ruminations about the condition's effects on many aspects of her life, including her overall physical and emotional state, friendships, and her relationship with her boyfriend. It details her intense pain and discomfort and her many fruitless attempts to obtain an accurate medical diagnosis and effective treatment.

> One of the central themes of the book concerns the impact of her chronic pain on the emotional and physical relationship with Kaysen's boyfriend. To that end, the book details, graphically on a few occasions, several sexual encounters between them. It portrays the boyfriend as becoming increasingly frustrated and impatient with Kaysen's condition and her reluctance and/or refusal to engage in physical intimacy. . . . Ultimately, the development of this theme culminates in a scene where the boyfriend is physically forceful in an attempt to engage her in sex. This scene is followed by ruminations about whether the relationship had exceeded the bounds of consensual sexual relations into the realm of coerced non-consensual sex[, wherein Kaysen says:] "For a short time I indulged myself in this idea. He was trying to rape me."

*Id*. at *4-*5 (first bracket in original).  A book about medical illness and possible rape is both newsworthy and wholly dissimilar to the instant case.  Additionally, the defendant in *Bonome* took efforts to limit the plaintiff's exposure.  *Id*. at 20.  Quite the opposite is true here.  Defendant's public blog is not about health, welfare, or crime, and Defendant made virtually every effort to exploit Plaintiff's identity.

4.    **"Newsworthiness" Requires the Statements at
      Issue to Be True; Many of the Statements in
      this Case are False – Precluding any "Newsworthiness" Claim**

It is axiomatic that "newsworthiness" requires the statements at issue to be true.  *Bonome* at *8.  Cutler's claim to newsworthiness is based on the false premise that the public blog is entirely true.  Plaintiff has already pointed out the numerous lies contained therein.  For example, Cutler, *inter alia*, falsely asserted that Plaintiff:  liked to "do freaky shit" with Cutler, "fucked [Cutler] every which way," "likes talking dirty [to Cutler]" is "crazy," "implied that [Plaintiff and Cutler] would be using [handcuffs] next time," would be "turned on" by Cutler getting "scared and panicky," and "[Cutler] ha[d] nasty sex like animals," and "told [Cutler] that he likes submissive women."   Complaint ¶ 31 & Appendix A.  Indeed, Cutler admitted that parts of the blog was are untrue.[29]  These statements cannot be newsworthy, as they are false.  Moreover, discovery needs to be taken to determine whether all of the other characters in her public blog even exist.  And, if so, discovery of each individual referenced by Cutler would be needed to determine whether Cutler's claims about each of them are equally as false.

5.    **Even if Cutler's Ineffable "Newsworthy" Topic Existed,
      It Would Not Permit the Disclosure of Plaintiff's
      Private Facts Here Because Those Facts Cannot Be
      Logically and Proportionally Related To Any Newsworthy Topic**

"[T]he privilege to disclose private information is limited by the requirement that the disclosure bear the necessary nexus (both logical and proportional) to the issue of legitimate public concern."  *Bonome* at *20.  In the instant case, there was no newsworthy topic.  Assuming, contrary to fact, there were a newsworthy matter, Cutler cannot describe how the number of times Plaintiff ejaculated, his difficulty in maintaining an erection while wearing a particular condom, spanking and hair pulling during sexual activity with Cutler (conveniently

---

[29]        http://www.eyeonbooks.com/ibp.php?ISBN=1401302009

leaving out Cutler's request of both), Plaintiff's intimate personal conversations with Cutler during sexual activity and the course of their relationship, physical descriptions of Plaintiff's naked body, the physical details of the sexual positions Plaintiff assumed during sexual activity, Plaintiff's suggestion that he and Cutler be tested for sexually transmitted diseases so that they would not have to make use of a condom, and statements made by Plaintiff regarding sexual positions bear any necessary nexus to that newsworthy topic.  Complaint ¶¶ 30-31.

