UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEINBUCH ) | |
| ) | |
| Plaintiff, ) | |
| ) CASE No. 01:05-CV-00970 (PLF) | |
| v. ) | |
| CUTLER ) | |
| ) | |
| Defendant. ) | |
| ) | |

**REPLY TO DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION TO AMEND THE COMPLAINT
AND DEFENDANT'S SUPPLEMENT TO ITS MOTION TO DISMISS**

Defendant has filed a Response to Plaintiff's Motion to Amend, in which she also moves for third time to dismiss.[1] Plaintiff has set forth claims in his Amended Complaint for invasion of privacy of public disclosure of private facts, invasion of privacy of false light, and intentional infliction of emotional distress.[2] Defendant has taken no issue with Plaintiff's Motion to Amend the Complaint other than to repeat the same arguments that were previously rejected by this Court. In essence, Defendant has responded to Plaintiff's Motion to Amend the Complaint by filing a third motion to dismiss. The foregoing analysis, the supporting affidavits, and this Court's previous ruling on Defendant's first motion to dismiss establish that Plaintiff has stated several causes of action that are not time barred, that the requirements for diversity jurisdiction amount in

---

[1] "Parties are not entitled to file redundant motions . . . . [D]efendants are not entitled to unlimited bites at the apple. Defendants' motion[s] . . . are merely repetitions of previous motions, which have already been denied. Therefore, the motions are frivolous." *Tyson v. Equity Title & Escrow Co. of Memphis, LLC*, 282 F. Supp. 2d 825, 827 (D. Tenn. 2003) (internal references omitted); *see also* 28 U.S.C. § 1927.

[2] Defendant incorrectly characterizes this action as a defamation case. As just discussed, this assertion is incorrect.

controversy are met, and that the amendment of the complaint would not be futile. Therefore, Plaintiff's Motion to Amend the Complaint should be granted.

I.      Plaintiff has Satisfied the Diversity Jurisdiction Amount in Controversy Requirement

Plaintiff has pled facts that constitute several causes of action as a matter of law. Plaintiff can claim significantly more than $75,000 in damages. Defendant's attempts to limit Plaintiff's damages to one aspect of the many available types of recoverable damages (his professional reputation in the Senate) is unavailing, because Plaintiff suffered numerous other professional and personal harms. Moreover, even the one sub-category of damages that Defendant chooses to acknowledge satisfies the amount in controversy requirement.

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that . . . <u>the sum claimed by the plaintiff controls if the claim is apparently made in good faith</u>. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim. But if, from the face of the pleadings, it is apparent, <u>to a legal certainty</u>, that the plaintiff cannot recover the amount claimed, or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed.
>
> *Rosenboro v. Kim*, 994 F.2d 13, 16-17 (D.C. Cir. 1993) (ellipses in original)

(emphasis added). In *Rosenboro*, the Court dismissed the case (without prejudice, incidentally) as to one plaintiff upon the presentation of <u>facts gathered through discovery that demonstrated to a legal certainty</u> that the plaintiff in that case had insufficient

damages to match the amount stated in the Complaint, and reversed the trial court regarding the other plaintiff – permitting his case to continue.[3]

    A.    Invasion of Privacy

"Invasion of privacy is not one tort, but a complex of four, each with distinct elements and each describing a separate interest capable of being invaded. The four constituent torts are (1) intrusion upon one's solitude or seclusion; (2) public disclosure of private facts; (3) publicity that places one in a false light in the public eye; and (4) appropriating one's name or likeness for another's benefit." *Wolf v. Regardie*, 553 A.2d 1213, 1216-17 (D.C. 1989). "[I]t is 'possible and not infrequent' for a particular act to constitute more than one of the four types of privacy torts." *McSurely v. McClellan*, 753 F. 2d 88, 113 (D.C. Cir. 1985) (citing <u>Restatement (Second) of Torts</u> § 652A). Defendant has disclosed private facts of Plaintiff and placed him in a false light.

