UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


ROBERT STEINBUCH,                    .
                                     .
            Plaintiff,               .
                                     .   CA No. 05-0970 (PLF)
       v.                            .
                                     .   Washington, D.C.
JESSICA CUTLER,                      .   Wednesday, April 5, 2006
                                     .   2:05 p.m.
            Defendant.               .
                                     .
. . . . . . . . . . . . . . .        .



TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          JONATHAN S. ROSEN, ESQ.
                            1200 Gulf Boulevard
                            Suite 1506
                            Clearwater, Florida 33767
                            908-759-1116


For the Defendant:          JOHN UMANA, ESQ.
                            6641 32nd Street, NW
                            Washington, D.C. 20015
                            202-244-7961


Court Reporter:             BRYAN A. WAYNE, RPR, CRR
                            Official Court Reporter
                            U.S. Courthouse, Room 4808-B
                            333 Constitution Avenue, NW
                            Washington, D.C. 20001
                            202-216-0313




Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

```
 1                     P R O C E E D I N G S
 2          THE DEPUTY CLERK:  Civil action 05-970, Robert
 3   Steinbuch versus Jessica Cutler.  Mr. Rosen for the plaintiff,
 4   Mr. Umana for the defendant.
 5          THE COURT:  Good afternoon.
 6          MR. UMANA:  Good day, Your Honor.  I'm John Umana for
 7   the defendant.
 8          MR. ROSEN:  And I'm Jonathan Rosen representing
 9   Mr. Steinbuch.
10          THE COURT:  Okay.  How do you pronounce your last
11   name?
12          MR. UMANA:  Umana.
13          THE COURT:  It's your motion.
14          MR. UMANA:  Thank you, sir.
15      Your Honor, this is a case about counsel on Senator
16   DeWine's staff on the important Senate Judiciary Committee
17   having a sexual relationship with a young, female, entry-level
18   staffer.
19      Mr. Steinbuch is asking this court to go beyond where any
20   court has ever gone before, to create a new tort, under the
21   guise of invasion of privacy or intentional infliction of
22   emotional distress, every time a former lover discloses a casual
23   sexual encounter.
24      This court should eschew Mr. Steinbuch's invitation.  Were
25   plaintiff's theory accepted, anybody who has casual sex outside
```

1    of marriage could run into court and complain when a former

2    lover reveals details.   There's not a single case that supports

3    such a massive extension of the law, and plaintiff has cited

4    none.

5         The complaint in this case, Your Honor, fails to state a

6    claim for relief on any cognizable legal theory, and the case

7    should be dismissed under Rule 12(b)(6) of the Federal Rules of

8    Civil Procedure, because they have failed to state a claim.

9         The plaintiff, Robert Steinbuch, Esquire, held an important

10   government post as Senator DeWine's counsel on the Senate

11   Judiciary Committee.   Jessica Cutler at the time was a

12   25-year-old new staff assistant in the Senator's office.

13        As I will demonstrate, there are three separate grounds for

14   dismissal under Rule 12(b)(6).   First, all the claims are

15   barred.   Not most of them, all of the claims are barred in this

16   complaint under the one-year limitations period, under D.C. Code

17   12-301(4), and I'll get to that in a moment.

18        Second, I'll show that the complaint fails to allege the

19   material elements for invasion of privacy or the intentional

20   infliction of emotional distress, and hence, the complaint must

21   be dismissed as a matter of law on those grounds as well.

22        And finally, I will show that the complaint fails as a

23   matter of law because the matters publicized are of general

24   public interest and as such --

25             THE COURT:   Well, don't spend much time on that one.

1          MR. UMANA:  All right, sir.

2          THE COURT:  Because they're not.

3          MR. UMANA:  Okay.  On a Rule 12(b)(6) motion to

4    dismiss, the court is to accept the allegations in the complaint

5    as true.  Browning v. Clinton, 292 F.3d at 235, a D.C. Circuit

6    decision quoting Conley v. Gibson.  But having said this, "We

7    accept neither inferences drawn by plaintiff if such inferences

8    are unsupported by the facts set out in the complaint, nor legal

9    conclusions cast in the form of factual allegations."  292 F.3d

10   at 242.

11        "Dismissal is proper when the court finds that plaintiff

12   has failed to allege all the material elements of his cause of

13   action."  Weyrich v. The New Republic, 235 F.3d at 623, Your

14   Honor.

15        Now, in considering a motion to dismiss, it's important to

16   consider that the complaint itself attaches Exhibit A.  Exhibit

17   A is a reproduction of Jessica Cutler's blog.  Plaintiffs did

18   not have to attach that, but they chose to do so, sir.  And that

19   has very significant consequences under Federal Rule of Civil

20   Procedure 10(c), because a copy of any written instrument which

21   is an exhibit to a pleading is part thereof for all purposes.

22   See People's Natural Gas Company v. Federal Power Commission at

23   127 F.2d at 156 in the D.C. Circuit 1942.

24        And indeed, in that case, Your Honor, the party -- where

25   the party did not deny the statements in his exhibit, they were

1    deemed to be admitted.

2         Now, anybody can set up a blog.  Anybody can go -- and I

3    did a test yesterday myself on blogger.com.  It just takes a

4    couple minutes.  People use blogs all the time to keep personal

5    diaries.  They can be private blogs or you can make it a blog

6    listed for publication.  There's a distinction.

7         Now, the facts here are on May 5, 2004, Jessica Cutler

8    created her personal blog, http://washingtonienne.blogspot.com.

9    She was asked in the Settings area when you set up the blog:

10   "Add your blog to our listings?"  Ms. Cutler said no.  That's in

11   Jessica's declaration, paragraph 5.

12             THE COURT:  I can't consider the declaration on a

13   motion to dismiss.

14             MR. UMANA:  All right, sir.  Unless the Court

15   chooses -- the Court has discretion to treat it as a Rule 56

16   motion --

17             THE COURT:  Well, I'm not going to do that.  If this

18   case doesn't get dismissed, you're going to take each other's

19   depositions, you're going to spend as much time as you want to

20   in a room with each other, get all of this in the public record,

21   embarrass the world.

22        I don't know why we're in federal court to begin with.  I

23   don't know why this guy thought it was smart to file a lawsuit

24   and lay out all of his private intimate details in an appendix

25   to the complaint.  I don't know why we're in federal court.  I

1     don't know why you're wasting my time with this lawsuit.  I

2     don't know why you're wasting my time with the motion to

3     dismiss.

4          Either you guys ought to settle this case or the plaintiff

5     ought to voluntarily dismiss the case, or let's move on to

6     discovery and summary judgment.  Because I'm looking at the four

7     corners of the complaint, and unless you can persuade me they

8     haven't made out the elements -- it may be a stupid lawsuit, it

9     may be foolish, this guy may be laying his own sex life out on

10    the public record, and just repeating what she put on her blog

11    for whatever reason.  And I'm surprised I didn't see an argument

12    in your papers that he's waived whatever rights he had by just

13    filing the complaint, because he spread it on the public record.

14    But I didn't see that.

15          MR. UMANA:  Sir, I'm going to treat this as a 12(b)(6)

16    and not as a summary judgment.

17          THE COURT:  Let's treat it as a 12(b)(6).

18          MR. UMANA:  The Exhibit A to the complaint makes

19    an extremely significant admission, sir, and that is that

20    Ms. Cutler's blog was not in fact a public blog.  Now, if we

21    look at page 1 of Exhibit A, sir, it states, "The original

22    Washingtonienne page was never cached by Google."

23          THE COURT:  Where are you reading from?

24          MR. UMANA:  From page 1 of Exhibit A, sir.  And this

25    becomes part of the complaint for all purposes under Rule 10(c).

1    And if Your Honor looks at that, it's on the section under the

2    heading "Who restored it?"  It says "The original

3    Washingtonienne page was never cached by Google."  That's an

4    extremely significant admission, Your Honor.

5        And the reason is, this means that the blog was never

6    picked up, cached, listed, indexed or stored by Google.  It

7    could not be located.  As Ms. Cutler has said -- well, I'm going

8    to stay away from her declaration, but I don't need to rely on

9    her declaration because it's right here in Exhibit A, page 1.

10        This made it a private blog, sir, until on May 18, 2004,

11    somebody else ran to the blog site, ran to the cyber gossip

12    Internet site, wonkette.com, and they are the ones who made this

13    public.

14        Now, the complaint fails to allege that Ms. Cutler

15    disclosed her blog to Wonkette gossip site, and she didn't do

16    so.  This was not a public blog until it was picked up by

17    somebody else.  It was Wonkette that disclosed this, not my

18    client.  So there is a fatal pleading deficiency in this case at

19    the very outset, Your Honor, and it should be thrown out.  It

20    does not deserve to be in the federal judiciary.  There was no

21    intention of my client to publicize anything.

22        Now, the postings in the blog.  I was going to go into

23    those details.  Your Honor has seen them.  It's not until May 7,

24    2004, that the first posting as to Mr. Steinbuch, to which he

25    objects, comes forth.  And that's about the spanking and

1    whatnot.  That is when the statute of limitations begins to run,

2    sir:  May 7, 2004, at 9:35 a.m.

3        Now, the blog also shows, and it's quoted verbatim in the

4    complaint itself, Your Honor, and it's attached as Exhibit A,

5    that he was joking around the office about this spanking matter,

6    that he was joking about it himself.  There's clearly -- and,

7    "When he walks out of a room, he'll slap himself on the

8    backside."  That's May 12 blog posting at 9:28.  That's a waiver

9    right there.  That's a waiver, sir.

10        These are devastating admissions that knock the complaint

11    out of the water as a matter of law, because they fail to plead

12    the elements of the claim.

13        Now, one, the statute of limitations bar.  That's very

14    simple.  There's a one-year statute of limitation here, sir.

15    The D.C. courts have applied the one-year limitation period for

16    defamation, D.C. Code 12-301, subsection 4, to invasion of

17    privacy claims for disclosure of private facts on the rationale

18    that invasion of privacy is a type of defamation.  That's

19    Grunseth v. Marriott Corp., 872 F. Supp. at 1074.

20        Doe v. Southeastern --

21            THE COURT:  But if it was a private blog, how --

22    limited to four people, how would he know on May 7, 2004, that

23    he'd been injured?