Moreover, in speaking of the "proportionality" element of the nexus test, the Court in *Bonome* recognized, "it is of importance that [defendant in that case] did not use [plaintiff's] name in the book. The defendants did not subject [plaintiff] to unnecessary publicity or attention."  *Id*. At *20.  In contrast, Cutler took pains to identify Plaintiff, using his first name (Rob), his initials (RS), his religion (Jewish), his job (Committee Counsel to the Senate Committee on the Judiciary), his specific place of residence (Bethesda, MD), the fact that he has a twin; his appearance; his resemblance to a commonly known individual; and the one specific and identifiable detail of Cutler's intimate relationship with Plaintiff that Cutler apparently had previously disclosed to colleagues and co-workers without Plaintiff's permission or knowledge at the time.  Complaint ¶¶12-13.

Thus, instead of minimizing Plaintiff's exposure, Defendant exploited it.  Indeed, Cutler used Plaintiff's identity to advertise the book she wrote based on the public blog:  According to Cutler's publisher (and agent), Cutler writes a "semi-autobiographical novel that is sure to initiate a new Washington parlor game of *Who's Who*.  In a witty, unapologetic voice, the novel's narrator Jackie tells the story of . . . the staff counsel whose taste for spanking she 'accidentally' leaks to the office."  Hyperion/Disney Advertisement for Cutler's book (reproduced on numerous sites including Amazon.com); Complaint ¶¶ 27-28.

Cutler improperly cites *Peckham v. Boston Herald, Inc.*, 719 N.E.2d 888, 894 (Mass. Ct.

App. 1999).  As an initial matter, *Peckham* itself points out that:

> Decisions of other courts show a lack of agreement as to whether newsworthiness should in a given case be treated as a question of fact for the jury, or a mixed question of fact and law. . . .  It is the role of the court to determine whether a jury question is presented, and here, where the standard is founded on community mores, the question is whether reasonable minds could differ as to how the community would regard the publication at issue.

*Id*. at 288-89 (citations omitted).

Moreover, the Court in *Peckham* relied on the following five factors to determine the newsworthiness of the disclosed facts; <u>none</u> of those factors are present in this case.

(1) The subject disclosure in *Peckham* was made in a news article.  *Id*.  Here the disclosure was made in a public blog that Defendant explicitly claims was not intended for news-like publication.  Cutler claims that the public blog was for her friends to read.  Defendant's Brief at 24.  Defendant cannot have it both ways.  The public blog cannot be intended to be news and not intended to be news at the very same time.

(2) "Peckham himself was noteworthy both as a prominent real estate professional and as a recognized civic leader."  *Id*.  Here, Defendant <u>admits</u> that nobody knew of Plaintiff or Defendant prior to her blog.  Neither were prominent nor leaders.  Cutler said, "I'm a nobody and the people I'm writing about are nobodies.'"  Richard Leiby, *Reliable Source*, Washington Post, May 23, 2004.

(3) *Peckham* dealt with a public judicial proceeding regarding a paternity lawsuit.  *Id*.  Here, there was no public judicial proceeding, no lawsuit and no pregnancy – no less a dispute regarding paternity or anything like it.

(4) In *Peckham,* "the article dealt with a workplace liaison between an employee and her superior, the subsequent disavowal of paternity and layoff of the employee, and the possibility that a mother would be forced to seek public assistance because the putative father refused to give support."  *Id*.  Here, there was no relationship between an employee and her superior, no paternity issues, no layoffs and no issue of public assistance.  Plaintiff and Defendant worked for different organizations.  Plaintiff worked for the Senate Judiciary Committee.  Defendant was on a Senator's personal staff.  Neither was the employee of the other; Plaintiff and Defendant were both exactly at the same level of hierarchy; both were four levels down in their respective chains of command.