        1.    Defendant Publicly Disclosed Plaintiff's Private Facts

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter published is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public. The tort is generally considered as having five constituent elements:
> (1) publicity,
> (2) absent any waiver or privilege,
> (3) given to private facts,
> (4) in which the public has no legitimate concern,
> (5) and which would be highly offensive to a reasonable person of ordinary sensibilities.

*Wolf v. Regardie*, 553 A.2d 1213, 1220 (D.C. 1989).

---

[3] Contrary to Defendant's assertions, Plaintiff's good faith ability to claim injury here is not complicated by the fact that he <u>prevailed</u> in a previous lawsuit before Judge Collier of this Court concerning a harm unrelated to this case.

It is now undisputed that Cutler gave publicity to private facts. Defendant's Response Brief (Document 42) at 8 and 11. "Sexual relations, for example, are normally entirely private matters . . . . [Even regarding a] public figure, [t]here may be some intimate details of [,say, a motion picture actress'] life, such as sexual relations, which even the actress is entitled to keep to herself." *Doe v. Mills*, 212 Mich. App. 73, 82 (Mich. Ct. App. 1995).

The private facts revealed by Cutler include the number of times Plaintiff ejaculated, his difficulty in maintaining an erection while wearing a particular condom, spanking and hair pulling during sexual activity with Cutler (conveniently leaving out Cutler's request of both), Plaintiff's intimate personal statements, descriptions of Plaintiff's naked body, details of the sexual positions Plaintiff assumed, Plaintiff's suggestion that he and Cutler be tested for sexually transmitted diseases so that they would not have to make use of a condom, and statements made by Plaintiff regarding sexual positions. Complaint ¶¶ 30-31, Amended Complaint ¶¶ 46, 82.

> The Courts have broadly construed in general the elements of psychic damage recoverable for actionable public disclosures and have permitted proof of the following: injury to feelings or sensibilities; feelings of violation and mortification; fear for physical security; the undermining of or destruction of a marriage; ostracism by family, friends; harassment and discriminatory treatment by third persons; past and future humiliation; embarrassment; diminished ability to form or maintain sexual or social or business relationships; depression; withdrawal from society; memory lapses; insomnia; nightmares; shame; physical symptoms and complaints. In addition, plaintiff can collect for reputational injury and special damages, including the cost of medical treatment or psychotherapy, aggravation of any preexisting medical or psychiatric condition, and business losses suffered. . . . The amount of the total award is necessarily a matter for jury determination.

David Elder, *Privacy Torts* §3:8 (2002). Punitive damages are also available. *Id*. Plaintiff suffered from many of these harms, but Defendant only mentions one of them. Steinbuch

4

Aff. ¶¶ 10-14, Eidelberg Rosen Aff. ¶¶ 8, 15-19. Defendant cannot claim that Plaintiff lacks damages just by ignoring the extensive damages that Plaintiff suffered.[4]

### 2. Defendant Placed Plaintiff in a False Light

> To prevail on a false light claim . . . [a party] must show that (a) the published material places appellant in a false light which "would be highly offensive to a reasonable person," and (b) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

*Weyrich v. New Republic, Inc.,* 235 F.3d 617, 628 (D.C. Cir. 2001).

Cutler falsely claimed, *inter alia*, that Plaintiff:

1. liked to "do freaky shit" with Cutler,

2. "fucked [Cutler] every which way,"

3. "likes talking dirty [to Cutler]"

4. is "crazy,"

5. "implied that [Plaintiff and Cutler] would be using [handcuffs] next time,"

6. would be "turned on" by Cutler getting "scared and panicky,"

7. and "[Cutler] have nasty sex like animals," and

8. "told [Cutler] that he likes submissive women."

Complaint ¶ 31 & Appendix A; Amended Complaint ¶ 46, 83-84.