24            MR. UMANA:  Your Honor, we have to go by the

25    allegations of the complaint.  The complaint alleges at

1  paragraph 33, Ms. Cutler exposed private facts "on the Internet

2  for the entire world to read."  If that's true, the statute

3  begins to run.  That's the allegation of the complaint at

4  paragraph 33.  It's repeated in the first paragraph of the

5  complaint, that "Cutler disseminated her blog on the World Wide

6  Web."

7       At paragraph 10 of the complaint, "Cutler published a

8  blog."  Paragraph 30 of the complaint, "Cutler caused widespread

9  publication of private intimate facts."  But the most

10  significant one I find, Your Honor, if we go by what the

11  complaint alleges, which we have to do under 12(b)(6), is

12  paragraph 33, that she "exposed private facts on the Internet

13  for the whole world to see."

14       Given that allegation, Your Honor, this entire complaint is

15  time barred, because any claim that would have begun to arise

16  accrued on May 7, 2004, Your Honor.

17            THE COURT:  Only if he had a way of being made aware

18  of it.  The discovery rule says that the statute of limitations

19  begins to run from the day that you know or should through due

20  diligence -- I'm paraphrasing -- could know of the existence of

21  the harm.  And so if this were a private blog until someday

22  subsequent to May 7, 2004, and it was limited to four people,

23  how would he know he was injured until it was all made public

24  subsequent?

25       Now, there may be a question as to whether or not she made

1  it public or somebody else did, and whether she had any role in

2  its being made public, or whether it even matters whether she

3  had a role in it being made public.  But if he could not have

4  known through due diligence what was being said from the day

5  that she started the blog until the day it was made public, why

6  doesn't the one year start to run from sometime after May 7?

7      MR. UMANA:  Respectfully, Your Honor, we have to

8  take -- for a 12(b)(6), we have to take what they allege.  If

9  this is true --

10      THE COURT:  Where do they allege that it became a

11  public blog on May 7?

12      MR. UMANA:  All through the complaint.  All through

13  the complaint, sir.  "Ms. Cutler exposed private facts on the

14  Internet for the entire world to read."  That's right there in

15  the complaint.  If that's true, and the Court has to assume it's

16  true under Conley v. Gibson, then it follows that this complaint

17  must be dismissed as a matter of law.

18      And I also want to call to Your Honor's attention something

19  that I didn't see in the briefing.  I didn't write this motion.

20  I just came into the case.

21      THE COURT:  I know.

22      MR. UMANA:  The entire complaint is time barred under

23  the single publication rule, and that rule holds, for purposes

24  of the statute of limitations, the date on which it's first

25  generally available to the public is the date that the statute

1    begins to run.  That's <u>Mullin v. Washington Free Weekly, Inc.</u>,

2    785 A.2d, at 298 note 2, D.C. 2001, citing <u>Ogden v. Association</u>

3    <u>of U.S. Army</u>, 177 F. Supp. at 499 to 502.  That's a DDC case in

4    '59.

5         So May 7 is, under the single publication rule, is when the

6    statute begins to run.  The issue about -- certainly the -- if

7    Ms. Cutler were here to testify today and this were not a

8    12(b)(6) hearing, certainly she would tell Your Honor she never

9    intended to make any of this public, and she took every

10   precaution to make it a private blog.  But the complaint alleges

11   to the contrary.

12        THE COURT:  What's the single publication you're

13   talking about?  There were publications on several different

14   days between May 7 and May 18.

15        MR. UMANA:  Right.  And under the single publication

16   rule, the first one is when the statute begins to run.  Years

17   ago there was a multiple publication rule, and you can see this

18   in the cases I've cited.

19        THE COURT:  But that can't be right in a case like

20   this.  Let's suppose that a jury were to find, if we ever got to

21   a jury, or I were to find that the first publication was on May

22   7, but the particular statement on May 7 wasn't offensive or

23   wasn't an invasion of somebody's privacy, or didn't meet the

24   other criteria, and the second one didn't and the third one

25   didn't either, but the seventh, eighth, ninth and 10th ones did,

1    and they were published --

2         MR. UMANA:  That's right.  Sure, of course.  But here

3    on May 7, that's the first one he takes objection to.  That's

4    the spanking, we had sex on May 6, we went and had drinks at

5    Union Station.  That's the first one that he counts as

6    objectionable.

7         And that's why I -- the first entry about "RS" -- she

8    doesn't ever once mention his name.  The first entry about this

9    "RS" is on May 6, but I'm not starting -- I don't think the

10   statute begins there.  It begins on May 7, under the single

11   publication rule.

12        Now, under the intentional infliction of emotional

13   distress, the statute is also one year.  And that's Browning v.

14   Clinton, 292 F.3d at 244, Saunders v. Nemati, 580 A.2d at 661 to

15   662.  Where the cause of action is intertwined, as here,

16   Your Honor, with one for which the limitations period is

17   specifically prescribed, the specific period applies, the one

18   year.

19        Mullin v. Washington Free Weekly, 785 A.2d at 297, D.C.

20   2001, holding that because intentional infliction of emotional

21   distress was intertwined with the other claim, the defamation

22   claim, the one-year limitation period applied.  And those cases

23   are briefed at motion page 16, Your Honor.

24        So the statute of limitation in my view bars the whole

25   thing.  The only posting -- if you don't accept the single

1  publication rule, which is the law and should be accepted by

2  this court, the only thing that would be left is the May 18

3  posting, 2004.  And all that says is that the couple had sex in

4  the missionary position and he used a condom.  Clearly, not

5  actionable under any legal theory.  So even in the alternative,

6  the May 18 posting can fail as a stated claim for which any

7  relief can be granted.

8      Okay.  Argument No. 2.  The elements of invasion of privacy

9  have not been alleged, and hence this court must dismiss the

10  complaint as a matter of law.

11      Five elements of an invasion of privacy, and I'm referring

12  to Wolf v. Regardie in the D.C. Court of Appeals, 553 A.2d at

13  1220.  The elements are, No. 1, publicity; 2, absent any waiver;

14  3, given to private facts; 4, in which the public has no

15  legitimate concern; 5, which are highly offensive to a

16  reasonable person of ordinary sensibilities.  That's Wolf v.

17  Regardie.

18      Now, publicity, I come back to the first page of Exhibit A

19  of the complaint.  That shows, Your Honor, respectfully, that

20  there was no publicity.  This was a private blog, it was not a

21  public blog.  Publicity means that the matter is made public by

22  communicating it to the public at large.  Sure, it's true that

23  if you go to blogger.com, it's on the Internet, but that doesn't

24  give everybody access to it.

25      I mean, I have blogs myself, and I want them to be public,

1  on questions of science and whatnot that I have blogs about, and

2  you have to take specific action so that it can be picked up by

3  Google and other search engines.  She took action to keep it

4  from Google and to keep it private.  And that's right in Exhibit

5  A to the complaint.  As a matter of law, Your Honor, there was

6  no publicity here, and hence the complaint fails the stated

7  cause of action for invasion of privacy.

8       Indeed, the publicity that's required is that it be highly

9  offensive.  And none of the things here --

10            THE COURT:  Let's start with publicity first.  At some

11  point someone took action to make it public.

12            MR. UMANA:  Yes.

13            THE COURT:  And at what point did that occur?

14            MR. UMANA:  Apparently on May 18, 2004, she told three

15  people, and one told somebody else.

16            THE COURT:  Before May 18?

17            MR. UMANA:  Before May 18.

18            THE COURT:  In other words, before May 18 there were

19  three people --

20            MR. UMANA:  Only three.

21            THE COURT:  -- that were receiving this private blog.

22            MR. UMANA:  Yes, sir.  And a friend of a friend is the

23  fourth person, apparently in San Diego.  Somebody around May 18

24  disclosed this to wonkette.com, which is the cyber gossip Web

25  site in D.C.

1    Okay.  Point No. 2.  So there's no publicity.  Point No. 2,

2    there was a waiver here.  The right to privacy, like any other

3    personal right, Your Honor, can be lost by express or implied

4    waiver of consent, or by the course of conduct which prevents

5    its assertion.  And here we have both kinds of waiver.  Waiver

6    is a knowing relinquishment of a known right.

7    The blog attached to the complaint reveals that on May 11

8    Mr. Steinbuch informed Ms. Cutler about the rumor of spankings

9    had spread to other Senate offices.  Blog entry May 11 at 5:54

10   p.m.  That night at dinner the plaintiff told Ms. Cutler that

11   he's really not mad about the gossip at all, that he's actually

12   joking around the office about it, and that when he walks out of

13   a room, he'll slap himself on the backside.  May 12 blog posting

14   at 9:28 a.m.

15   None of these facts were denied in the complaint,

16   Your Honor.  There is simply no allegation in the complaint that

17   these facts were not true.

18       THE COURT:  Wait a minute.  That's separate from the

19   question of waiver.  What facts are not true?

20       MR. UMANA:  That he was joking in the office himself.

21       THE COURT:  Okay.  So he's joking in the office.

22       MR. UMANA:  About the affair.

23       THE COURT:  About one particular thing, the spanking.

24       MR. UMANA:  Yes, sir.

25       THE COURT:  There's a lot of other stuff in these blog

1    entries that he didn't joke about the office about, that he

2    didn't say anything to her about, that were on the blog.  Lots

3    of other things.

4            MR. UMANA:  I understand that, but my --

5            THE COURT:  So I mean, are you saying that he's waived

6    his rights to privacy about the most intimate details of their

7    sexual relationship because he waived his rights about one

8    detail, which maybe he didn't consider quite as intimate, which

9    most people wouldn't consider quite as intimate.

10           MR. UMANA:  Respectfully, Your Honor, I submit the

11   argument for your consideration.  It's certainly true that what

12   the blog says is that what he joked about:  This affair is all

13   over the office, it's going to other offices, the spanking, when

14   he walks out of a room he'll slap himself on the backside, to me

15   that's more -- that's conduct that constitutes a waiver.  And I

16   just submit that to Your Honor.  It's here and it's part of the

17   12(b)(6) motion.

18           THE COURT:  I understand.

19           MR. UMANA:  Three, it has to be private facts.  Again,

20   how do you have private facts if this matter is being joked

21   about in the office?  Respectfully, I think these were no longer

22   private facts if they had been at one point.

23      In addition, Mr. Steinbuch lacked any reasonable

24   expectation of privacy in having an affair with someone in his

25   office.  The 9th Circuit has held, for example, that the right

1    of privacy is closely connected with the integrity and sanctity

2    of the family.  That has always been the hallmark, Your Honor,

3    of privacy invasions in the law.  Fugate v. Phoenix Civil

4    Service Board, 791 F.2d at 738, 9th Circuit, 1986.

5         I am simply unaware of any case creating a duty of lovers

6    in a casual sexual relationship not to disclose the details of

7    that affair.