Defendant incorrectly cites *Anonsen v. Donahue*, 857 S.W.2d 700 (Tex. App. 1993).  In *Anonsen*, the defendant appeared on a national television show (Donahue) and revealed that her ex-husband had committed incest or rape with her then 11-year-old daughter (the plaintiff) and

that a child was born as a result of the event. In that case, the Court properly held that matters

concerning rape, incest, and murder were matters of public concern. *Id*. at 706. The Court

contrasted that case about serious criminal matters with one of "obvious exploitation of public

curiosity where no legitimate public interest exists." *Id*. One can think of no better description

of the instant case. Here, Defendant fails to even meet the threshold inquiry; there was no matter

of public concern. And, certainly there was no logical "nexus between matters of legitimate

public interest and the disclosures about the plaintiff to merit constitutional protection." *Id*.[30]

---

[30]    Cutler cites *Campbell v. Seabury Press*, 614 F.2d 395 (5th Cir. 1980). *Campbell* is inapposite. In *Campbell*, however, both parties <u>agreed</u> that the book that defendant wrote was newsworthy. *Id*. at 397. Of course, here not only does Plaintiff contest newsworthiness, Cutler herself repeatedly asserts that she was not trying to spread the information as news or otherwise of public interest. Defendant stated that she "did not advertise the Blog . . . anywhere . . . [and told] only four people [about the Blog.]" Defendant's Brief at 24 (brackets in original). Cutler is again trapped by her own admissions.

   Similarly, *Nobles v. Cartwright*, 659 N.E.2d 1064, 1077 (Ind. Ct. App. 1995) is also inapposite. In *Nobles*,

> Crawford's alleged sexual harassment and the manner in which the Bayh administration handled the investigation into the harassment allegations were no doubt matters of legitimate public interest. Also of legitimate public interest is misconduct of public officials. We also recognize that the public has a legitimate interest in sexual harassment in the workplace and those actions which constitute such intolerable behavior.

*Nobles v. Cartwright*, 659 N.E.2d 1064, 1077 (Ind. Ct. App. 1995). Here, there is no newsworthy topic such as an allegation of sexual harassment by public officials or anyone else, for that matter. Moreover, the Court in *Nobles* clearly distinguished facts comparable to the very facts here:

> We are aware the disclosure of sexual and other such intimate information about even the most public of figures is often not considered newsworthy because it usually has nothing to do with that person's public life, and thus may not be considered of any legitimate concern to the public. Likewise, where involuntary public figures are involved, information of a sexual or intimate nature usually is unrelated to the general topic legitimately within the public's interest. This case presents a unique situation, however, because Cartwright has become a person of public interest due to her harassment allegations against Crawford and her subsequent public pronouncements regarding the Bayh administration's handling of the entire situation. The allegations themselves necessarily involved intimate and sexually explicit episodes.

*Id*.

   Finally, Cutler cites *Gilbert v. Medical Economics Co.*, 665 F.2d 305, 308 (10th Cir. 1981) . Again, contrary to the instant case, in that case there was a "concededly newsworthy topic." *Id*. Second, contrary to the instant case, that case dealt with "a publication by the media." *Id*. at 307. Third, the *Gilbert* Court articulated the test that inures to the benefit of Plaintiff here:

> In attempting to strike an acceptable balance between these competing interests, liability may be

IV.     **Defendant Incorrectly Asserts the Statute of Limitations**

Defendant claims that part of her invasion of privacy is time barred. Defendant is mistaken for four independent reasons: (1) the statute of limitations is three years for virtually all of Plaintiff's claims; (2) the public blog cannot be parsed into different parts; (3) the statute of limitations only starts to run when a victim could reasonably discover the harm caused by a tortfeasor; and, (4) even under Defendant's calculations, Plaintiff filed timely.

A.     **The Statute of Limitations Is Three Years for Most Invasion of Privacy Claims**

Maryland and D.C. apply the three-year statute of limitation provided for by statute to most invasion of privacy claims.[31] Only those invasion of privacy claims that mimic defamation claims are limited to a one-year statute of limitations, i.e., false-light claims. *Smith v. Esquire, Inc.,* 494 F. Supp. 967, (D. Md. 1980).