When the publicly-available blog is, <u>as Defendant urges</u>, "read as a whole and in context," Defendant's Brief in Support of Her First Motion to Dismiss at 26 and 33 (Document #5 on this Court's Docket sheet), Cutler's characterizations about Plaintiff's

---

[4] As discussed in Plaintiff's Affirmation, Plaintiff suffered from numerous injuries. Defendant attempts to focus only on the damage that Plaintiff suffered to his professional reputation in the Senate – which, conveniently for the Defendant, was the most limited of the damages due to the professional respect that Plaintiff developed from his colleagues in the Senate. That notwithstanding, Defendant even mischaracterizes Plaintiff's damage to his professional reputation in the Senate. Defendant falsely (and without attribution) asserts that Plaintiff claimed that his reputation had not changed in the Senate as a result of Cutler's actions. Defendant's Brief at 5. As the Affirmation makes clear, Defendant's assertion in this regard is false and wholly without basis.

sexual activities with her, including calling them "freaky," gave the false and offensive impression that the Plaintiff demonstrated highly unusual sexual behavior with Cutler. These assertions constitute false light. *Gill v. Curtis Pub. Co.*, 239 P.2d 630, 634-36 (CA 1952) (depiction of "persons engaged in the so-called 'wrong kind of love'" constitutes false light); *cf. Geisler v. Petrocelli*, 616 F.2d 636, 637-39 (2d Cir. 1980) (valid claim for false depiction of "untoward sexual conduct").

> [C]ases have allowed false light plaintiffs to recover for the following symptoms or indicia of psychic damage: humiliation; mental distress or anguish; feelings of degradation; embarrassment; scorn, contempt, ridicule and shunning by the community; anxiety; distress causing a negative effect on employment or on plaintiff's physical condition or recuperation; mortification; shock. . . . These general damages are not measurable by any fixed standard and triers of fact are accorded a "wide and elastic discretion."

David Elder, *Privacy Torts* §4:6 (2002). Punitive damages are also available. *Id.* The Restatement echoes this description of damages. *Restatement (Second) of Torts* § 652F-H (invasion of privacy-absolute and conditional privileges). Plaintiff suffered from many of these harms, but Defendant only mentions one of them. Steinbuch Aff. ¶¶ 10-14, Eidelberg Rosen Aff. ¶¶ 8, 13-18. Defendant cannot claim that Plaintiff lacks damages just by ignoring the extensive damages that Plaintiff suffered.

> B.      Plaintiff Has a Cause of Action for
>         <u>Intentional Infliction of Emotional Distress</u>

Plaintiff's claim for intentional infliction of emotional distress is similarly valid. "Defendants' [actions of] g[iving] unreasonable or unnecessary publicity to purely private matters involving plaintiffs . . . . [constitutes a] claim of intentional infliction of emotional distress. Defendants' conduct involved more than mere insults, indignities, threats, annoyances, or petty oppressions. We believe this is the type of case that might cause an average member of the community, upon learning of defendants' conduct, to exclaim,

6

'Outrageous!'" *Doe v. Mills*, 212 Mich. App. 73, 92-93 (Mich. Ct. App. 1995) (recognizing the validity of both a cause of action for invasion of privacy and a cause of action for intentional infliction of emotional distress arising from the same facts).

> Courts have long recognized that tortfeasors should be responsible for causing distress, emotional harm, anxiety, diminished enjoyment, losses of autonomy, and similar intangible harms. The exact form of the intangible harm, so long as it is real, seldom matters. All such harms can be referred to as distress or as emotional harm. Such harms are real. They represent the antithesis of happiness or enjoyment of life which everyone pursues. One indicator of the importance of this subject lies in the fact that people spend a great deal of time and money to promote happiness and to avoid distress . . . . [Some] torts permut recovery of distress as a major element in the tort, as in . . . right of privacy cases, which address the distress resulting from the plaintiff's loss of seclusion, or subjection to publicity.

Dan Dobbs, *The Law of Torts* 821 (2000). Plaintiff suffered from significant emotional distress. Steinbuch Aff. ¶¶ 10-14, Eidelberg Rosen Aff. ¶¶ 8, 13-18.