8              THE COURT:  It can't be that the right of privacy at

9    common law is limited to the family or to married people.

10             MR. UMANA:  I'm not saying it's limited to, but I'm

11   saying that has certainly been the paradigm example of what the

12   privacy rights cover in the case law, if you look at the cases.

13             THE COURT:  Well, certainly -- first of all, the

14   restatement invasion of privacy tort is actually four separate

15   torts, and the first one, which is unreasonable intrusion upon

16   the seclusion of another, may be the most basic one.  But the

17   commentary to the restatement said the right of privacy has been

18   defined as the right to be let alone, and that's not just in the

19   family setting or in the marital setting or in the marital

20   bedroom, it seems to me.  There may be a whole variety of ways

21   of invading that right or that interest.

22             MR. UMANA:  I concede that.  That's correct.

23        In which the public has no legitimate concern.  Five, and

24   the fifth element, and which is highly offensive to a reasonable

25   person of ordinary sensibilities, Wolf v. Regardie.

1    I believe that the plaintiff's complaint fails to allege

2    the elements of an invasion of privacy.  And you're right, there

3    are four different kinds, and the one, the sole invasion of

4    privacy which they tried to allege in the complaint is

5    disclosure of private facts.

6    They just have failed to do that, and Exhibit A knocks them

7    out of the water at the outset, Your Honor.  That statement that

8    there was no publicity knocks them out of the water as a matter

9    of law.  And they can't get around it, and it's futile to try to

10    amend.

11    Next, intentional infliction of emotional distress.  That

12    wasn't pleaded properly either, in this complaint.  That count

13    is at page 21 of the complaint.  The elements are simply not

14    alleged.  "To establish a claim for intentional infliction of

15    emotional distress, a plaintiff must prove that the defendant

16    engaged in (1) extreme and outrageous conduct that (2)

17    intentionally or recklessly caused (3) severe emotional distress

18    to another."  Jung v. Jung, 791 A.2d at 50, D.C. Court of

19    Appeals in 2002.

20    Liability doesn't extend to mere insults or annoyances,

21    oppressions or other trivialities; it's only imposed when the

22    conduct goes beyond all possible bounds of decency and is

23    regarded as atrocious and utterly intolerable in a civilized

24    community.  Waldon v. Covington, 415 A.2d at 1076, D.C. Court of

25    Appeals 1980.

1     Your Honor, they simply have not alleged these elements.

2     As a matter of law, this complaint cannot be permitted to go

3     forward under 12(b)(6).

4          Moreover, there's no intent.  They don't even allege that

5     Ms. Cutler had an intention to purposely cause severe emotional

6     distress to this plaintiff.  You have to allege that.  They

7     failed to do that.  If you look at page 21 of the complaint,

8     they simply failed to allege intention properly.  This is an

9     intentional tort.

10         Moreover --

11              THE COURT:  I think some of the cases in D.C. say

12    intentionally or recklessly.

13              MR. UMANA:  Well, they have to say intentionally --

14    this is an intentional tort.  This is not negligent infliction

15    of emotional distress.  It's intentional.  That's what they

16    claim.

17         Moreover, they fail to allege -- here's another one they

18    left out, Your Honor.  They've got to allege specific physical

19    manifestations of the alleged severe emotional distress.  That's

20    Abourezk v. New York Airline, 705 F. Supp. at 665, DDC 1989.  In

21    Abourezk, Your Honor, the court granted summary judgment for

22    defendant on intentional infliction of emotional distress

23    because the record was devoid of any allegation that the

24    plaintiff had received physical or psychiatric treatment as a

25    result of the conduct complained of.

1        That holding applies here even though we're talking about a

2   motion to dismiss and not summary judgment.  The basis is the

3   same, because there was no allegation that the plaintiff had

4   received physical or psychiatric treatment.

5        Your Honor, for all of these reasons, for all of these

6   reasons, the complaint has failed to state a claim, and it

7   should be dismissed as a matter of law.  Thank you very much,

8   sir.

9            THE COURT:  Thank you.  Mr. Rosen.

10           MR. ROSEN:  May it please the Court, Your Honor, my

11  name is Jonathan Rosen and I represent the plaintiff, Robert

12  Steinbuch, in this action.

13       To first address your concern regarding the salacious and

14  X-rated nature of this complaint, it is garbage and it's

15  horrible, and we're here because my client suffered harm

16  professionally, lost jobs, ruined his professional reputation

17  prior to this lawsuit being filed.

18           THE COURT:  You need to go a little slower so the

19  reporter can get it all down.

20           MR. ROSEN:  This harm he suffered, Your Honor, he

21  suffered prior to this lawsuit being filed.  And I submit when

22  Googling his name prior to this lawsuit being filed, the

23  salacious, X-rated and horrible assertions made by -- including

24  the defendant and others, ruined his reputation, has lost jobs

25  as a direct result of, not filing this lawsuit, Your Honor,

1  which would have been to negate his name for Cutler's tortious

2  behavior, but lost it because of, for publicity and her

3  publishing -- publicizing her X-rated blog.

4       Unbeknownst to Mr. Steinbuch, Ms. Cutler, a self-admitted

5  liar and drug user, revealed and disseminated personal, private,

6  and intimate facts about Rob through her X-rated Internet Web

7  site blog, entitled Washingtonienne, on the World Wide Web for

8  everyone to read.  She did not password protect it, even though

9  she's admitted to knowledge of password protection.

10      This court is well aware of the ubiquitous nature of the

11  material when it's placed on the Internet.  In Blumenthal,

12  Your Honor, this court held that the Web is designed to be

13  inherently accessible from everywhere in the world, and never

14  before has it been so easy to circulate speech among so many

15  people once the word is written.  It is disseminated to mass

16  audience literally with the push of a button.

17      Cutler invaded Rob's privacy by publicly disclosing private

18  facts, and made false statements and claims about Rob in her

19  public X-rated blog, painting Rob in a false light.

20      And Your Honor, of the four recognized -- well-recognized

21  torts of invasion of privacy, we are here and have pled public

22  disclosure of private facts, which by the way there's a

23  three-year statute of limitations on, and false light, in which

24  there's a one-year statute of limitation.

25           THE COURT:  Where do you think you plug false light?

1              MR. ROSEN:  Paragraph 31.  Paragraph 31, in the

2   complaint, Your Honor, I'll read it to you, and also -- on

3   paragraph 31 I will quote:  "Other private and personal facts

4   were scandalized to attract more attention.  For example,

5   plaintiff's response to Cutler's question:  'Am I too lazy in

6   bed?' of 'I don't mind passive' was presented, and 'He told me

7   that he likes submissive women.'  And finally, Cutler added

8   "apocryphal event."  The definition of "apocryphal," which I

9   will submit to the Court, Your Honor, Merriam-Webster's

10  Dictionary defines "apocryphal" as fictitious.  It's an

11  adjective, of doubtful authenticity.  That's false.

12         And under the liberal pleading rules, Your Honor, certainly

13  that withstands any motion to dismiss on a false light claim.

14  In addition, Your Honor, the defendant has been well aware of

15  our contention of false light since, in lieu of filing an

16  answer, the defendant filed a motion to dismiss, in lieu of

17  filing an answer.  And we responded immediately setting forth

18  the clarity of our claims.

19         Cutler's X-rated blog tracks events from May 5 through May

20  18, 2004.  This action was filed on May 16 of 2005.  Without

21  providing any discovery, Cutler filed a motion to dismiss.  To

22  survive such a motion, the complaint need only set forth a

23  short, plain statement of the claims, giving the defendant

24  notice of the claims, and to the grounds upon which it rests.

25         First, Your Honor, the defendant admits that when they

1    filed their motion to dismiss, they introduced new evidence in

2    the form of an affidavit, or what they call as a declaration.

3    That's outside the complaint.  And by attaching the affidavit of

4    Ms. Cutler, that alone, that action alone defeats the motion to

5    dismiss.  Therefore, this court must deny the motion to dismiss.

6            THE COURT:  He suggests that the other option, it is

7    an option in some cases, is to consider the affidavit, give you

8    the opportunity to file something, and then treat it as a motion

9    for summary judgment.  But my initial reaction, which I stated

10   earlier, is that some discovery -- if the motion to dismiss was

11   denied, I think some discovery is required -- a whole bunch of

12   things, but even the issue of whether her blog was public, when

13   it became public, if it wasn't public initially.  And you may

14   have some answers to that even without discovery.  And she says,

15   but we don't know, that she took no actions to make it public.

16       But that goes to the statute of limitations, if it's a

17   one-year statute of limitations.  But there may be other things

18   that we ought to have discovery on before there's any sort of a

19   motion for summary judgment.

20           MR. ROSEN:  Your Honor, I agree.  First the motion to

21   dismiss should be granted.  There's no discovery --

22           THE COURT:  You mean it should be denied?

23           MR. ROSEN:  Should be denied, because it's improper.

24   Excuse me, Your Honor, it should be denied, because there is no

25   discovery taken and we never had any opportunity to respond to,

1    if it were a motion for summary judgment.  And I would suggest

2    that if you were to convert it, the only purpose of converting

3    it would be to deny it.

4        With respect to the statute of limitations, Cutler admits

5    that her X-rated blog, and in their brief repeatedly, must be

6    read as a whole and in context, quote-unquote.  They say must be

7    read as a whole and in context.  The blog, she created it and, I

8    argue respectfully, Your Honor, made it -- publicized it for the

9    world to see on May 5, when it was first created.  And read as a

10   whole and in context, it lasted through May 18.

11       Now, let me just speak a moment, Your Honor, about the

12   technicalities of a blog.  A blog is one document.  It is not

13   separate entries which are piece-parted out.  It is in fact one

14   document that we attached as a copy -- not to make it public.

15   The whole world knew about this prior to the filing.

16       But for example -- and Your Honor, I know counsel is very

17   new to this case, and to set the record straight, his initials

18   were not used.  On the first page of the blog, I'm holding it

19   right here, his name, Rob, R-O-B.  That's not an initial,

20   Your Honor.  That's Rob, his first name, and it's the name he

21   goes by.  In addition to Rob, she also used the initials RS.  So

22   it's Robert S.  She also said he was Jewish, he worked on the

23   Hill, he worked for the committee of the judiciary, and he had a

24   twin sister, he lives in Bethesda.  Identifying characteristics,

25   that he looks like famous people.  I can go on and on,

1    Your Honor.

2        So just to set the record straight from here on in, they

3    did not merely use his initials to identify him.  They used his

4    name specifically.