Accordingly, in *Smith*, the Court held that if a plaintiff brings a claim for defamation and false light for the same underlying facts, the statute of limitations for the defamation action shall control both claims, because of their similarity. *Id.* If, however, if there is a distinct invasion of privacy claim, such as for the disclosure of private facts, then there is no such restriction on the

---

imposed for publicizing matters concerning the private life of another "if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." As [the Restatement] points out, not all matters are of legitimate public interest:

> The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake with which a reasonable member of the public, with decent standards, would say that he had no concern.

*Id.* at 308 (citations omitted).
[31]     Although, a choice of law analysis would have to investigate the applicability of Maryland law as the domicile of Plaintiff, the law of Maryland and the District of Columbia are the same on these issues. *Cf. McSurely v. McClellan*, 753 F. 2d 88, 110 (D.C. Cir. 1985) ("We discern no substantial disparity in the premises underlying privacy tort law in the two jurisdictions [of the District of Columbia and Kentucky]").

statute of limitation.[32]  The District of Columbia articulated the same distinction in deciding whether the statute of limitations applicable to any invasion of privacy claim shall be the one-year statute that applies to defamation actions or the general three-year limit.  *See Grunseth v. Marriott Corp.*, 872 F. Supp. 1069, 1074-1075 (D.D.C. 1995) (invasion of privacy only limited to one year because the claim was the same as the one for defamation).

In the instant case, there is no defamation action, and even if there were, Cutler acknowledges that Plaintiff brought an invasion of privacy claim based on the disclosure of private facts – which is clearly independent from any claim of defamation.  Defendant's Brief at 10-11.  Accordingly, Plaintiff's claim for the disclosure of private facts is governed by the three-year statute of limitations.  The false light claim is governed by the one-year statute, and, as discussed below, Plaintiff filed within that period, as well.

### B.    Defendant's Attempt to Parse Her Single Public Blog into Separate Documents Is Unavailing

Cutler's public blog cannot be parsed into pieces.  It is one document, and when accessed on the Internet, the whole document is produced -- as one.  Complaint Exhibit A.  Cutler admits exactly this in her brief; she says, "read as a whole and in context, Cutler's Blog . . . ." Defendant's Brief at 26 (emphasis added); *see also* Defendant's Brief at 33 ("Read in context, Cutler's . . . Blog entry for 9:53 a.m., . . . appears to reflect . . .").  In fact, Plaintiff's colleague who made him aware of the public blog, identified him as the subject based on the entirety of the public blog.  Defendant cannot now claim that the document that she herself admits is one text, should now be parsed for the benefit of her strained statute of limitations' argument.

---

[32]    The reason why this limitation only applies to the false light branch of the invasion of privacy tort and not to the rest of the branches is because false light has significant overlap with defamation.  To have a different statute of limitations for these very similar causes of action would allow parties to use false light as an end-around the statute of limitations on defamation.  As such, the three year statute of limitations applies to the public disclosure of private facts claim and the intentional infliction of emotional distress claim.

[Indeed,] [o]ne of the fundamental differences between blogs and other web-based publishing venues such as home pages is that blogs . . . [i]nstead of substituting new materials for old ones, as is normally done on regular web pages, the idea with blogs is to *add* postings frequently, creating an ever-growing compilation of entries. This simple feature, the ability to append without erasing any of the previous content, makes blogs fundamentally different from other kinds of web sites. The mounting compilation of postings serves as context for readers of blog sites. By allowing readers to examine earlier postings at will, blogs provide an informative backdrop against which to situate more recent writings. . . .  <u>Over time, a blog [] can read very much like an evolving portrait of its author's interests and experiences.</u>

Viégas, F. B., *Bloggers' Expectations of Privacy and Accountability: An initial Survey,* Journal of Computer-Mediated Communication, 10(3), Article 12 (2005) (emphasis added).[33]