II.     <u>The Statute of Limitations Does not Bar this Action</u>

Defendant admits that she publicized private facts about the Plaintiff, but claims that her publication for some of her statements is time barred. Defendant is mistaken: (1) Defendant's own caselaw unequivocally demonstrates that the single-paged blog cannot be parsed into different dates; it is one document and the invasion of privacy is one continuing harm. In fact, Cutler only disclosed Plaintiff's name at the very end of the blog, which the Defendant herself admits is within the statute if limitations. (2) The caselaw provided by Defendant also establishes that the statute of limitations only starts to run when a victim could reasonably discover the harm caused by a tortfeasor. And, (3) even under Defendant's calculations, Plaintiff filed timely.

A.   Continuing Tort

"If the continuing tort has a cumulative effect, such that the injury might not have come about but for the entire course of conduct (*e.g.*, a physical condition brought about by longterm medical treatment), then all damages caused by the tortious conduct are recoverable even though some of the conduct occurred outside the limitations period." *John McShain, Inc. v. L'Enfant Plaza Properties, Inc.*, 402 A.2d 1222, 1231 (D.C. 1979) (citing *Fowkes v. Pennsylvania R. Co.*, 264 F.2d 397, 398-99 (3d Cir. 1959)).  Defendant herself readily admits that her blog must be "read as a whole and in context." Defendant's Brief in Support of Her First Motion to Dismiss at 26 and 33 (Document #5 on this Court's Docket sheet).  No single section of the single document be parsed from a document that Defendant herself urges must be "read as a whole and in context." *Id*. The caselaw that Defendant cites <u>supports</u> this proposition.  In *Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 882 (D.C. 1998) the Court stated:  "Since usually no single incident in a continuous chain of activity can fairly or realistically be identified as the cause of significant harm, it seems proper to regard the cumulative effect of the conduct as actionable."  *Id*.

Cutler's public blog provides cumulatively identifying characteristics of Plaintiff, <u>culminating with the disclosure of Plaintiff's name only at the very end of the blog</u>.[5] Thus, Plaintiff's identity became clear upon reading the entire blog, which appears on

---

[5]   Defendant continues to repeat the same intentionally misleading claim that the portion of the blog that she admits falls within the statute of limitations does not identify Plaintiff by his actual name.  This is false.  The very portion of the blog that Defendant admits is within the statute of limitations is the very first time that Defendant uses Plaintiff's actual name, and, therefore, the most damaging.  As the attached Affirmations make clear, this was dispositive in identifying Plaintiff with certainty to readers of the blog. Defendant is misrepresenting facts that are clearly established in the record.

8

one single page.[6]  Steinbuch Aff. ¶¶ 5-8; Eidelberg Rosen Aff. ¶¶ 5-8.  Cutler's publicly-available blog cannot be parsed into pieces.  *Id.*  In fact, Plaintiff's colleague who made him aware of the publicly-available blog, identified him as the subject based on the entirety of the publicly-available blog.  Steinbuch Aff. ¶ 4.  Defendant cannot now claim that the document that she herself admits is one text, should now be parsed for the benefit of her statute of limitations' argument.

> [Indeed,] [o]ne of the fundamental differences between blogs and other web-based publishing venues such as home pages is that blogs . . . [i]nstead of substituting new materials for old ones, as is normally done on regular web pages, the idea with blogs is to *add* postings frequently, creating an ever-growing compilation of entries. This simple feature, the ability to append without erasing any of the previous content, makes blogs fundamentally different from other kinds of web sites. The mounting compilation of postings serves as context for readers of blog sites. By allowing readers to examine earlier postings at will, blogs provide an informative backdrop against which to situate more recent writings. . . .  <u>Over time, a blog [] can read very much like an evolving portrait of its author's interests and experiences.</u>

Viégas, F. B., *Bloggers' Expectations of Privacy and Accountability: An initial Survey,* Journal of Computer-Mediated Communication, 10(3), Article 12 (2005) (emphasis added).[7]

Cutler was writing one unfolding narrative about Plaintiff's private facts.  Every time Cutler edited and added to this single-main page, she created a new document.  In fact, in the middle of this main page, in response to the "popular demand" of her readers, admits Cutler, she provides a "key" to understand the rest of the main page.  Complaint at page 9, Amended Complaint ¶ 46.