5        Second, when you view the log, it has to be viewed as one

6    document.  In viewing it -- and a blog in and of itself is read

7    in context of one another.  It cannot be piece-parted.  And the

8    fact of the matter is, with respect to the statute of

9    limitations, I'm going to try to clearly lay this out as

10   possible.

11       With respect to the invasion of privacy claim, for our

12   public disclosure of private facts, that's three years.  It's

13   clearly within three years, No. 1.  No. 2, for the false light

14   claim, false light is one year, Your Honor, because it mirrors

15   and tracks defamation law.  One year.  This complaint was filed

16   May 16 of 2005.  These events occurred from May 5 to May 18 of

17   2005.

18       Even by their own admission, we have statements which were

19   false on May 18, and also harmful on May 18.  In addition to

20   being read as a whole, one key piece of the blog, for example,

21   there is a key in the middle of this blog, a key as in how to

22   identify people, distinguishing characteristics.  So by

23   necessary requirement, in order for you, for example, when she

24   did use an initial, you have to go to the middle of the

25   document, to the key, which sets forth who is who with respect

1    to her -- so there's no way you can even read it without --

2    understanding the players, without looking in the middle of the

3    document.

4          In addition, she makes horrible references to his ability

5    to ejaculate or his difficulty in coming with using a particular

6    kind of condom.  The only reason those are written is because

7    she makes previous references to prior days.  So there's no way

8    to understand the entry on the 18th without referencing prior

9    entries on the 5th, 7th, 9th, 12th, and 14th.

10          So, with regard to the one-year statute of limitations,

11    taking the document as a whole, even by their own admission,

12    there was tortious action on the 18th, which is obviously within

13    the one year, and the entire document can't be parsed out, must

14    be read as a whole.  None of the entries make sense -- and as a

15    matter of fact, by defendant's own admission, when you open up

16    the blog, it allows you to go back in time and actually change

17    the entries from previous days.  It's not like they're date and

18    time stamped, that you can never go back.

19          And in fact, the defendant told the plaintiff that she in

20    fact on days went back to change a previous day's entry.  So

21    these are not date and time stamped, and it's not as if any user

22    or viewer of a blog needs to go and open up particular days.

23    It's all one document, Your Honor.  And like I said, as they

24    admitted over and over again, must be read as a whole and in

25    context.

1    THE COURT:  Just sticking with the discovery theory

2    point, is it your contention that because she didn't use a

3    password, that your client could have as early as May 7 somehow

4    found this on the Internet?

5    MR. ROSEN:  Well, someone prior to May 18 did in fact

6    find it.  That's not in contention.

7    THE COURT:  I know, before May 18.

8    MR. ROSEN:  I'll even take their argument, their

9    argument which says that Cox, who publishes the Wonkette, in

10   fact did find it, that that's what they say.  They say they

11   didn't notify her, she found it on her own.  Well, if it's not

12   publicly available, how can you find it on your own?  It doesn't

13   make any sense, Your Honor.  Their argument belies one another.

14   They want to argue on this side that regarding the statute

15   of limitations, okay, regarding the statute of limitations is

16   one year and he should have known immediately on the 5th.  And

17   over here they now argue that oh, no, no, no, you should have

18   discovered it immediately.  I don't understand.  You have to

19   choose one or the other.  I mean, either it was public -- and I

20   submit, Your Honor, for our argument it was public on the 5th,

21   and a new document became public on the 6th, which includes the

22   postings from the 5th.  It then is public -- every time you open

23   the document -- and the key, Your Honor, especially --

24   THE COURT:  Well, your easiest argument to deal with

25   is that even if it never became public until the 18th, it always

1   republishes the earlier days, and therefore everything is part

2   of what's published on the 18th.  That's the easiest argument to

3   deal with.

4        But beyond that argument, is the fact that she didn't

5   choose a password, and some of these other things, mean that

6   anybody or a creative user of the Internet could somehow have

7   come upon this blog, even though -- even if you accept for the

8   moment her statement that it was only made available to three

9   people or three of her friends, was it still technically, if not

10  easily available, nevertheless available to somebody?

11       MR. ROSEN:  Your Honor, the facts -- first, the facts

12  entirely undercut her argument.  First, the evidence in

13  discovery will show that she sent out a mass e-mail, a mass

14  e-mail before creating this blog.  Mass e-mail to hundreds of

15  people requesting, should I put all this stuff on the Internet

16  or what?  And the answer came out yes.  That's a direct quote

17  and an admission from the defendant.

18       Second, she set up the blog for the alleged purpose of four

19  people.  Well, Your Honor, you know for a fact, even if we take

20  their facts as true, that someone, Cox from the Wonkette, in

21  fact did find the information.  So it's not even as if we have

22  to go to a theoretical objective standard.  Someone in fact did

23  find, according to them, in fact did find it.

24       The fact of the matter is -- and here's the most damaging,

25  Your Honor.  She, Cutler, when she created the X-rated blog,

1    hyperlinked to the Wonkette.  That means she put a link there so

2    any reader of her blog could click and hyperlink to the

3    Wonkette.  Now, when you hyperlink to the Wonkette or to

4    anybody's Web site, the person you hyperlink to knows that you

5    in fact put your hyperlink there.  So I contend that the

6    hyperlink shows another manifestation of her attempt to

7    publicize.

8        But, Your Honor, if you look at the words themselves, if in

9    fact you look at her argument, which says she only was doing

10   this for three close friends, the lines in the document -- did

11   you read this stuff?  It says "I'm a staff assistant or, quote,

12   staff ass, what the men on the Hill like to say.  It's the

13   entry-level job in your office (for those of you who don't

14   know.)"

15       You're writing to three close friends about your alleged

16   involvement on the Hill and your personal matters.  You would

17   know whether they knew what a staff meant -- it's so clear from

18   the language that it's written for a wide and -- she's clever --

19   and Your Honor, the reason why we're here is because, oh, she's

20   good.  She's good at making this scandalous, self-promoting

21   herself, *Playboy* magazine, her cashing in on the activity,

22   Your Honor.  And it's a key, the cashing in on the activity.

23       This material is not newsworthy.  We shouldn't be here in

24   federal court.  It's embarrassing, and it's embarrassing me here

25   to even be saying these words, that are not my words, that are

her words, Your Honor.

With respect to newsworthy, in order for something to be newsworthy, it first has to be true.  It has to be true.  Some of the material is not true in this document.  Second, you have to look -- let's look to her words themselves.  Her words themselves, quote, "If I were sleeping with a congressman, maybe, but I'm a nobody.  And the people I'm writing about are nobodies." *Washington Post*.  "The blog is really about a bunch of nobodies fucking each other.  I still can't believe people care.  I mean, I thought it was pretty typical."

Cutler told Playboy, "I wasn't doing anything extraordinary.  None of these people were elected officials, so they don't deserve the scrutiny.  It's not like I dated Dick Cheney.  If I had, I would have tried to cash in on that earlier."

These are not my words, Your Honor.  These are her words.  Why we're here in court, why you're angry, why my client suffered, and why I'm here forced to defend him and to clear his name, is because this trash and garbage which is out there.  It's absurd.  Absolutely absurd.

If Your Honor is still considering the question of newsworthy, I can go on and list ad nauseam the number of ejaculations, the types of condoms, whether it's a thick condom or thin condom, and how he comes or not.  It's ridiculous.  So I will continue with the newsworthiness of this or --

1          THE COURT:  I don't think -- I don't believe, as I

2     think I said this to begin with, that I did not think there was

3     anything to the defendant's argument that these were matters of

4     general public interest, which was his third of three points.

5     So I don't think --

6          MR. ROSEN:  Yes.  And it's not of legitimate public

7     concern.  Thank you, Your Honor, for sparing me the

8     embarrassment.

9          Cutler admitted, I wrote an X-rated blog.  Not newsworthy

10    issues, because the statements are false, and it's in our papers

11    and I'll submit to the litany of expressions used that clearly

12    show that.

13         With respect to the damage and why we're here, Your Honor,

14    this is about his name and professional association.  And I know

15    firsthand from professional matters in which, and associations

16    in which he has been rejected and his name has been hurt, as

17    being associated with this lawsuit.

18         And Your Honor, the information that is out there saying

19    oh, he came forward with respect to his identity.  His identity,

20    including his first name, was on the first page of the blog.  He

21    was identified, for example, by a Web site -- the Cheshire Cat

22    Web site, while this story broke, which linked him as --

23    identified him -- Calico Cat, Your Honor, Calico Cat is a

24    popular underground site that discovered his identity.  Well,

25    discovered it, they just read his name, Rob, and he's Jewish and

1    he works on the Hill and he lives in Bethesda, and they

2    identified him, and he was exposed prior to this lawsuit in fact

3    being filed.

4         Just to set the record straight with respect to the

5    pleading for intentional infliction of emotional distress, on

6    page 21 of our complaint, paragraphs 34, 38, and 39, we allege

7    defendant acted intentionally, defendant was reckless, the

8    widespread dissemination of the private facts have caused severe

9    emotional distress, humiliation, embarrassment, and anguish.

10        Turning to each element of the cause of action, the

11   invasion of privacy and public disclosure of private facts, we

12   don't disagree on the case law.  The case claw is clear.  There

13   are five elements.

14        We have publicity.  She admitted in her declaration she

15   made it public.  By creating the Internet blog, that is in fact

16   publicity.  In defendant's reply brief, that I know counsel

17   didn't write, but in defendant's reply brief on page 13, admits

18   the fact that it was public.  They admit publicity.  And in that

19   brief, they admit publicity, and they merely contend, oh, it's

20   publicity but it's public facts.  They've already admitted

21   publicity.  First element, therefore, must be satisfied.

22        Cutler wrote, "I was writing on the bathroom wall."  "With

23   a blog you cannot expect your private life to be private

24   anymore."  "Some people with blogs are never going to get

25   famous, and they've been doing it for like a year, or like over

1    a year.  I feel bad for them."  These are quotes, admissions by

2    the defendant in this action.  Publicity has in fact been

3    satisfied.