On a blog, at a certain point material is archived.  Thus, there is material on the main page and then links to the archive.  <u>All</u> of the material on the Cutler's public blog that is subject to this suit was -- at all relevant times -- on the main page, not in an archive -- and, indeed, concerned the very same topic.  Accessing Cutler's public site produced the whole blog, not a portion of it.  Cutler wrote one narrative about Plaintiff's private facts.  For example, her indication that the Plaintiff now could ejaculate with a condom on qualifies her previous disclosure that the Plaintiff could not do so.  Every time Cutler edited and added to this single-main page, she created a new document.  This would only change when Cutler archived the material regarding Plaintiff.  In fact, in the middle of this main page, in response to the "popular demand" of her readers, admits Cutler, she provides a "key" to understand the rest of the main page.  Complaint at page 9 (citing the public blog).  The whole page is virtually meaningless without the key that she herself provides in the middle of the document.  Plaintiff, here, is only suing about the contents of the main page, not about any archived material whatsoever.

---

[33]     Also found at:  http://jcmc.indiana.edu/vol10/issue3/viégas.html

The caselaw that Defendant cites <u>supports</u> "reading the [public blog] <u>as a whole</u> and in context." In *Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 882 (D.C. 1998) the Court stated: "Since usually no single incident in a continuous chain of activity can fairly or realistically be identified as the cause of significant harm, it seems proper to regard the cumulative effect of the conduct as actionable." *Id.*[34]

Courts simply cannot get involved in determining when specific words in one single document were written. Such a task would be overwhelming. Defendant must concede that the public blog attached to the Complaint[35] reflects the main page of the public blog on the Internet on May 18th, and that any on day prior thereto, the main page was not complete.[36] Thus, the first day that the document existed in the form that Plaintiff and many others saw it was on May 18, 2004 – putting the public blog well within the statute of limitations even if were only one year, as Defendant incorrectly suggests.

Furthermore, the entire public blog was accessible and continued to be accessible at all times. Since it was on the Internet, it was continually being broadcast up and until she removed it from the Internet. Thus, while up on the Internet, it was her decision that the *entire public blog*

---

[34]    The Court in *Wallace* limited the *Page* continuing-harm doctrine to the time when the plaintiff actually discovered the harm. Thus, if a harm was progressive or continuing, and at some point during the defendant's actions, the plaintiff discovered the harm, the statute would start upon plaintiff's discovery. That limitation on *Page* is not relevant here, as the post-discovery tortious behavior is within the statute of limitations period conceded by the Defendant.

[35]    Since the blog attached to the Complaint is from a republisher, it has one difference from the original public blog; it has an introductory paragraph added by the republisher. That is not in dispute here.

[36]    Moreover, the evidence will show that every time she wrote in her public blog, Defendant was able to amend or delete previously recorded information. Indeed, studies show that that people often do change their blog posts. "When asked whether they had erased or edited content they had published on their blogs, 75% of the respondents said yes." Viégas, F. B., *Bloggers' Expectations of Privacy and Accountability: An initial Survey,* Journal of Computer-Mediated Communication, 10(3), Article 12 (2005); http://jcmc.indiana.edu/vol10/issue3/viégas.html

*be accessible to everyone at all times.*  The Internet is not like a newspaper or a TV broadcast that is once publicized and done.  It is a continual broadcast.  It works because a public blog is on a server, and when people access that server, they download the whole public blog.  A newspaper is printed and then it is done.  The same holds true with a regular radio and TV broadcast.  It's a broadcast and then it is done.[37]

     **C.**    **The Statute of Limitations Did Not Begin to Run<br>Until Plaintiff Reasonable Discovered Cutler's Tortious Behavior**

The very cases that Defendant cites demonstrate that D.C. recognizes that the statute of limitations does not begin to run until the person harmed reasonably discovers the tortious behavior.  *Mullin v. Washington Free Weekly, Inc.,* 785 A.2d 296, 298-99 (D.C. 2001) ("[W]hen 'the relationship between the fact of injury and the alleged  conduct [is] obscure,' this court determines when the claim accrues through application of the discovery rule, i.e., the statute of limitations will not run until plaintiffs know or reasonably should have known that they suffered injury due to the defendants' wrongdoing.").[38]  Here, Cutler's publication on the Internet would take reasonable people in Plaintiff's position several days to discover.  The contrary would require Cutler to assert that her disclosure was equivalent to publishing the information in a local newspaper.  She has explicitly disavowed such a claim, admitting "the Blog was not publicized (within the meaning of the caselaw defining the publicity element of the tort) until . . . May 18,