---

[6]   The significance is that the entire blog appears on just one webpage.  Thus, a reader is exposed to the entire blog contents merely by accessing the one page.  No additional links or buttons are required to be pressed or activated in order to read any portion of the blog.  The new and unique version of the single web page that existed for the first time on May 18, 2004 "sufficiently modif[ied] the content [of previous versions] such that it is properly considered a new publication for the purposes of the statute of limitations period."  *Oja v. U.S. Army Corp. of Engineers*, 440 F. 3d 1122, 1132 n. 14  (9th Cir. 2005).

[7]   Also found at:  http://jcmc.indiana.edu/vol10/issue3/viégas.html

Defendant cites *Oja v. U.S. Army Corp. of Engineers*, 440 F. 3d 1122 (9th Cir. 2005) for the simple proposition that the single publication rule applies to internet postings. That is not in dispute here. <u>We agree with the Defendant that the holdings of *Oja* apply to this action</u>. Defendant confuses the single publication rule with the continuing tort and discovery of harm rules. The *Oja* Court makes clear that the "[i]nformation contained on [an] Internet site is . . . properly classified as an aggregate publication." *Id*. at 1131 n. 8. That is exactly the point. Defendant cannot parse her single web-page into separate torts. It is one "aggregate publication," just as the *Oja* Court stated. To rule otherwise would allow a tortfeasor to invade the privacy of an individual without identifying the victim, wait one year, and then add the victim's name to the web-page. The *Oja* Court recognized exactly that: "<u>Of course, substantive changes or updates to previously hosted content that are not 'merely technical' may sufficiently modify the content such that it is properly considered a new publication for the purposes of the statute of limitations period</u>." *Id*. at 1132 n. 14 (emphasis added). It is undisputed that that is what has occurred here. Defendant's substantive additions to her single web page, <u>such as (among other things) the use of Plaintiff's actual name for the first time</u>, sufficiently modifies the content such that it is properly considered a new publication for the purposes of the statute of limitations period. As such, under the *Oja* Court's recognition of the continuing tort doctrine, the statute of limitations under all views of the facts proffered in this case began on May 18, 2004.

Finally, as this Court recognized, "people can change things in a blog, that what she may have entered on May 7 may in fact have been changed . . . some days later, by her." Transcript of April 5, 2006 Hearing at 51. And, Cutler <u>admitted</u> that she edited her blog. Steinbuch Aff. At ¶ 15. Thus, the dates on the blog have no definitive bearing here.

    B.    <u>Discovery Rule</u>

The very cases Defendant cites also demonstrate that D.C. recognizes that the statute of limitations does not begin to run until the person harmed reasonably discovers the tortious behavior. *Mullin v. Washington Free Weekly, Inc.,* 785 A.2d 296, 298-99 (D.C. 2001) ("[W]hen 'the relationship between the fact of injury and the alleged conduct [is] obscure,' this court determines when the claim accrues through application of the discovery rule, *i.e.*, the statute of limitations will not run until plaintiffs know or reasonably should have known that they suffered injury due to the defendants' wrongdoing").[8] Here, Cutler's publication on the Internet would take reasonable people in Plaintiff's position several days to discover. *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 945-46 (D.C. 2003) (D.C.'s highest court holding that the application of the "discovery -[of harm]-rule" applies to invasion of privacy claims in D.C.); *Grunseth v. Marriott Corp.,* 872 F. Supp. 1069, 1075 (D.D.C. 1995) ("if the statute of limitations did not begin to run in October of 1990, it certainly began to run on March 12, 1992, when Plaintiff wrote the Marriott to inquire about whether confidential information had been disclosed"); *National R.R. Passenger Corp. v. Krouse*, 627 A.2d 489 (D.C. 1993); *Hobson v. Coastal Corp.,* 962 F. Supp. 1407, 1411 (D. Kan. 1997) (Court "adopt[s] the discovery rule for the accrual of a cause of action for defamation based on defamatory oral statements concerning a plaintiff's employment history. Like a credit reporting case, publication of defamatory material in an employment history case is also likely to go undiscovered until long after the statute of limitations has run. The . . . Court of Appeals has recently applied the discovery rule to slander of title,

---

[8]     The Court in *Mullin* did not apply the discovery of harm rule because defendant publicized the private material in a local newspaper published in the very jurisdiction at issue. In that case, a reasonable person could have discovered the tortious behavior upon the local newspaper's publication.