4        There was no waiver.  The contention about ass slapping or

5    office joking, that is in fact inaccurate and factually

6    inaccurate, and we contend in the complaint it's factually

7    inaccurate.  This isn't privileged information, nor was there

8    any waiver.  And even if the Court would find speaking about it,

9    mentioning it in the office would be a waiver, there's a whole

10   litany of other information which was not.

11       In her own statement, she says in here that Rob is a

12   discreet person.  She admits that Rob is a discreet person and

13   understands the importance of his discretion and recognized the

14   fact that he was upset.

15       Given to private facts.  The number of times he ejaculated,

16   all the garbage which I will not state again, I contend they are

17   private facts, they're not public.  And it's hornbook law that

18   sexual activity in the bedroom, even including someone, that is

19   the paramount of private information.  That's why bedrooms have

20   doors on them.  The case law has held that explicit sexual

21   material are the epitome of private facts.

22       Again, the fourth element, there's no legitimate concern.

23   There's no legitimate public concerns here.  And we shouldn't

24   even be here.

25       And finally, would be highly offensive to a reasonable

 1   person of ordinary sensibilities.  Your Honor, I submit to you

 2   that case law has made it clear that's a mixed question of law

 3   and fact.  The judge must first determine whether there is room

 4   for the material to be highly offensive to a reasonable person

 5   of ordinary sensibilities.  I submit as a matter of law, you

 6   would rule that this as a matter of law is offensive to an

 7   ordinary reasonable person, but certainly there's room for a

 8   jury to decide that.

 9        Second, with respect to false light, that Cutler published

10   material that placed him in a false light that would be

11   offensive to a reasonable person.  She had knowledge and she

12   acted recklessly with regard to the falsity and the publicity of

13   the material.  She said false things, and the false things

14   include that he liked to do freaky shit, fucked every way, likes

15   to talk dirty, stated that he would be using handcuffs on her,

16   enjoyed hair pulling, had sex like nasty animals, would get

17   turned on by her being scared and panicky, and that he told her

18   that he likes submissive women.

19        These are not true.  The statements are not true, and place

20   the defendant in a false light.

21             THE COURT:  It's not true that he said these things?

22             MR. ROSEN:  Not true that -- the statements he made --

23   he did not say those things.  He did not tell her that he likes

24   submissive women, that's right.

25             THE COURT:  So presumably you're going to try to

1    establish the falsity of that by deposing her under oath?

2              MR. ROSEN:  And deposing him.

3              THE COURT:  And deposing him.

4              MR. ROSEN:  Right.  He will testify here today that he

5    did not say that.  Right here, he'll say that he did not say

6    that.

7              THE COURT:  That's all right.  We're here on a motion

8    to dismiss, remember?

9              MR. ROSEN:  That's right.  It's a professional injury,

10   Your Honor.  The real harm in this case is the injury to his

11   reputation and his profession.  He's an attorney, counsel for

12   the judiciary, and law professor, and has and continues to

13   suffer harm as a result.

14        Your Honor, I submit to you the ubiquitous nature of the

15   Internet, each of his students now Googles his name.  Google his

16   name.  Google "Steinbuch."  Put it in there.  See the first

17   thing that comes up.  The first thing that comes up -- see the

18   first five entries that come up, Your Honor.

19        He teaches legal ethics and professional responsibility.

20   Comments, snickering.  It's not funny.  It's not funny and it's

21   damaging.  It's horrible, absolutely horrible.

22        If you have any questions, Your Honor.

23              MR. UMANA:  There's no question, Your Honor, that the

24   things of which the plaintiff's counsel complained are sad, sad

25   matters.  That's not the issue before the Court today.  The sole

1   issue before the Court is whether the plaintiff has stated a

2   case, has stated the material elements of the claims, and has

3   filed a complaint on time.

4        And hearing the argument and the very emotional argument of

5   plaintiff's counsel, what he's done is just reemphasize that

6   this complaint, the one he filed, he can't ride with.  He needs

7   to recast his complaint and make it a complaint about false

8   light.  But that's nowhere to be found in this complaint.

9        And this complaint should be dismissed, Your Honor, because

10  it fails to allege the elements of the claims.  And moreover,

11  the statute of limitations, I just heard Mr. Rosen state that

12  indeed on May 5, 2004, she made it public for the whole world to

13  see.  That's a quote, as best I could write it down.

14       Well, that kills them on the statute of limitations.  None

15  of the cases, incidentally, Your Honor, talk about the possible

16  application of the discovery rule.  We haven't seen any cases

17  cited on either side that apply the discovery rule to invasion

18  of privacy here.

19       But moreover, the theory of the complaint, what the Court

20  has to go by, is what the complaint alleges.  And I said this

21  earlier, Your Honor, but throughout this complaint, the

22  complaint alleges that this blog and these statements were

23  public and they were on the Internet.

24       I made a separate point about page 1 of Exhibit 1, because

25  page 1 of Exhibit 1, they chose to put that in there, they

1    didn't have to but they chose to put it in.  It kills them.

2    It's devastating to their case, because it proves that my client

3    wasn't intending to publicize this.

4        Now, they just made another statement -- I didn't see this

5    in the complaint, but they said that she put in a hyperlink.

6    That's not true.  That's not alleged.  And Exhibit A is right

7    here.  There's no hyperlink there.  I don't know why they said

8    that.  It's just not true.  It's not -- in considering the

9    12(b)(6), we can look at Exhibit A, and it's not there.

10       Now, the sad fact here is that my client only referred to

11   "RS," and apparently at one point "Rob."  But nowhere did she

12   identify this individual.  Nowhere did she identify, throughout

13   this blog, her private blog.  Could some people maybe in the

14   office have figured it out?  Sure, but that's not publicity.

15   Making it available to the public at large under the cases I

16   cited, Your Honor.  It just isn't there.  It just isn't there.

17       That's the whole reason plaintiff's counsel is struggling

18   to rewrite his complaint.  Now it's a complaint about false

19   light.  Well, what does paragraph 31 say?  Paragraph 31 is the

20   only place in the entire complaint that takes issue with

21   something that's said in the blog in terms of mischaracterizing

22   the -- she says in the blog, well, he likes submissive women.

23   He says well, I didn't really say that.  What I said was

24   something a little different.

25       That's the only place in the entire complaint, paragraph

31.    False light isn't even mentioned in the complaint.    It's
silly for them to be arguing a whole new legal theory when the
complaint that they've stated fails to allege the elements of
the complaint.

Now, we also heard plaintiff's counsel argue about the
password protection.    There is no possible way to do that.    I
ran a test yesterday myself, Your Honor.    The question that
comes up:  "Add your blog to our listings?"    She put in "no."
She put "no."    A public blog appears in your blogger profile.
If you select no, we will not show your blog anywhere on
blogger.com.    There's nothing about passwords or not.

I don't know if it's possible to use other blog sites where
you can use password protections, but what I can represent to
this court is it was not possible to use a password protect.
What she did was limit the URL to three friends and a friend of
a friend, and that was it.    That's simply not publicity.

I'm not saying this is a happy case.    It's not.    It's a
very sad case.    But I'm also telling the Court that this case
doesn't even come close to alleging the timely filed complaint.
It's not there.    They waited too long to file this case.    They
waited too long.    And waited to find out that she was getting
advance on a book or whatever.    It has nothing to do with the
causes of action alleged.

As a matter of Rule 12(b)(6), Your Honor, there is no way
that this complaint can stand, respectfully.    Thank you so much.

1       MR. ROSEN:  May I briefly respond, Your Honor?

2       THE COURT:  Yes.

3       MR. ROSEN:  Plaintiff's counsel is not making up the

4  word "false" or "apocryphal."  The word "apocryphal" is in the

5  complaint.  If he doesn't have a dictionary, I can lend him

6  mine.  There is the dictionary definition of the word

7  "apocryphal," with respect to fictitious or false.  I understand

8  in the future I'll restrict my vocabulary to not as fancy of

9  words.

10      Regarding the declaration and regarding attaching, it's

11  absurd, their argument.  We attached a copy of the blog to prove

12  its existence, that it is what it is.  Not the contents.  It's

13  not the truth of the matter asserted.  We don't -- if that were

14  the case, Your Honor, you could never have a defamation case or

15  a false light case.  By merely attaching the document we somehow

16  ascribe to the truthfulness of the document?  No, we're

17  attaching it to say there's where the false stuff is.  That's

18  why it's there.

19      With respect to the hyperlink, it's a matter of record.  It

20  is on there.  And just to set the record straight, first we --

21  we didn't use his name, just his initials.  Okay.  Well, now we

22  used his initials and his name, on the first page, "Rob."  And

23  he used his religion.  And he used where he worked.  And he used

24  where he had a twin sister.  And he used that he lived in

25  Bethesda, Maryland.  And he used that he was counsel for the

1    judiciary.  And he used descriptive physical -- of his naked

2    body.

3        So it's completely disingenuous for them to argue that he

4    was not identified.  He was clearly identified.  In addition,

5    the objective facts show he was identified because third parties

6    in fact -- the Calico Cat -- found out that it was him.  Not

7    office people, not some intimate knowledge.  Third parties,

8    objective third parties found out.

9        Yes, and the harm started on May 5.  And it was on May 6,

10   and on May 7, and continued through May 18.  So regardless of

11   the statute of limitations, certainly No. 1, for public

12   disclosure of private facts, that's three years.  So that's in,

13   regardless.

14       With respect to one year, at best it could be as of the

15   16th.  Even if Your Honor were to rule, and I suggest of course

16   you do not, that it were not, the material that falls outside,

17   on the 18th, certainly survives the statute of limitations, and

18   certainly because, using their own words, read as a whole and in

19   context -- their words, read as a whole and in context -- the

20   18th addition to the document, which is one document, which I

21   remind Your Honor was changed in the past, must be taken as a

22   whole.

23       And thank you for your time and your understanding.

24           THE COURT:  Is there something else you wanted to say?

25           MR. UMANA:  Just one last word.  And I can feel the

1    tension in this room.  I don't think I've ever been in a

2    12(b)(6) hearing like this in my life in 30 years of practicing

3    law in Washington.

4              MR. ROSEN:  And I've never been in a case like this in

5    my life, Your Honor.

6              MR. UMANA:  But the fact is that under the single

7    publication rule, and that's the law in the District of

8    Columbia, Your Honor, <u>Mullin v. Washington Free Weekly</u>, 785 at

9    298, note 2, you've got to go by the first publication of

10   something that they consider a disclosure of false -- of private

11   facts.