---

[37]     Moreover, while Defendant eventually took down the public blog, she never sought to have others not republish her private, and, indeed, copyright-protected material.  Indeed, she befriended, went out drinking with, and was employed by the Cox – the source Cutler says directed additional people to her public blog.  When Cox hyperlinked to a copy of Defendant's blog, why didn't Cutler ask Cox to take down the hyperlink?  Defendant, after all, owns the copyright in that material and was friends with, and worked for, Cox.  That is because Defendant wanted the material to remain on-line and in the public domain.  Indeed, Defendant, herself, republished it in the Newspaper and in a book three months ago.  Defendant titled the book the same name that the public blog was entitled – "Washingtonienne"  Complaint ¶ 27.

[38]     The Court in *Mullin* did not apply the discovery of harm rule because defendant publicized the private material in a newspaper published in the very jurisdiction at issue.   In that case, a reasonable person would have discovered the tortious behavior upon the local newspaper's publication.

2004."[39]  Defendant's Brief at 21.  And, indeed caselaw make the discovery-of-harm rule's

applicability to the instant case apparent.  *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d

939, 945-46 (D.C. 2003) (D.C.'s highest court holding that the application of the "discovery -[of

harm]-rule" applies to invasion of privacy claims in D.C.); *Grunseth v. Marriott Corp.,* 872 F.

Supp. 1069, 1075 (D.D.C. 1995) ("if the statute of limitations did not begin to run in October of

1990, it certainly began to run on March 12, 1992, when Plaintiff wrote the Marriott to inquire

about whether confidential information had been disclosed"); *National R.R. Passenger Corp. v.

Krouse*, 627 A.2d 489 (D.C. 1993); *Hobson v. Coastal Corp.,* 962 F. Supp. 1407, 1411 (D. Kan.

1997) (Court "adopt[s] the discovery rule for the accrual of a cause of action for defamation

based on defamatory oral statements concerning a plaintiff's employment history.  Like a credit

reporting case, publication of defamatory material in an employment history case is also likely to

go undiscovered until long after the statute of limitations has run. The . . . Court of Appeals has

recently applied the discovery rule to slander of title, another cause of action where the alleged

defamation is likely to be of a 'confidential or inherently secretive nature.'") (citing *LaBarge v.

City of Concordia*, 927 P.2d 487, 494 (Kan. Ct. App. 1996) (holding "the statute of limitations

began to run on the date the plaintiffs discovered that their title had been slandered.")).

    Indeed, Defendant takes great pains to claim that her public blog was not readily

discoverable until May 18, 2004, yet she paradoxically argues that it was widely disseminated

prior thereto.  Defendant's Brief at 9.  There is a fundamental inconsistency in Cutler's position.

If she says that it wasn't widely disseminated until <u>after</u> Wonkette hyperlinked to it, she cannot

---

[39]     Of course, Cutler has disavowed such wide publicity in the hopes that this Court will find no publicity
at all.  Defendant overreaches, as the caselaw demonstrates.  Cutler did, in fact, publicize private material, but
did not do so in a newspaper published in the jurisdiction at issue.  She did it over the Internet.  The Internet is
widespread, but diffuse, in its reach.  *See Blumenthal v. Drudge*, 992 F. Supp. 44, 48 (D.D.C. 1998) ("The web is
designed to be inherently accessible from every Internet site in the world.") (*citing* Stephen Wilske and Teresa
Schiller, *International Jurisdiction In Cyberspace: Which States May Regulate The Internet?* 50 FED. COM. L.
J. 117, 140 (1997)).

turn around and say that the statute of limitations should apply beforehand. Her logic would mean that a tortfeasor could invade someone's privacy but circulate it in circles other than a plaintiff's for the statutory period, and then this would serve as immunity when the plaintiff reasonably discovered the harm. That simply is not the law. *See, e.g., Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939 (D.C. 2003).