11

another cause of action where the alleged defamation is likely to be of a 'confidential or inherently secretive nature.'") (citing *LaBarge v. City of Concordia*, 927 P.2d 487, 494 (Kan. Ct. App. 1996) (holding "the statute of limitations began to run on the date the plaintiffs discovered that their title had been slandered.")). Plaintiff discovered Defendant's X-rated blog on May 18, 2004. Steinbuch Aff. ¶ 3-4; s*ee Hobson, supra*.

Again, the Ninth Circuit's opinion in *Oja* in entirely on point and recognizes the discovery rule for internet publication. The "statute of limitations commences when the person knows or has reason to know of the alleged violation. . . . We join the Seventh, Tenth and District of Columbia Circuits in holding that a cause of action . . . does not arise and the statute of limitations does not begin to run until the plaintiff knows or has reason to know of the alleged violation." *Oja*, 440 F.3d at 1135 (internal quotations omitted) (emphasis added).

      C.      Cutler Admits that the Statute has Not Passed

The portion of the publicly-available blog that Defendant admits is within the statute of limitations is more than sufficient to satisfy a cause of action for invasion of privacy. Defendant admits that that part of the publicly-available blog "discloses that Steinbuch and Cutler 'fucked missionary' and that Steinbuch 'came . . . [w]ith a condom on.'" Defendant's Brief at 13. Defendant conveniently leaves out of her discussion in the blog entry that she admits is within the statute of limitations the details about the Plaintiff's private, intimate statements about sexual positions and Defendant's first use of Plaintiff's actual name.

This section of the X-rated blog, which Defendant admits is within the statute of limitations, reveals the following facts:

12

1. Plaintiff's actual name for the very first time;

2. Plaintiff found it unusual to have sex in missionary form;

3. Plaintiff ejaculated with a condom on;

4. Plaintiff was previously unable to ejaculate with a condom on.  Amended Complaint ¶ 46.

Even if this were the whole blog, it reveals the plaintiff's identity and information about his sex life in a way that is highly intrusive and offensive.  And, as discussed above, any first-time reader reading these facts could readily scroll down the single page of the X-rated blog to read more.

III.    This Court Already Has Ruled That
        <u>Defendant's Admittedly X-Rated Blog Is Not Newsworthy</u>

This Court has ruled and held that there is no legitimate public interest in the information contained in the Defendant's admittedly X-Rated Blog and the information is not "newsworthy."  Transcript of Motions Hearing Before the Honorable Paul L. Friedman United States District Judge, Wednesday, April 5, 2006, Page 52 line 22 to Page 54 line 9 ("The argument that the defendant makes that there is a public interest in this kind of information I just reject. . . .  The argument that the blog was newsworthy . . . I just don't think carries the day here.").

> While . . . the general criteria for determining newsworthiness are (a) the social value of the facts published; (b) the depth of the article's intrusion into ostensibly private affairs; and (c) the extent to which the individual voluntarily acceded to a position of public notoriety, the cases and authorities further explain that the paramount test of newsworthiness is whether the matter is of legitimate public interest which in turn must be determined according to the community mores. . . .  <u>The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake</u>, with which a reasonable member of the public, with decent standards, would say that he had no concern.'"