12        That's May 7, 2004.  May 7, 2004 is when the statute runs

13   through the whole thing.  He had to act promptly, within a year.

14   That's the law in the District of Columbia, and that's the

15   statute, and they failed to file the complaint on time.

16        Apart from the fact that they failed to allege the claims

17   and now are trying to rewrite them, it's just not a close

18   question.  They're out of court on the statute of limitations.

19             THE COURT:  So the first time you're defamed, even if

20   there are 20 separate statements later and each one is worse

21   than the last, you have to bring the lawsuit within a year?

22             MR. UMANA:  That's what this rule holds, and it's the

23   law in the D.C. Court of Appeals, and it's what governs in this

24   case.  Thank you, sir.

25             THE COURT:  Which case are you talking about again?

1          MR. UMANA:  That's Mullin, M-U-L-L-I-N, versus

2   Washington Free Weekly Inc., 785 A.2d 296 at page 298, note 2.

3   D.C. Court of Appeals 2001, citing several other cases,

4   including a case in the district court here, Ogden, which is 177

5   F. Supp. at 499 to 502, Your Honor.  That's a DDC case in 1959,

6   sir.  This is the law that governs this case.  Thank you, sir.

7          THE COURT:  Why don't we take about a 15-minute break

8   and I'll try to come back and decide this.

9          (Recess from 3:06 p.m. to 3:28 p.m.)

10          THE COURT:  What I'm going to do is give you a brief

11   oral opinion on the motion to dismiss, rather than do anything

12   in writing, because it's just easier and faster.  So if

13   anybody -- so there won't be a written opinion, it will just be

14   an order denying the motion to dismiss for the reasons that I'm

15   going to state now.  So if anybody wants the transcript, you can

16   order the transcript.

17          Briefly, as set forth in the complaint, the relevant events

18   in this case took place over a period of around two weeks in May

19   of 2004 when the defendant, Jessica Cutler, was working as a

20   staff assistant for Senator Mike DeWine of Ohio.  And according

21   to the complaint, she was having, unbeknownst to the plaintiff

22   at the time, I guess, she was having sex with a number of

23   different men, and she created a blog on May 5, 2004, on a blog

24   site, and that's set forth in Appendix A to the complaint.

25          As I understand the allegations, the blog did not require a

1    password to be read, and the plaintiff alleges based on that and

2    some other things that it was a publicly available blog and

3    anybody -- not anybody but lots of people could have had access

4    to it.  The defendant says that that's not so and that she

5    really only included three people in the blog initially, and

6    that it was -- she did not distribute it beyond those three

7    people plus one fourth person who was a friend of one of those

8    three.

9        That, of course, is set in the briefs in this case and in

10    the declaration that Ms. Cutler has submitted.  For the reasons

11    I suggested during oral argument, since this is a motion to

12    dismiss under 12(b)(6), I'm not going to consider the

13    declaration at this point.

14        Mr. Steinbuch's involvement began on May 6, 2004, when he

15    first went out for a drink with her, and over the next 12 days

16    she wrote about him and their sexual relationship on her blog.

17    She referred to him by his initials, "RS," she referred to him

18    as "Rob," she referred to him in other respects.  I can't recall

19    whether it says in the complaint -- and the complaint says it

20    identified him as a committee counsel of the Senate Committee on

21    the Judiciary, identified his place of residence, said that he

22    had a twin, described his general appearance, and provided

23    details of the intimate relationship between the plaintiff and

24    the defendant.

25        On May -- and all of this is set out in detail in the

complaint and the appendix to the complaint.  This relationship

began on May 6, and according to the complaint ended on May 18.

Meanwhile, there was an Internet gossip site known as the

Wonkette by Anna Marie Cox.  And on May 18 the Web site

wonkette.com posted a link to the defendant's, Ms. Cutler's

blog, and described Ms. Cutler's blog's contents and republished

excerpts on the Wonkette Web site, and also linked to that blog.

And from there it was, according to the complaint, widely

disseminated beyond that.

Ms. Cutler apparently took the blog down from the Web site

on or shortly after May 18.  She was fired from her job with

Senator DeWine, she subsequently wrote herself for wonkette.com,

posed for Playboy, gave interviews, and wrote a novel, which

apparently Sarah Jessica Parker's company is now interested in

making into a television show.

Now, the lawsuit was filed on May 16, 2005, which is

certainly less than one year after May 18, 2004, but more than

one year after the date this all began, which is on May 6, 2004.

The complaint alleges two common law torts, one for invasion of

privacy for one for intentional infliction of emotional

distress.

We're here on the Defendant's Motion to Dismiss the

Complaint for failure to state a claim under Rule 12(b)(6) of

the Federal Rules of Civil Procedure.  And as I mentioned,

Ms. Cutler has, through counsel -- through her former counsel,

1    has attached a sworn declaration.

2        On a motion to dismiss for failure to state a claim, the

3    Court is to assume the truth of the facts alleged in the

4    complaint.  It's not supposed to go outside the four corners of

5    the complaint, and can grant a motion to dismiss for failure to

6    state a claim only if it appears beyond doubt that the

7    complainant will not be able to prove any of the facts set out

8    that would justify relief.

9        The complaint is construed liberally in plaintiff's favor

10   in a motion to dismiss, and the Court should grant the plaintiff

11   the benefit of all legitimate inferences from the facts that

12   have been alleged, but the Court need not accept factual

13   inferences if the inferences are not supported by any facts

14   alleged, and must not accept any legal conclusions.

15       So clearly if there's a failure to allege all the elements,

16   or under no set of facts and circumstances would a particular

17   tort be able to be proved, then it's proper for a motion to

18   dismiss.  Or as I said, if the facts alleged wouldn't make out

19   the tort.

20       The defendant argues that the invasion of privacy claim

21   should be dismissed because the plaintiff had no reasonable

22   expectation of privacy in his sexual relationship with Cutler,

23   that the plaintiff waived whatever rights he might have had,

24   that the facts disclosed were already public by the time they

25   were disclosed in the blog, that the defendant was not the one

1   who publicized the blog, and that there was a legitimate public

2   interest in all of these matters, I guess because people are

3   interested in sex and politics and the interrelationship between

4   them.

5        I'm thinking of Fanne Foxe in the reflecting pool, for

6   those of you who are old enough.  I think it was the reflecting

7   pool.

8        In any event, the second claim is for intentional

9   infliction of emotional distress.  And the argument is that, A,

10  there's a failure to meet the statute of limitations, which the

11  defendant says is one year, and secondly that the complaint

12  doesn't make out either an emotional distress claim or an

13  invasion of privacy claim.

14       Most of what the defendant argues with respect to the

15  invasion of privacy claim involves facts and interviews and

16  statements in the briefs about what actually happened or didn't

17  happen.  Whatever's in Ms. Cutler's declaration, whatever

18  assertions of fact either side makes in the briefs are really

19  not relevant in a 12(b)(6) motion.  What's relevant is what's in

20  the complaint itself and whether it makes out a claim for

21  relief, and whether, if these facts are proved, the plaintiff

22  has a claim.

23       As we discussed earlier, an invasion of privacy really is

24  four separate torts, and the District of Columbia courts have

25  adopted the restatement in the second American Law Institute's

1   restatement of torts section -- I guess it's Chapter 22A.  And

2   in Section 652A the restatement says one who invades the right

3   of privacy of another is subject to liability for the resulting

4   harm to the interests of the other.  And then it says the right

5   of privacy is invaded by, and there are four separate entries,

6   each of which is considered a separate tort.  Two of them

7   clearly do not apply here, are not alleged here.

8        The plaintiff says he has alleged the third of the four,

9   unreasonable publicity given to the other's private life, and

10   says also that, although somewhat obliquely, they've also

11   alleged in paragraph, I think it was 31, the fourth of these

12   four torts, publicity that unreasonably places the other in a

13   false light before the public.

14        The elements of the first, one who gives publicity to a

15   matter concerning the private life of another is subject to

16   liability for invasion of privacy if the matter publicized is of

17   a kind that would be highly offensive to a reasonable person,

18   and it's not of legitimate concern to the public.

19        So, the key case which discusses the fact that there are

20   essentially four constituent torts, and the elements of them, is

21   Wolf v. Regardie, which I think both sides have cited, at 532

22   A.2d 1213.  And while a plaintiff may in fact bring suit on two

23   or more of these constituent claims, at the end of the day

24   there's only one recovery, regardless of which theory.

25        The more clearly stated of plaintiff's claims is the third

1  of the four under the restatement, invasion of privacy,

2  unreasonable publicity given to another's private life, in

3  paragraphs 30 through 34 of the complaint.  And in paragraph 31,

4  the plaintiff says "Other private and personal facts were

5  scandalized to attract more attention.  For example, plaintiff's

6  response to Cutler's question:  'Am I too lazy in bed,' 'I don't

7  mind passive' was presented as, 'He told me that he likes

8  submissive women.'"  And finally, "Cutler added apocryphal

9  events."

10  I think the public disclosure of private facts claim has

11  been clearly pled, as I said, in paragraphs 30 to 34.  The false

12  light claim is at best somewhat difficult to discern, but I

13  think under Rule A it's enough, it's there.  And certainly the

14  plaintiff is on notice of the fact that it's there.  If

15  plaintiff wanted to amend his complaint to make it more

16  explicit, obviously the plaintiff could do it as of right now,

17  because no responsive pleading has yet been filed, and always

18  could move to do so.

19  But I think in view of the reading of that one paragraph,

20  alongside a dictionary, as Mr. Rosen suggested, there's enough

21  there to survive, although barely, a motion to dismiss on that

22  particular theory, and there's certainly enough to survive a

23  motion to dismiss on the other theory.

24  Now, let me deal with the defendant's arguments.  And

25  again, these are arguments that, in order to dismiss, I would

have to accept as a matter of law.  The first is that there's no
reasonable expectation of privacy because it's not in a family
situation, people who have casual affairs can't expect things to
remain private, and so forth.

And it may in fact be true that the fact of a relationship
with someone you don't know well, you might be engaging in some
sort of blind trust with someone you have no reason to
completely trust not to disclose the fact of the relationship.
But the details of what occur in the bedroom are classic
examples of normally private facts under this particular
invasion of privacy theory.  There's discussion of it in the
restatement itself, there are a whole series of cases.