Plaintiff did not read blogs and had no idea that Cutler was blogging about him. When Cox directed people to Cutler's public blog, people who knew the Plaintiff immediately recognized Plaintiff's identity in Cutler's public blog and told him. Cox's gossip about Washington, DC, exposed the blog to people within Plaintiff's circle. It was at this point, on May 18, 2004, that it was reasonable for Plaintiff to have found out about it. *See Hobson, supra*. Thus, again, even if the statute of limitations were only one year, as Defendant incorrectly suggests, Plaintiff filed well within the statute of limitations.

**D.    Cutler Admits that the Statute Has Not Passed**

Finally, the part of the public blog that Defendant admits is within the statute of limitations is more than sufficient to satisfy a cause of action for invasion of privacy. Defendant admits that a claim based on the part of the public blog that "discloses that Steinbuch and Cutler 'fucked missionary' and that Steinbuch 'came . . . [w]ith a condom on'" would be timely even if, as Cutler incorrectly suggests, the statute of limitations period was one year.[40] Defendant's Brief at 13. This disclosure alone constitutes an invasion of privacy in that it reveals the following facts:

1. Plaintiff and Defendant were involved in an intimate sexual relationship;

2. Plaintiff found it unusual to have sex in missionary form;

---

[40]    Defendant conveniently leaves out other parts the public blog that Defendant admits is within the statute of limitations, including details about the Plaintiff's private statements about sexual positions.

3.  Plaintiff ejaculated with a condom on;

4.  Plaintiff was previously unable to ejaculate with a condom on.

These facts alone provide a window into the Plaintiff's sex life and intimate details about how he has sex, his preferred sexual positions, his use of contraceptives, how he experiences orgasm, and more.  Even if this were the only post in the blog, it is revealing of the plaintiff's sex life in a way that is highly offensive.  And, as discussed above, any first-time reader reading these facts could simply read the rest of the same main page of the public blog containing this information to find out more.

**V.    Plaintiff's Intentional Infliction of Emotional Distress Claim is Valid and Timely**

Plaintiff's claim for intentional infliction of emotional distress is similarly valid and timely.[41]  "Defendants' [actions of] g[iving] unreasonable or unnecessary publicity to purely private matters involving plaintiffs . . . .  [constitutes a] claim of intentional infliction of emotional distress.  Defendants' conduct involved more than mere insults, indignities, threats, annoyances, or petty oppressions. We believe this is the type of case that might cause an average member of the community, upon learning of defendants' conduct, to exclaim, 'Outrageous!'" *Doe v. Mills*, 212 Mich. App. 73, 92-93 (Mich. Ct. App. 1995) (recognizing the validity of both a cause of action for invasion of privacy and a cause of action for intentional infliction of emotional distress arising from the same facts).

Defendant's own cases again support Plaintiff regarding the statute of limitations for this claim, as well.  "We therefore hold that an independent action for intentional infliction of emotional distress, not intertwined with any of the causes of action for which a period of

---

[41]      "To establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress."  *Larijani v. Georgetown Univ.,* 791 A.2d 41, 44 (D.C. 2002).

limitation is specifically provided in the other provisions of section 12-301, is governed by the general residuary three-year limitation of section 12-301(8)." *Saunders v. Nemati*, 580 A.2d 660, 665 (D.C. 1990). Since the cause of action for disclosure of private facts is governed by the general three-year limitation, so is the claim for intentional infliction of emotional distress.

## <u>CONCLUSION</u>

For the foregoing reasons, the Defendant's motion should be denied.

Dated: September 15, 2005                    Respectfully Submitted,

<u>/Jonathan Rosen/</u>
Jonathan Rosen (NY0046)
1200 Gulf Blvd., #1506
Clearwater, FL 33767
(908) 759-1116
Attorney for Plaintiff