13

*Sipple v. Chronicle Publishing Co.*, 154 Cal. App. 3d 1040, 1048-49 (italics in original, underline added, citation omitted).[9]

"Sexual relations, for example, are normally entirely private matters . . . . [Even regarding a] public figure, [t]here may be some intimate details of [say, a motion picture actress'] life, such as sexual relations, which even the actress is entitled to keep to herself." *Doe v. Mills*, 212 Mich. App. 73, 82 (Mich. Ct. App. 1995). Cutler herself has consistently maintained that her the publicly-available blog is not newsworthy. Cutler said on Cox's "Wonkette" blog: "I just think it's so silly. <u>The blog is really about a bunch of nobodies fucking each other</u>. I still can't believe people care." Wonkette blog found at http://www.wonkette.com/archives/washingtonienne-speaks-wonkette-exclusive-must-credit-wonkette-the-washingtonienne-interview-009693.php  Cutler told *Playboy*: "I wasn't doing anything that extraordinary . . . . None of these people [identified in the X-rated blog] were elected officials, so they don't deserve the scrutiny. . . . [Otherwise,] I would have tried to cash in on that earlier." *Internal Affairs*, Playboy (online), September 8, 2004. Defendant's complete reversal of her position in her most recent motion to dismiss are unavailing.  If Cutler now claims that her recitation of private facts "about a bunch of nobodies [having sex]" is newsworthy, then no bureaucrat or employee in Washington, D.C. – indeed no person anywhere in the Country – would have a right to privacy.

Moreover, Defendant doesn't even attempt to describe the "newsworthiness" of:  the number of times Plaintiff ejaculated, his difficulty in maintaining an erection while wearing a particular condom, spanking and hair pulling during sexual activity with Cutler

---

[9] Moreover, "[i]f there is room for differing views whether a publication would be newsworthy the question is one to be determined by the jury and not the court." *Times-Mirror Co. v. Superior Court*, 198 Cal. App. 3d 1420, 1428-1429 (Cal. Ct. App. 1988).

(conveniently leaving out Cutler's request of both), Plaintiff's intimate personal conversations, descriptions of Plaintiff's naked body, the details of the sexual positions Plaintiff assumed, Plaintiff's suggestion that he and Cutler be tested for sexually transmitted diseases so that they would not have to make use of a condom, and statements made by Plaintiff regarding sexual positions. Complaint ¶¶ 30-31; Amended Complaint ¶ 46. Here, "the publicity is so offensive as to constitute a morbid and sensational prying into private lives for its own sake, it serves no legitimate public interest and is not deserving of protection.'" *Michaels v. IEG*, 5 F. Supp. 2d at 840. In fact, Cutler admitted such, stating that "I wrote an X-rated blog." April Witt, *Blog Interrupted,* Washington Post Magazine, Aug. 15, 2004, at W12.

More importantly, it is axiomatic that "newsworthiness" requires the statements at issue to be true. *Bonome v. Kaysen*, 17 Mass. L. Rep. 695, No. 03-2767, 2004 Mass. Super. LEXIS 172 (Super. Ct. 2004) at *8. Cutler's claim to newsworthiness is based on the false premise that the publicly-available blog is entirely true.[10] These statements cannot be newsworthy, as they are false.

Furthermore, "the privilege to disclose private information is limited by the requirement that the disclosure bear the necessary nexus (both logical and proportional) to the issue of legitimate public concern." *Bonome* at *20. In the instant case, there was no newsworthy topic, no logical nexus thereto, and no proportionality. Assuming, contrary to

---

[10] Defendant continues to rely on her X-rated blog that is a subject of this case for the truth of the matters asserted therein. As this Court ruled, attaching Defendant's publicly-available blog as an exhibit to the Complaint does not transform the statements contained therein into undisputed facts. [cite] Otherwise, by Defendant's logic, a complaint for defamation that appropriately attached the defamatory comment would be instantly self-defeating – as the alleged defamer would simply assert that statements were now true by virtue of their attachment. Moreover, the Complaint makes it perfectly clear that many of the statements contained in Defendant's publicly-available blog are false and give rise to a cause of action. Complaint ¶ 31; Amended Complaint ¶¶ 83-84.