The cases that are cited by the defendant to the contrary,
the Rhode Island case, rely on a particular Rhode Island
statute, and one other case, do not persuade me to the contrary.
I suppose it's possible that after discovery it could be shown
that Mr. Steinbuch had no reasonable expectation of privacy, but
certainly not on a motion to dismiss.

With respect to the waiver argument, you know, the fact
that plaintiff knew that some of his coworkers knew that they
went and had a drink together and may have seen them together,
the fact that the plaintiff knew that Ms. Cutler told coworkers
about the fact that he enjoyed spanking, and he said that was
okay, and the fact that he joked about it, all of which, if one
accepts that as true -- although again on the motion to dismiss

1   the plaintiff disputes much of that, maybe not all of it, but

2   much of that -- it seems to me that that does not constitute a

3   waiver of all of these details that she put on the blog and that

4   she communicated with others.   It fails as an argument to

5   dismiss the complaint.

6       This is an overly broad view of waiver in my opinion.   Even

7   if the defendant's version of the events is true, on a motion to

8   dismiss for failure to state a claim, it's not the defendant's

9   version of events but the plaintiff's version of events as set

10  forth in the complaint that I need to rely upon.   That's both

11  his waiver argument and part of his argument that it's not

12  private if it was being joked about in the office.

13      With respect to that issue of privacy, as I said a minute

14  ago, it's not the fact of the sexual relationship that is the

15  private fact that Mr. Steinbuch is basing his complaint about,

16  it is the revelation of specific details of the sexual

17  relationship and the sex between the two of them.   The fact that

18  he may have acknowledged to some coworkers that he was having a

19  relationship with her does not constitute a waiver of his right

20  to privacy with regard to every aspect of that relationship,

21  including details of sexual encounters.

22      And in fact, to the extent that that disclosure that they

23  had seen each other, or that the spanking incident occurred

24  early in this 12-day period, it certainly wouldn't be a waiver

25  of everything that happened thereafter.

1    The defendant says that she took action not to make it

2    public by limiting it to three people or four people, and

3    there's no indication that she made it public.  Well, I think

4    that's a highly intensive factual question, exactly -- it's

5    factually intensive in a couple of different ways.  One is just

6    sort of the technical stuff we've been talking about today about

7    how a blog works, or how this blog worked, whether or not there

8    was a hyperlink, whether the failure to put in a password, what

9    the implications of that were.  All of those sorts of things.

10   How Ms. Cox learned about it initially.  Those are sort of the

11   technical aspects of it.

12       The other aspect of it is whether or not Ms. Cutler took

13   steps on May 7 or May 8 or some other date to make it public

14   herself, or whether it was somebody else who made it public,

15   beyond her.  Another aspect of whether it was private or public,

16   and what was private or public, which I hadn't thought about,

17   although it may have been in the briefs and it was mentioned

18   today, the fact that people can change things on a blog, that

19   what she may have entered on May 7 may in fact have been changed

20   by the time it was made public, if it was made public some days

21   later, by her.

22       And to the extent that -- maybe I'm repeating myself here,

23   but to the extent that plaintiff argues that she's responsible

24   for publicizing the blog to the larger world beyond these three

25   or four people, either as the anonymous tipper to Wonkette or

1    though other actions, linking the blog to Wonkette or otherwise,

2    that's clearly a fact question that we can't decide today.

3        The other thing that is a little bit complicated perhaps,

4    but I don't think I need to decide at this point, is the term

5    "publicity" in this tort, in this type of invasion of privacy

6    claim, the publication of a private matter, or the publicizing

7    of a private matter is different from publication as that term

8    is used in defamation, and that's made clear in the comment to

9    section 652D of the restatement.

10        So I think we need discovery on a lot of these things,

11    including specifically what role Ms. Cutler played in the

12    publicizing or the making public of these matters.  I will say

13    this, that how many people have to be in the loop in order for

14    something to be made public may be certainly worth talking about

15    during discovery, but I do think the primary case on which the

16    plaintiff relies that publication, even to one or two people,

17    may be sufficient, <u>McSurely v. McClellan</u>, 753 Fed. 2d. 88, is

18    kind of a unique case that is not applicable across the board

19    and does not generally stand for the proposition that

20    publicizing it to one or two or three people is sufficient to

21    satisfy the elements of this tort.

22        The argument that the defendant makes that there is a

23    public interest in this kind of information I just reject.

24    Normally you balance the public's right to a certain kind of

25    information against the individual's right to privacy.  It seems

1    to me that the public has no such right to this kind of

2    information about a person; that the individual's entitled to

3    maintain it privately, and there's no legitimate logical nexus

4    between the private facts allegedly disclosed here and the

5    matters of public interest that are invoked; namely, people are

6    interested in politics and in government, and everybody's

7    interested in relationships, whether they're financial

8    relationships or sexual relationships on Capitol Hill.

9         Financial relationships, maybe there is a strong public

10   interest in, and some of the things that have been in the press

11   recently about relationships between lobbyists and politicians

12   are of legitimate interest, and if somehow sex is involved in

13   that, maybe there is a public interest in it.

14        None of that is what's involved in this case.  It's just

15   a -- and I know that Mr. Umana did not write the brief, but the

16   argument -- I just want to make sure I have the right thing --

17   the argument that the blog was newsworthy "as a shocking and

18   disturbing portrayal of casual and even reckless sexual

19   encounters between young entry-level Capitol Hill staffers like

20   Cutler and more senior staffers like Steinbuch, more prominent

21   executive branch officials and older, married, powerful and

22   wealthy men is of interest to the public," and "the

23   interrelationship between youth, beauty, sex, money and power in

24   Washington has long been a matter of legitimate and sometimes

25   pressing public interest," I just don't think carries the day

1    here.

2        What's involved in this case is not the fact of a

3    relationship between two people, but the intimate details of

4    that relationship.  As I said before, facts surrounding sexual

5    intimacy are regarded as a classic example of private facts that

6    deserve protection, and comment B to the restatement says that,

7    that sexual relationships are normally entirely private matters.

8    Even public figures who do not have the same expectation of

9    privacy have an interest of privacy in those matters.

10       And Mr. Steinbuch's not a public figure.  So I just reject

11   the notion that the relationship between the two of them was a

12   matter of public concern or interest, particularly the details

13   of the sex act they performed is just -- just doesn't carry the

14   day at all.  That's not a basis to dismiss.

15       Intentional infliction of emotional distress -- I won't say

16   anything more about the other form of invasion of privacy that

17   is less explicitly alleged in paragraph 31 of the complaint,

18   which is publicity placing a person in a false light.

19       The restatement says one who gives publicity to a matter

20   concerning another that places the other before the public in a

21   false light is subject to liability to the other for invasion of

22   his privacy if A, the false light in which the other was placed

23   would be highly offensive to a reasonable person -- that kind of

24   parallels one of the elements of the other branch of this tort

25   we were just talking about -- and B, the actor had knowledge of

1   or acted in reckless disregard as to the falsity of the

2   publicized matter and the false light in which the other would

3   be placed.

4       And the reason I said before that we're going to have to

5   await the deposition of the defendant -- and Mr. Rosen said yes,

6   and of my client as well -- but the truth of the matter is I

7   think it's a hard claim to prove, and I'm sure I'm not telling

8   Mr. Rosen something he hasn't already thought about.  It's a

9   hard claim to prove when you've only got two people, and they're

10  not necessarily objective facts.

11      And if she admits that she lied, misstated, if she admits

12  under oath that she made false statements or placed him in a

13  false light, that's one thing, but if it's "he said, she said,"

14  it may be a very hard case to carry a burden of proof on unless

15  there are going to be other witnesses coming in here.  And I'm

16  not sure that Mr. Steinbuch's going to want to bring other

17  witnesses in on some of those issues.  So just a note of

18  caution.  But I do think the complaint states a claim under both

19  theories.

20      On the intentional infliction of emotional distress, in

21  this jurisdiction to sustain a claim or to state a claim for

22  intentional infliction of emotional distress plaintiff has to

23  allege extreme and outrageous conduct on the part of the

24  defendant -- that's one -- two, that either intentionally or

25  recklessly, three, caused the plaintiff severe emotional

1   distress.

2        Again, on a motion for dismissal for failure to state a

3   claim, I think this complaint states enough.  The conduct is

4   alleged to be extreme and outrageous, not in so many words, but

5   that's what it says, and that it was done, it's alleged, both

6   initially and recklessly, or probably in the alternative, and

7   that it caused him severe emotional distress.

8        And I'm either going to have to decide on a motion for

9   summary judgment whether it doesn't meet that test, or if it

10  does, drawing all reasonable inferences in favor of the

11  nonmoving party, whether it's a matter that has to go to the

12  jury to see whether they think, on proper instructions, the

13  conduct was extreme or outrageous, and whether there's a causal

14  connection between the conduct and harm to the plaintiff.

15       Again, I agree that it's not stated in the complaint

16  exactly what that harm is, but there's enough there -- Mr. Rosen

17  made some statements today, it's a fruitful ground for discovery

18  to -- both document discovery and deposition discovery, what the

19  harm was, has he really lost a job, has he really lost income,

20  what has it done to his reputation in the communities in which

21  he operates.  So I think there's enough to state a claim.

22       Now, with respect to the statute of limitations question,

23  there's basically two branches of one tort claim and then a

24  second tort claim.  So the question is what is the statute of

25  limitations under invasion of privacy, namely an unreasonable

publicity given to the other person's private life; what is the

statute of limitations for right of privacy invasion by putting

someone in a false light.

If any of them is a three-year statute of limitation, then

there's absolutely no problem for the one that's a three-year

limitation.  If they're one-year limitations, then there are

some problems.

The defendant -- I'm sorry, the plaintiff argues that the

statute of limitations for invasion of privacy, public

disclosure of private facts, is three years, and I think makes

the same argument with respect to intentional infliction of

emotional distress.  But has conceded that with respect to false

light, it's one year.  He also argues in the briefs that these

are a continuous act and that, I guess alternatively, that if it

were a one-year rule, that there's a question of when the

plaintiff discovered or reasonably could have discovered that he

had been wronged.

And we've gone back and forth about whether the blog was

public or wasn't public, and how public was it, and whether

Mr. Steinbuch could have had access to it or did have access to

it.  But if it came to light not on the 6th or 7th of May but

somewhere later, it may be as late as the 18th, and it can be

established that he did not know and could not have known

without due diligence before some particular date after May 6 or

7, then some or all of these statements arguably fall within the

1    one-year statute of limitations, if there's a one-year statute

2    of limitations.