15

this Court's ruling, there is a newsworthy matter, Cutler cannot describe how the number of times Plaintiff ejaculated, his difficulty in maintaining an erection while wearing a particular condom, spanking and hair pulling during sexual activity, Plaintiff's intimate personal conversations, descriptions of Plaintiff's naked body, details of the sexual positions Plaintiff assumed, Plaintiff's suggestion that he and Cutler be tested for sexually transmitted diseases so that they would not have to make use of a condom, and statements made by Plaintiff regarding sexual positions bear any necessary nexus to that newsworthy topic.

As one Court said:

> [E]ven though a matter is of legitimate public concern, there may be details about a person involved in that matter which are too private to also be considered of legitimate public concern. . . .We are aware the disclosure of sexual and other such intimate information about even the most public of figures is often not considered newsworthy because it usually has nothing to do with that person's public life, and thus may not be considered of any legitimate concern to the public. Likewise, where involuntary public figures are involved, information of a sexual or intimate nature usually is unrelated to the general topic legitimately within the public's interest.

*Nobles v. Cartwright*, 659 N.E.2d 1064, 1074 n.16 (Ind. Ct. App. 1995).

Moreover, in speaking of the "proportionality" element of the nexus test, the Court in *Bonome* recognized, "it is of importance that [defendant in that case] did not use [plaintiff's] name in the book. The defendants did not subject [plaintiff] to unnecessary publicity or attention." *Id*. At *20 (emphasis added). In contrast, Cutler took pains to identify Plaintiff, using his name (Rob), his initials (RS), his religion (Jewish), his job (Committee Counsel to the Senate Committee on the Judiciary), his specific place of residence (Bethesda, MD), the fact that he has a twin; his appearance; his resemblance to a commonly known individual; and the one specific and identifiable detail of Cutler's intimate relationship with Plaintiff that Cutler disclosed to colleagues and co-workers without

16

Plaintiff's permission or knowledge. Complaint ¶¶12-13; Amended Complaint ¶¶ 42-46. Thus, instead of minimizing Plaintiff's exposure, Defendant exploited it.

IV.     This Court has Already Ruled that Plaintiff Is Not a Public Official

This Court has already ruled and held that Plaintiff is not a public official. Transcript of Motions Hearing Before the Honorable Paul L. Friedman United States District Judge, Wednesday, April 5, 2006, Page 54 line 10-14 ("Mr. Steinbuch's not a public figure. So, I just reject the notion that the relationship between the two of them was a matter of public concern or interest, particularly the details the sex act they performed is just -- just doesn't carry the day at all. That's not a basis to dismiss.") As the D.C. Court of Appeals held:

> In *Gertz*, *supra*, the Court stated that "absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." . . . . The Court's holding in *Hutchinson v. Proxmire*, 443 U.S. 111 (1979), confirms that Ayala is not a public figure. . . . The Court held that Hutchinson was not a public figure. . . [b]ecause Hutchinson at no time thrust himself into view or assumed any role of public prominence, he was not a public figure. By virtue of his position, like Hutchinson, [Plaintiff] potentially affected a matter of public concern; but also like Hutchinson, [Plaintiff] did nothing to assume a public role regarding that concern. Consequently, [Plaintiff] cannot be considered a public figure.

*Ayala v. Washington*, 679 A.2d 1057, 1059-60, 1064 (D.C. 1996) (brackets other than those referring to "Plaintiff" or "Defendant" found in original) (emphasis added); *Kassel v. Gannett Co.*, 875 F.2d 935 (1989) (finding that government employee is not a "public official" emphasizing that he did not routinely supervise, manage, or direct government operations, did not independently formulate policy and did not govern); *Moss v. Stockard*, 580 A.2d 1001, 1029, (D.C. App. 1990) ("public official" cannot be thought to

include all public employees), *quoting Hutchinson v. Proxmire*, 443 U.S. 111, 119 n.8 (1979).

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's Motion to Amend the Complaint, deny Defendant's repeated motions to dismiss, and allow this case to proceed to begin discovery.

Dated:  August 15, 2006

>*/s/ Jonathan Rosen*
>Jonathan Rosen (NY0046)
>1645 Lamington Rd.
>Bedminster, NJ  07921
>(908) 759-1116
>Attorney for Plaintiff