3        Now, a couple of different points to be made.  I conclude

4    that there is a one-year statute of limitations with respect to

5    all three of these things.  And the plaintiff relies in part on

6    a case from the District of Maryland, Smith v. Esquire, 494 F.

7    Supp. 967.  And we have at least two extremely relevant D.C.

8    cases from this court.  One is Southeastern University, Doe v.

9    Southeastern University, Judge Harris's decision in 732 F. Supp.

10   7, and the other more recent one by Judge Kessler, Grunseth v.

11   Marriott, 872 F. Supp. 1069.

12       And in Grunseth Judge Kessler points out, as I have today,

13   that there are actually four different theories for an invasion

14   of privacy claim.  And she says that -- and the one that was

15   involved in the case before her was the primary one involved

16   here, public disclosure of private facts.  And she says that

17   there is a one-year statute of limitations for libel, slander,

18   assault and other similar intentional torts, and that this

19   limitation has been applied to invasion of privacy claims, under

20   the rationale that invasion of privacy is essentially a type of

21   defamation.  She said it's just Harris's approval in Doe v.

22   Southeastern.

23       She rejects the plaintiff's argument that the three-year

24   statute applies, and says that -- and then goes through the

25   elements of the third of the four theories under Wolf v.

1    _Regardie_, so it's clear that that's the one she's talking about.

2    So she has concluded the one-year statute applies to the third

3    of the four theories.  In the restatement it's conceded that it

4    applies to the fourth of the four theories in the restatement.

5        And with respect to the intentional infliction of emotional

6    distress -- and so I agree with her.  And with respect to the

7    intentional infliction of emotional distress, it's clear that

8    the question is whether it's -- I can't remember the exact

9    language, but whether it's officially intertwined with the

10   underlying violation, then the same statute of limitations

11   applies.

12       And by the nature of the complaint I think the allegations

13   are that the intentional infliction of emotional distress claim

14   is very much intertwined with the invasion of privacy claims,

15   and therefore seems to me that it follows from my finding or

16   conclusion that it's a one-year statute of limitations for the

17   invasion of privacy claims, the same will be true with the

18   intentional infliction of emotional distress claims.  _Thomas v._

19   _News World Communications_, 681 F. Supp. 55, and _Dooley v. United_

20   _Technology Corporation_, 1992 Westlaw 167053, a 1992 case.

21       But when does the one year start to run, is the question.

22   Mr. Umana argued that, you know, multiple publication rule and

23   once you publish it once it runs from that date.  The _Mullin_

24   case that he mentions, _Mullin v. Washington Free Weekly_, 785 A.

25   2d 296, is essentially, Judge Steadman's opinion there is

1    talking about the old common law multiple publication rule.    And

2    what that's all about is in the old days every time you called

3    somebody a thief, you slandered them again, and if you said it

4    20 times, there were 20 separate slanders, defamations, or

5    libels.

6        And as he points out, it's sort of -- the reason it

7    developed at common law was this was the time of Thomas Payne's

8    pamphlets and things like that.    He said "such a rule began to

9    produce bewildering results after the rise of mass periodicals."

10   Well, imagine the bewildering results after the rise of the

11   Internet.

12       If you're saying the exact same thing, in the old days,

13   over and over again, maybe it's a separate libel.    But here

14   we're talking about not saying the same thing; we're talking

15   about saying separate things.    And we're also talking about the

16   possibility of the statement made over the Internet or on the

17   blog on day one, could have been changed or altered on day six,

18   and wasn't the identical statement.    We also don't know when it

19   first became public.

20       Mullin, by the way, also is one of those cases that had as

21   an issue before it the discovery rule.    And in Mullin, Judge

22   Steadman says the statute of limitations will not run until the

23   plaintiff knows or reasonably should have known that he suffered

24   injury due to the defendant's wrongdoing.    So similarly here.

25       I think we have a lot of questions as to when the statute

1    began to run with respect to each of the statements or all of

2    the statements or some of the statements.  And that's going to

3    be a matter for discovery, but at least you'll now know that

4    you've got to operate on the notion that I believe there's a

5    one-year statute of limitations.

6        So unless I've missed something, those are my reasons for

7    denying the motion to dismiss.

8            MR. UMANA:  Your Honor, I just want to state that on

9    the last question of fact you raised about how a blog works, if

10   you change a blog in any way, it posts the exact date and time

11   that you changed it, so you can't go back and say, I want to

12   rewrite what I did on May 7, 2004.  If you do that, then that's

13   a separate entry.  I don't know if that helps or changes your

14   analysis.

15           THE COURT:  It doesn't change my analysis on a motion

16   to dismiss.

17           MR. ROSEN:  No, it's not true.  It technically doesn't

18   work that way.  I'm actually getting an expert in the area and

19   we can submit proof that it doesn't work that way.  And in fact,

20   in this case she did in fact change it.

21           THE COURT:  Well, it seems to me that if, during

22   discovery you want to each propose an expert or experts on this,

23   you can do it, or it may not be relevant depending upon what

24   fact discovery shows.  It may turn out not to be important.  Or

25   if we get to a point where discovery is closed on fact discovery

and you want to propound an expert affidavit on summary judgment
or experts for trial, you can do what you want to do.  But if I
were you I wouldn't want to spend my money at this point to
engage experts in it, really focus on the facts.

I know this is the kind of lawsuit which can get very
nasty, but if I were advising you or your clients, who
presumably are paying money for your services, I think a lot
could be accomplished just by taking the plaintiff's deposition
and the defendant's deposition.  And then you may have to go to
a slightly larger group.  Rather than just being litigious and
deposing everybody in the world, you might want to start slowly
and see how far you get.

What I would suggest is this.  Under our local rules, it's
local civil rule 16.3, the next step, unless of course Mr. Rosen
wants to amend his complaint -- that's up to him, but even if he
does, it's not going to change much.  The next step is for the
two lawyers to get together and go through the checklist under
rule 16.3 and come up with a discovery plan and what you want to
do, whether you want to go to alternative dispute resolution now
or later, what kind of discovery you want to propose.

Hopefully you can agree on how many depositions and how to
proceed and how much time you need, whether or not you want to
do it in phases or not.  I really don't care.  But try to work
out an agreement.  I know you're new to the case so you may need
a little time to think about it.  Where do you practice out of,

1    Mr. Rosen?

2            MR. ROSEN:  New Jersey and Florida.

3            THE COURT:  Assuming you can agree on most things,

4    even if there are some minor points of disagreement, then you

5    submit a joint report.  Make it a joint report even if you say

6    we disagree about this or that.  I don't know that we need to

7    actually come back and have another status conference and make

8    you travel.

9        Why don't you come up with a discovery plan, follow the

10   rules, file it in the next couple of weeks.  And then I'll just

11   issue a scheduling order.

12           MR. UMANA:  Your Honor, I would just as soon move

13   towards a quick trial in this case.  And if Your Honor feels

14   that these factual questions have to be decided, that's the way

15   to do it, that's the way I do things.  I'd like to just move the

16   case along.

17           MR. ROSEN:  And me too, Your Honor.  I'd like to move

18   it along, and I think we can come up with a schedule and do it

19   in an expedited matter.  We'd like to dispose of it and get

20   through this as quickly as possible.

21           THE COURT:  Okay.  Well, that sounds like a good way

22   to begin.  The other thing that I'll ask you is this:  On the

23   issue of discovery, again, I see this as a case that could get

24   litigious, and I don't like motions to compel and I don't like

25   to spend a lot of time on those things.  And typically what I do

1    is I say if you've got any problems, work them out.  If you

2    can't work them out, we'll have a telephone conference call.

3        But if you are already foreseeing things that might get

4    more complicated or time-consuming than that, I could refer the

5    matter to one of our magistrate judges, who are very good, all

6    of them are very good, so that you've got somebody that's always

7    available to help you sort through these things if you're going

8    to have some problems.

9        You're shaking your head up and down, so maybe --

10            MR. ROSEN:  Just one question:  That's regarding

11    discovery, that the magistrate would be assigned?

12            THE COURT:  Yes, just for discovery purposes.  Does

13    that sound like a good idea to you?

14            MR. ROSEN:  Sure.

15            MR. UMANA:  If you wouldn't mind just taking those

16    telephone calls, I think we could cut through a lot of this,

17    Your Honor, without extensive briefing.

18            THE COURT:  Well, the reason --

19            MR. UMANA:  The issues here are not that difficult.  I

20    don't think this case should have been brought and --

21            THE COURT:  The reason I tell people I'll take the

22    telephone calls is in order to discourage them from making any

23    telephone calls.  Because in a lot of cases if you tell people,

24    if you've got a problem you can't work out, you call me, that

25    means they'll work it all out.  This seems to be the kind of

1    case that that's not going to happen.

2        And I don't want to volunteer to take the telephone calls

3    if there are going to be many.  I only want to volunteer to take

4    the telephone calls if it will discourage you from making any of

5    them.  And I just have a feeling in this case, Mr. Umana,

6    because, just of the nature of the case.

7        And Mr. Steinbuch's a lawyer, and I don't know your

8    client's background, but even though he's a lawyer, he feels

9    very, very strongly about this whole thing.  And there are some

10   kinds of cases -- you know, when it's about money, lawyers can

11   work things out.  Sometimes when it's about sex, they can't work

12   it out as easily because they've got clients that are pushing

13   them, and they may need a referee, and I'm not as available to

14   play that role as the magistrate judge would be.

15       I'm still not encouraging you to file lots of motions to

16   compel and things.  Try to work out a deal with them where

17   they'll take phone calls or very preliminary briefs and so on.

18   I'm inclined to refer it to a magistrate judge.  So when I get

19   your joint proposal for a scheduling order, I'll issue the

20   scheduling order and I'll refer it to a magistrate judge.

21       And you know, if you can both agree on a reasonably

22   expedited period, then we can get it to a motion for summary

23   judgment and/or a trial reasonably quickly.  But I don't think

24   we need to have you come back from New Jersey just to talk about

25   scheduling.  So you should be able to agree pretty much on that

1    at least.

2              MR. ROSEN:  Yes.

3              THE COURT:  Okay.

4              MR. UMANA:  Thank you, Judge.

5              THE COURT:  Thank you.

6         (Proceedings adjourned at 4:17 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

BRYAN A. WAYNE